1  RICHARD K. DIAMOND (State Bar No. 070634)
   *rdiamond@dgdk.com*
2  JOHN J. BINGHAM, JR. (State Bar No. 075842)
   *jbingham@dgdk.com*
3  JULIA W. BRAND (State Bar No. 121760)
   *jbrand@dgdk.com*
4  DANNING, GILL, DIAMOND & KOLLITZ, LLP
   2029 Century Park East, Third Floor
5  Los Angeles, California 90067-2904
   Telephone: (310) 277-0077
6  Facsimile: (310) 277-5735

7  Attorneys for Debtor and Debtor-in-Possession,
   Meruelo Maddux - 845 S. Flower Street, LLC

8

9              **UNITED STATES BANKRUPTCY COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

11             **SAN FERNANDO VALLEY DIVISION**

12  In re                              )  Case No. 1:09-bk-21621-KT
                                       )
13  MERUELO MADDUX - 845 S. FLOWER     )  Chapter 11
    STREET, LLC,                       )
14                                     )  **NOTICE OF MOTION AND MOTION FOR**
           Debtor and                  )  **ORDER AUTHORIZING: (1) SALE OF**
15         Debtor-in-Possession.       )  **CONDOMINIUM UNITS FREE AND CLEAR**
                                       )  **OF LIENS; (2) RETENTION OF KENNEDY**
16                                     )  **WILSON AUCTION GROUP, INC. AS BROKER**
                                       )  **FOR THE SALE OF CONDOMINIUM UNITS**
17                                     )  **AND APPROVAL OF THE TERMS THEREOF**
                                       )  **INCLUDING COMMISSIONS TO BROKERS;**
18                                     )  **(3) USE OF CASH COLLATERAL FOR**
                                       )  **PAYMENT OF CERTAIN EXPENSES WITH**
19                                     )  **RESPECT TO SALE OF CONDOMINIUM**
                                       )  **UNITS; (4) USE OF SALE PROCEEDS AND**
20                                     )  **CASH COLLATERAL FOR PAYMENT OF**
                                       )  **OPERATING AND OTHER EXPENSES; (5)**
21                                     )  **PROVISION OF SELLER FINANCING TO**
                                       )  **CONDOMINIUM PURCHASERS; AND (6)**
22                                     )  **OBTAINING LETTER OF CREDIT AND**
                                       )  **GRANTING OF PRIMING LIEN ON MERUELO**
23                                     )  **CHINATOWN LLC PROPERTY TO ACT AS**
                                       )  **SECURITY FOR HOA BOND; MEMORANDUM**
24                                     )  **OF POINTS AND AUTHORITIES; REQUEST**
                                       )  **FOR JUDICIAL NOTICE**
25                                     )
                                       )  Date:   December 9, 2009
26                                     )  Time:   9:30 a.m.
                                       )  Ctrm:   "301"
27                                     )          21041 Burbank Blvd.
                                       )          Woodland Hills, CA 91367
28  _____)

                                   -1-

345296.05 [XP]    25293

1   **TO THE HONORABLE KATHLEEN THOMPSON, CANPARTNERS REALTY**
**HOLDING COMPANY IV, LLC, ALL PARTIES ASSERTING LIENS OR INTERESTS IN**
2   **THE REAL PROPERTY OF DEBTOR MERULEO MADDUX - 845 S. FLOWER STREET,**
**LLC, INCLUDING CREDITORS ASSERTING MECHANICS' LIENS, THE TWENTY**
3   **LARGEST UNSECURED CREDITORS, THE UNITED STATES TRUSTEE AND OTHER**
**INTERESTED PARTIES**[1]**:**
4

5   By this Motion, Meruelo Maddux - 845 S. Flower Street, LLC (the "Debtor")[2] seeks

6   authorization from the Court to engage in a sales program to sell individual condominium units in

7   Debtor's 35 story luxury residential condominium tower located at 705 W. 9th Street in the South

8   Park area of Los Angeles (the "Project") through a one-day sale event of approximately 48 of the

9   214 condominium units, comprising six floors of the Project (the "Initial Sale Event"), followed by

10   a conventional sale program for remaining condominium units.  The Debtor desires to retain

11   Kennedy Wilson Auction Group, Inc. ("KW"), an expert in this type of sale program, pursuant to

12   the Residential Marketing Agreement (the "KW Agreement") attached to the Declaration of

13   Richard A. "Rhett" Winchell as Exhibit "7", to assist the Debtor with the marketing and sale of the

14   condominium units at the Initial Sale Event and through the conventional sale program ending June

15   30, 2010 (the Initial Sale Event and the conventional sale program are hereinafter collectively

16   referred to as the "Sale Program").  The Debtor also requests authorization to extend the term of the

17   KW Agreement, if the Debtor determines that it is in the best interest of the estate to do so.

18   The Debtor requests that the Court authorize the sale of condominium units free and clear

19   of the liens, claims, and encumbrances (collectively, the "Liens") of Canpartners Realty Holding

20   Company IV LLC ("Canpartners") and all other creditors of the Debtor asserting Liens, including

21   those creditors asserting mechanics' liens (collectively, the "Mechanics' Lien Creditors")[3], with the

22   —————————————

23   [1] Concurrently herewith, a companion motion will be filed in the case of Meruelo Chinatown LLC.

24   [2] References to the Debtor include its estate created on the filing of the petition unless the context
indicates otherwise.

25   [3] A list of the known Mechanics' Lien Creditors is attached to the Declaration of Lynn Beckemeyer
as Exhibit "6".  These amounts are included in the Construction Budget and these claims will be
26   satisfied through the conclusion of the construction process and the satisfaction of claims through
the construction budget such that any valid liens attaching to the Project will be released in the
27   ordinary course of business.

28

345296.05 [XP]     25293

1  Lien of Canpartners to attach to the net proceeds of the condominium unit sales to the same extent

2  and with the same validity and priority as such Lien had in the condominium units immediately

3  prior to the sale.  The Liens of the Mechanics' Lien Creditors will remain on the unsold portion of

4  the Project.

5       The Debtor and KW believe that the Sale Program is the best means for the Debtor to

6  maximize the value of the Project for the benefit of the creditors and the estate and that it is an

7  opportune time to engage in such a sale program.  Sales of multi-unit residential projects have been

8  realizing increasingly greater value for their owners over the past six to nine months as evidenced

9  by recent sales at the Concerto Lofts and Evo projects located nearby to the Debtor's Project.  In

10 addition, the inventory of available condominium units in the South Park sale market has been

11 decreasing over recent months.  These factors, combined with the unique and iconic nature of the

12 Project that makes it superior in quality to other projects on the market, indicates that the Debtor

13 could achieve sale prices for the condominium units in excess of those realized by other projects in

14 recent sales.  As a result, the Debtor projects that it will receive on average between $415 and $500

15 per square foot for the condominium units to be sold in the Initial Sale Event.  The Debtor projects

16 that the remaining units will sell for an even higher price per square foot than those in the Initial

17 Sale Event, but even assuming these conservative prices, if the remaining units in the Project were

18 sold at these initial prices on average, the sales would generate gross proceeds of $105,534,500 to

19 $127,150,000.  This range does not take into account the value in the 6,800 square feet of

20 commercial condominium space which has been earmarked for a high quality restaurant.  If prices

21 increase after the Initial Sale Event as expected, the value of the project would exceed $131 million

22 which is the value the Debtor has placed on the Project as a realized project.  The debt owing to

23 Canpartners is only approximately $84,000,000, which equates to approximately $322 per square

24 foot (including the commercial space).  Furthermore, KW is confident that the proposed pricing of

25 units in the Project will generate the projected sale prices and thus it has agreed that the aggregate

26 purchase prices for the sale of the first 48 condominium units will be not less than $22.3 million in

27 gross sale proceeds (or approximately $415 per square foot on average).

28

345296.05 [XP]     25293

1    As important, the Sale Program as structured will provide the Debtor additional options for

2    repayment of its $84 million debt to Canpartners. A sale of the units in the manner proposed by the

3    Debtor and KW will enable the Debtor to pay its debt to Canpartners in full with interest in

4    accordance with a plan of reorganization to be proposed by it. The Debtor's plan of reorganization

5    will be filed prior to the hearing on this Motion and will propose repayment of the Canpartners'

6    debt, including, as necessary under a cram down.   Moreover, if, as the Debtor and KW believe, a

7    successful marketing and Sale Program will establish the market and the value of the Project, then

8    the Debtor and KW believe that the Debtor will have the additional option of refinancing the

9    Canpartners' debt, thus providing a potentially earlier retirement of the Canpartner's debt than may

10    be proposed in the plan. The proposed Sale Program is the key component to the Debtor's ability to

11    maximize value for Canpartners, other creditors and its equity holders to reorganize under Chapter

12    11.   In addition, excess proceeds from the sale of condominium units, over and above those

13    necessary to pay the debt to Canpartners, will be available for distribution to the Debtor's parent

14    entity debtors, Meruelo Maddux Ventures LLC, Meruelo Maddux Properties, Inc. and Meruelo

15    Maddux Properties, L.P. for use in connection with the plan of reorganization of the 55 related

16    debtor affiliates of 845 S. Flower or as necessary to support the operations of the business of all of

17    the related debtors.

18    The relevant terms of the Sale Program are as follows:

19    • The Debtor will sell approximately 48 condominium units (six full floors) at the

20    Initial Sale Event which is scheduled to be held approximately 30 to 45 days after

21    entry of an order approving this Motion on a date selected by the Debtor, as may be

22    adjusted by the Debtor for the success of the Initial Sale Event.

23    • The Debtor will retain KW pursuant to the proposed Residential Marketing

24    Agreement and all of the terms contained therein (the "KW Agreement") attached to

25    the Declaration of Richard A. "Rhett" Winchell.  KW will market the condominium

26    units, conduct the Initial Sale Event and thereafter act as broker to market and offer

27    for sale up to an additional forty-eight (48) condominium units, which number may

28

4

be adjusted by the Debtor, for the period ending June 30, 2010, as the same may be extended.

- The aggregate purchase prices for the sale of the first 48 condominium units will not be less than $22.3 million.

- The Debtor may adjust the number of condominium units to be offered at the Initial Sale Event and thereafter, provided that the aggregate purchase prices for the first 48 condominium units shall not be less than $22.3 million and the purchase price for the sale of any subsequent condominium unit will not be less than $340 per square foot (net of costs of sale).

- KW's sole compensation shall be a fee equal to three percent (3%) of the sales price of the condominium. Cooperating brokers may receive a fee of three percent (3%) of the sales price as well.

- KW will conduct an auction marketing program that will begin with an advertising and public relations campaign lasting approximately 30 to 45 days, with print and other media advertising. The advertising campaign may highlight the auction day starting bid prices. The marketing campaign and any starting bid prices will be designed to generate the interest and volume of potential buyers necessary to create competition for the limited number of condominium units for sale. The amount budgeted for the marketing program is $250,000.

- Starting bids may be in an amount less than the projected sales prices. However, the Debtor will reserve the right to reject the otherwise highest bid for a condominium unit at the Initial Sale Event if the pre-determined unpublished reserve price, to be fixed by the Debtor, is not met. In any event, the pre-determined unpublished reserve prices, in the aggregate, will not be less than an amount necessary to achieve the $22.3 million in aggregate purchase prices for the first 48 units to be sold.

- KW will assist in providing a preferred lender to pre-qualify buyers for the condominium units.

345296.05 [XP]   25293

- To enhance the sale process and due to the vagaries in the lending market, the Debtor will offer seller financing to those purchasers who are unable to finance the purchase of a condominium unit through another lender. The purchaser will be required to make a down payment of at least 20 percent of the purchase price. The purchaser will provide a promissory note for the remaining balance of the purchase price. The note will bear interest at the rate of six percent per annum, and interest only will be due and payable monthly in arrears. All principal and any outstanding and unpaid interest and any other amounts owing will be due at the maturity date, which will be five years after the date title passes to the purchaser. The note will be secured by a deed of trust on the purchaser's condominium unit. The buyer will be required to qualify for such financing based primarily on FHA underwriting guidelines. The Debtor will cap its seller financing program at $20 million in the aggregate of the face amount of the notes.

In order to effectuate the Sale Program, the Debtor requires the use of cash collateral for payment of expenses essential to the Sale Program and for operating expenses of the Project during the Sale Program. Accordingly, the Debtor requests use of loan proceeds held in the Reserve Accounts as follows:

- $250,000 to pay marketing expenses as set forth in the KW Agreement, including Exhibit A-1 thereto.

- $250,000 to furnish models and provide an on-site marketing office as set forth in the KW Agreement, including Exhibit A-2 thereto.

- Up to $500,000 for operating expenses for the Project for the period December 2009 through April 2010, the month when the sales from the Initial Sale Event are expected to close. The expenses are detailed in the Operating Budget attached to the Declaration of Lynn Beckemeyer as Exhibit "5".

- $200,000 for partial payment of the fees of Debtor's professionals.

The foregoing expenses are collectively referred to as the "Sale Expenses".

345296.05 [XP]    25293

1       Sale proceeds (net of costs of sale, including broker commissions) will be deposited by the

2  Debtor into a new DIP operating account and the Debtor requests use of such funds to pay the

3  following necessary expenses:

4        •  $883,170 to fund a reserve to cover six months of homeowners' association dues

5            (the "HOA Reserve"), which reserve will be held in escrow or as otherwise required

6            by the DRE, to replace the Homeowner's Bond referenced below.  The HOA

7            Reserve will not be used to pay HOA dues until such time as the DRE permits its

8            release, which is generally in connection with the sale of 80 percent of the units.

9        •  Homeowners Association Dues for unsold units in the amount of $686,394.

10      •  Warranty Reserve of $2,140,000.

11      •  Partial payment against the fees of Debtor's professionals in the amount of

12            $200,000.

13  The foregoing expenses are collectively referred to as "Operating Expenses".

14       To facilitate issuance of the White Report from the DRE, the Debtor requests authorization

15  to obtain from a surety, bank or other financial institution (the "Issuer"), a bond, letter of credit or

16  other security device (the "HOA Bond") on commercially reasonable terms, which security device

17  is to be secured by a first priority, priming deed of trust on the real property of Meruelo Chinatown,

18  LLC ("Chinatown"), which deed of trust shall be senior in priority to all existing liens and

19  encumbrances other than such liens for real property taxes of the County of Los Angeles.

20       The Debtor proposes adequate protection for the release of the liens on the condominium

21  units to be sold, the use of cash collateral, and the priming lien as follows:

22      •  Canpartners and the Mechanics' Lien Creditors shall retain their Liens on the

23            remaining unsold portions of the Project after the sale of condominium units.[4]

24      •  Canpartners shall have a replacement lien on the net cash proceeds of sale and such

25            proceeds will only be disbursed for other Operating Expenses.

26

27  [4]   Canpartners has asserted that the real property owned by Chinatown is its collateral as well.

28

- Canpartners shall have a replacement lien on the notes and deeds of trust and other instruments arising from and received by the Debtor in providing seller financing to one or more condominium buyers and the proceeds thereof.

PLEASE TAKE NOTICE THAT, pursuant to the foregoing, the Debtors 845 S. Flower and Meruelo Chinatown will, and hereby do, move the Court for an order pursuant to 11 U.S.C. §§ 330, 363(b), (f) and (m), 364(d) and Federal Rule of Bankruptcy Procedure 6004, granting the foregoing relief and entering an order:

1.     Authorizing the Debtor to engage in the Sale Program.

2.     Authorizing the Debtor to provide seller financing on the terms provided herein.

3.     Authorizing the sales of condominium units free and clear of the Liens of Canpartners and the Mechanics' Lien Creditors, with the Lien of Canpartners to be transferred to the net proceeds of the sales to the same extent and with the same validity and priority as such Lien had on the condominium units immediately prior to the sales, and for sales where seller financing is provided, transferring Canpartners' Lien on the condominium units to the Debtor's interest in the notes, deeds of trust and other loan documents executed and delivered by purchasers to the Debtor.

4.     Authorizing the Debtor to retain KW as the exclusive agent and broker for the marketing and sale of condominium units at the Project pursuant to the KW Agreement, approving the KW Agreement, and the payment of brokers' commissions to KW and cooperating brokers and authorizing the Debtor to extend the term of the KW Agreement if the Debtor determines that it is in the best interest of the estate to do so.

5.     Authorizing use of cash collateral for the Sale Expenses and the Operating Expenses.

6.     Finding that each condominium purchaser is a good faith purchaser of each such condominium and is therefore purchasing the condominium in good faith within the meaning of section 363(m).

7.     Finding that Canpartners and the Mechanics' Lien Creditors are adequately protected for the release of their Liens on the condominium units, the use of cash collateral and the priming lien.

345296.05 [XP]      25293

8.      Authorizing 845 S. Flower to obtain a HOA Bond from an Issuer and authorizing Chinatown to grant a priming lien to the Issuer as security for the HOA Bond if the HOA Reserve cannot be funded from the proceeds of the Initial Sale Event.

PLEASE TAKE NOTICE that pursuant to L.B.R. 4001-2, the Debtors represent that the proposed order authorizing the use of cash collateral and authorizing 845 S. Flower to obtain a HOA Bond from an Issuer does not and will <u>not</u> contain the following provisions other than the priming lien granted with respect to Chinatown's real property:

| Provision | Proposed Cash Collateral Order |
|---|---|
| Provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors (i.e., clauses that secure prepetition debt by postpetition assets in which the secured creditor would not otherwise have a security interest by virtue or its prepetition security agreement or applicable law). | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or debt or the waiver of claims against the secured creditor. | No |
| A provision that waives the estate's rights under 11 U.S.C. § 506(c). | No |
| Provisions that grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548, or 549. | No |
| Use of postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b). | No |
| Provisions that provide disparate treatment for the professionals retained by a creditors' committee from that provided for the professionals retained by the debtor with respect to a professional fee carve out. | No |
| Provisions that prime any secured lien. | Yes |

PLEASE TAKE FURTHER NOTICE THAT the hearing on this motion will be held on December 9, 2009 at 9:30 a.m. in Courtroom 301 of this Court located at 21041 Burbank Boulevard, Woodland Hills, California.

PLEASE TAKE FURTHER NOTICE THAT pursuant to section 9013 of the Local Bankruptcy Rules, any opposition to the motion must be in writing and must be filed and served 14

9

345296.05 [XP]      25293

1  days prior to the date set for hearing on the Motion.  Failure to oppose the motion may be deemed

2  by the Court to be consent to the granting of the motion.  If you do not have any objection to the

3  motion, you do not need to take any further action.

4        WHEREFORE, pursuant to 11 U.S.C. §§ 363(b), (f), and (m), 364(d) the Debtors

5  respectfully request that this Court enter an order as requested herein.

6

7  Dated:  November 18, 2009           DANNING, GILL, DIAMOND & KOLLITZ, LLP

8

9                               By:  *Julia W Brand*

10                              Julia W. Brand
                             Attorneys for Debtor and Debtor-in-

11                              Possession, Meruelo Maddux - 845 S.
                             Flower Street, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

345296.05 [XP]      25293

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................................................iii

MEMORANDUM OF POINTS & AUTHORITIES ..........................................................1

I.    STATEMENT OF FACTS ..........................................................................................1

    A.    The Bankruptcy Case. ........................................................................................1

    B.    The Project. ........................................................................................................1

    C.    The Debtor's Loan with Canpartners. .............................................................3

    D.    The Loan Agreement Contemplates The Sale of Condominium Units. ..........5

    E.    The Debtor's Plan to Sell Condominium Units and Retain KW to
        Market and Conduct the Sale Program and to Make Seller Financing
        Available to Purchasers. .....................................................................................7

    F.    The Debtor's Proposed Use of Cash Collateral. ...........................................11

II.   LEGAL ARGUMENT................................................................................................12

    A.    Jurisdiction........................................................................................................12

    B.    The Debtor Should Be Authorized to Employ KW and To Sell
        Individual Condominium Units. .......................................................................12

           1.    A Sound Business Justification Exists for the Sale of
                Condominium Units........................................................................13

           2.    The Notice was Adequate and Reasonable Under the
                Circumstances.................................................................................15

           3.    The Minimum Bid and Initial Sale Event Will Result in
                Purchase Prices for the Condominium Units that Are Fair and
                Reasonable. .....................................................................................15

           4.    The Sales Will Be the Product of Good Faith. .............................16

    C.    The Debtor Should Be Authorized to Offer Seller Financing to
        Qualified Buyers of the Condominium Units....................................................16

    D.    The Court May Approve the Sale of Condominium Units Free and
        Clear of the Liens of Canpartners and Other Creditors Asserting
        Liens. ................................................................................................................18

    E.    The Sale Enhances the Value of the Collateral and Provides
        Adequate Protection..........................................................................................25

    F.    The Debtor Should be Authorized to Use Cash Collateral.............................26

1

## **TABLE OF CONTENTS (cont.)**

2                                                                                              **Page**

3        G.    Authorization for 845 S. Flower to Obtain the HOA Bond and the
Granting of the Priming Lien on the Real Property of Chinatown is
4            Necessary and Appropriate and Adequate Protection is Provided for
the Same......................................................................................................................30

5
    H.    Purchasers of Condominium Units are Entitled to Good Faith
6            Purchaser Status Pursuant to Section 363(m) of the Bankruptcy Code..................32

7    III.    CONCLUSION................................................................................................................33

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

345296.05 [XP]    25293

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

In re 240 North Brand Partners, Ltd. (240 North Brand Partners, Ltd. v. Colony GFP
    Partners, L.P.,
    200 B.R. 653 (B.A.P. 9th Cir. 1996) .................................................................. 12

In re Abbotts Dairies of Pennsylvania. Inc.,
    788 F. 2d 143 (3d Cir. 1986) .............................................................................. 32

In re Airlift. Int'l Inc.,
    18 B.R. 787 (Bankr. S.D. Fla. 1982) .................................................................. 13

In re Alpha Industries, Inc.,
    84 B.R. 703 (Bankr. Mont. 1988) ....................................................................... 16

In re Baldwin United Corp.,
    43 B.R. 888 (Bankr. S.D. Ohio 1984) ................................................................ 13

Big Shanty Land Corp. v. Comer Properties, Inc.,
    61 B.R. 272 (Bankr. N.D. Ga. 1985) .................................................................. 15

Bories v. Union Building and Loan Assoc.,
    141 Cal. 79 (1903) .............................................................................................. 23

Bray v. Shenandoah Savings and Loan Association (In re Snowshoe Co., Inc.),
    789 F.2d 1085 (4th Cir. 1986) ............................................................................ 31

In re Canyon Partnership,
    55 B.R. 520 (Bankr. S.D. Cal. 1985) .................................................................. 15

In re Carlisle Court, Inc.,
    36 B.R. 209 (Bankr. D.D.C. 1983) ..................................................................... 31

In re Chung King, Inc.,
    753 F.2d 547 (7th Cir. 1985) .............................................................................. 16

Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot),
    94 B.R. 343 (E.D. Pa. 1988) .............................................................................. 19

Clear Channel Outdoor, Inc. v. Knupfer (In re PW LLC),
    391 B.R. 25 (B.A.P. 9th Cir. 2008) ................................................ 19, 21, 22, 23, 24, 25

In re Elliott Lease Cars, Inc.,
    20 B.R. 893 (Bankr. D.R.I. 1982) ...................................................................... 30

In re Ewell (Ewell v. Diebert),
    958 F. 2d 276 (9th Cir. 1992) ............................................................................. 16

In re Exennium. Inc.,
    715 F. 2d 1401 (9th Cir. 1983) ........................................................................... 32

-iii-

# TABLE OF AUTHORITIES (cont.)

**Page(s)**

Fed. Nat'l. Mortgage v. Dacon Bollingsbrook Associates Ltd. P'ship,
   153 B.R. 204 (N.D. Ill. 1993) ................................................................................ 29

Fulton State Bank v. Schipper (In re Fulton State Bank),
   933 F.2d 513 (7th Cir. 1991) ........................................................................... 12, 17

Gouveia v. Tazbir,
   37 F.3d 295 (7th Cir. 1994) ................................................................................ 23

In re Grand Slam U.S.A., Inc.,
   178 B.R. 460 (E.D. Mich. 1995) ......................................................................... 20

In re Gulf States Steel, Inc. of Ala.,
   285 B.R. 497 (Bankr. N. D. Ala. 2002) .......................................................... 19, 20

In re Healthco Int'l, Inc.,
   174 B.R. 174, (Bankr. D. Mass. 1994) ................................................................ 20

In re Industrial Valley Refrigeration and Air Conditioning Supplies, Inc.,
   77 B.R. 15 (Bankr. E.D. Pa. 1987) ...................................................................... 16

In re Ionosphere Clubs, Inc.,
   100 B.R. 670 (Bankr. S.D.N.Y. 1989) ................................................................. 13

In re Johns-Manville Corp.,
   837 F.2d 89 (2nd Cir. 1988) ........................................................................... 18, 26

In re Jolan,
   403 B.R. 866 (Bankr. W.D. Wash. 2009) ............................................................. 25

In re Levitt & Sons, LLC,
   384 B.R. 630 (Bankr. S.D. Fla. 2008) ................................................................. 20

Lewis v. Anderson,
   615 F. 2d 778 (9th Cir. 1979), cert. denied, 449 U.S. 869, 101 S. Ct. 206
   (1980) ................................................................................................................. 13

In re Lionel Corp.,
   722 F. 2d 1063 (2nd Cir. 1983) ...................................................................... 12, 13

In re Martin,
   761 F.2d 472 (8th Cir. 1985) .............................................................................. 30

McCombs Properties VI, Ltd. v. First Tex. Savs. Assoc'n (In re McCombs
   Properties VI, Ltd.),
   88 B.R. 261 (Bankr. C.D. Cal. 1988) ............................................................. 29, 30

In re McGowan,
   6 B.R. 241 (Bankr. E.D. Pa. 1980) ...................................................................... 28

-iv-

# TABLE OF AUTHORITIES (cont.)

**Page(s)**

In re Mellor,
    734 F.2d 1396 (9th Cir. 1984) ............................................................... 26, 28

In re Monarch Beach Venture, Ltd.,
    166 B.R. 428 (C.D. Cal. 1993) ................................................................... 20

In re Oak Glen R-Vee,
    8 B.R. 213 (Bankr. C.D. Cal. 1981) ............................................................ 29

In re O'Connor,
    808 F.2d 1393 (10th Cir. 1987) ............................................................. 29, 30

P.K.R. Convalescent Centers, Inc. v. Va. Dep't of Med. Assistance Servs. (In re
    P.K.R. Convalescent Centers, Inc.),
    189 B.R. 90 (Bankr. E.D. Va. 1995)............................................................ 23

In re Princeton Square Associates, L.P.,
    201 B.R. 90 (Bankr. S. D. N.Y. 1996)......................................................... 29

Resolution Trust Corp. v. Bayside Developers,
    43 F.3d 1230 (9th Cir. 1995) ..................................................................... 24

In re Rock Indus. Mach. Corp.,
    572 F. 2d 1195 (7th Cir. 1978) ................................................................... 32

In re Rogers Development Corp.,
    2 B.R. 679 (Bankr. E.D. Va.1980).............................................................. 28

Scherer v. Fed. Nat'l Mortgage Ass'n (In re Terrace Chalet Apts. Ltd.),
    159 B.R. 821 (N.D. Ill. 1993) ............................................................... 19, 20

Stein v. U.S. Farmers Home Admin. (In re Stein),
    19 B.R. 458 (Bankr. E.D. Pa. 1982) ...................................................... 29, 30

Stephens Indus., Inc. v. McClung,
    789 F.2d 386 (6th Cir. 1986) ..................................................................... 13

In re Stroud Wholesale, Inc.,
    47 B.R. 999 (E.D.N.C. 1985), aff'd mem., 983 F.2d 1057 (4th Cir. 1986)....................... 19

Summerville v. March,
    142 Cal. 554 (1904) ................................................................................. 24

Taylor v. Lake (In re Cada Invs.),
    664 F. 2d 1158 (9th Cir. 1981) ................................................................... 32

In re Terrace Gardens P'ship,
    96 B.R. 707 (Bankr. W.D. Tex. 1989).......................................................... 26

In re Trans World Airlines, Inc.,
    322 F.3d 283 (3d Cir. 2003) ...................................................................... 23

-v-

## TABLE OF AUTHORITIES (cont.)

**Page(s)**

In re Triplett,
87 B.R. 25 (Bankr. W.D.Tex. 1988) ..... 29

Van Huffel v. Harkelrode,
284 U.S. 225 (1931) ..... 18

In re W.A. Mallory, Inc.,
214 B.R. 834 (Bankr. E.D. Va. 1997) ..... 13

Walter v. Sunwest Bank (In re Walter),
83 B.R. 14 (B.A.P. 9th Cir. 1988) ..... 12, 16

WBQ P'Ship v. Virginia Dep't of Med. Assistance Servs. (In re WBQ P'Ship),
189 B.R. 97 (Bankr. E.D. Va. 1995) ..... 19, 23

In re Western Pacific Airlines, Inc.,
223 B.R. 567 (Bankr. D. Colo. 1997) ..... 31

Wilde Horse Enterprises, Inc.,
136 B.R. 830 (Bankr. C.D. Cal. 1991) ..... 16

In re WPRV-TV. Inc.,
143 B.R. 315 (D.P.R. 1991) ..... 18, 26

Zimmer v. PSB Lending Corp (In re Zimmer),
313 F.3d 1220, n. 3 (9th Cir. 2002) ..... 21

**Statutes**

11 United States Code,

Section 108(a) ..... 22
Section 327 ..... 12
Section 361 ..... 28
Section 363 ..... 12, 23, 26, 28
Section 363(b) ..... 12, 16
Section 363(b)(1) ..... 12
Section 363(c) ..... 26
Section 363(c)(l) ..... 26
Section 363(c)(2) ..... 26
Section 363(c)(2)(A) ..... 27
Section 363(c)(2)(B) ..... 27
Section 363(e) ..... 28
Section 363(f) ..... 18, 19, 21, 22, 25
Section 363(f)(1) ..... 22
Section 363(f)(5) ..... 19, 20, 21, 22, 23, 25
Section 363(m) ..... 32, 33
Section 364 ..... 12, 28
Section 364(c) ..... 30, 31

# TABLE OF AUTHORITIES (cont.)

Page(s)

Section 364(d)................................................................................ 31
Section 364(d)(1)........................................................................... 31
Section 503(b)................................................................................ 30
Section 503(b)(1)...................................................................... 28, 30
Section 507(b)................................................................................ 30
Section 1107 .................................................................................. 30
Section 1107(a) ............................................................................... 1
Section 1108 .................................................................................... 1
Section 1129 .................................................................................. 25
Section 1129(b)....................................................... 19, 21, 22, 23
Section 1129(b)(2).................................................................. 20, 22
Section 1129(b)(2)(A) ..................................................................... 22
Section 1129(b)(2)(A)(ii)................................................................ 20

28 United States Code,

Section 157 .................................................................................... 12
Section 157(b)(2)............................................................................ 12
Section 1334 .................................................................................. 12

California Civil Code,

Section 783 .................................................................................... 24
Sections 1350 et. seq...................................................................... 6
Section 1351(f) .............................................................................. 24

California Code of Civil Procedure,

Section 568.5 ................................................................................. 23
Section 701.570 ............................................................................. 24
Section 701.630 ............................................................................. 23
Section 701.810 ............................................................................. 23

California Revenue and Taxation Code,

Section 2188.6 ............................................................................... 24

Washington Revised Code,

Section 7.60.260 ............................................................................ 25

**Other Authorities**

3 L. King, Collier on Bankruptcy,

¶ 361.03 at 361-9 (15th Ed. 2008) ............................................... 28

9 Harry D. Miller, Miller & Starr California Real Estate,
Sections 25B:5, 25B:6 ................................................................... 24

345296.05 [XP]    25293

# MEMORANDUM OF POINTS & AUTHORITIES

## I.

## STATEMENT OF FACTS

### A.     The Bankruptcy Case.

On September 3, 2009, the Debtor and debtor Meruelo Chinatown LLC ("Chinatown") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Meruelo Maddux Properties, Inc. ("MMPI") is the ultimate parent of the Debtor and Chinatown.  MMPI and 53 affiliated entities (collectively, the "MMPI Debtors") filed for relief under chapter 11 of the Bankruptcy Code on March 26 and 27, 2009.   The Debtor and Chinatown have each continued in possession of its property and has continued to operate its business as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner and no official committee has yet been appointed in this case.

Pursuant to First Day Motions filed by the Debtor, the Court authorized use of the loan proceeds, cash collateral,  held in the Debtor's Reserve Accounts to complete construction of the Project.  In addition, the Court authorized the Debtor to use such proceeds to make deposits with certain utilities, to obtain an appraisal of the Project and to pay the 2009-2010 real property taxes.

### B.     The Project.

845 S. Flower owns a 35 story residential condominium tower in the South Park region of downtown Los Angeles.  The building is comprised of 214 luxury residential condominium units totaling 254,300 square feet and a 6,800 square foot commercial unit on the ground floor.  The Debtor obtained a temporary certificate of occupancy for the Project and anticipates securing a final certificate of occupancy by the end of 2009.

The 6,800 square feet of ground floor commercial space is well suited for a restaurant and the Debtor is in negotiations with two prominent Los Angeles restaurant operators for a restaurant in this location.  The Project is capitalized by approximately $73 million of funds advanced by the Debtor and an $84 million construction loan from Canpartners for total capital expense of approximately $157 million.

-1-

345296.05 [XP]      25293

1    This building is a first class iconic structure in downtown Los Angeles. Viewed from the

2    street, this curtain wall building is clad with various shades of green glass and has numerous

3    distinctive and attractive architectural features which include external balconies on all four corners

4    of the building, a seventh floor amenity deck with a landscaped garden area and a premium

5    extended balcony and viewing deck located on the ninth floor. The residential common areas

6    including the amenity deck were designed by Hirsch Bedner International, a noted designer.

7    The Project has an attractive location at the corner of Ninth and Flower Streets, which is (a)

8    across the street from the newly opened Ralphs supermarket, (b) a few blocks away from the LA

9    Live complex and the Staples Center, (c) on an all residential corner and (d) closer than most other

10   South Park residences to the office core of downtown Los Angeles. The building has resident

11   amenities that start at street level which include (a) a valet entrance area adjacent to the lobby on

12   Ninth Street, (b) two gated entrances that lead to above ground parking providing in excess of one

13   parking space for each one bedroom residence and two parking spaces for each two bedroom

14   residence, and (c) an efficient loading dock area for resident move-ins.

15   There is a seventh floor amenity deck located on top of the six story parking facility. The

16   amenity deck clearly separates this building from its residential neighbors with its stunning visuals

17   and common area space. This floor contains (a) a gym that overlooks the pool complete with

18   changing rooms and showers, (b) an approximately 70 foot lap pool with infinity features, (c) a

19   Jacuzzi pool, (d) a landscaped garden and (e) a club room. The club room amenities include (a) a

20   demonstration kitchen/catering area, (b) a Wii electronic gaming room, (c) a pool table, and (d)

21   several large flat screen TVs.

22   The building's residences are located on the twenty eight residential floors that start on

23   floor 7 and culminate with the four penthouses on floor 35. The building's height puts it in lofty

24   company, as it is the third highest new construction residential project in Los Angeles behind the

25   ultra luxurious Ritz Carlton residences at LA Live and the high end "The Century" building in

26   Century City. The typical floor has 8 private homes. These 8 homes are comprised of 4 two

27   bedroom units (2 layouts) and 4 one bedroom units (2 layouts). The layouts of all these units are

28   efficient and open. Throughout the units in the building, there are two interior color schemes

2

1    which are (a) white cabinets with espresso wood floors and silver grey travertine stone in the

2    bathrooms and (b) brown cabinets with walnut wood flooring and sand colored stone in the

3    bathrooms.  All units come with Bosch clothes washer/dryers and Jennair refrigerators, ovens,

4    microwaves and dishwashers.

5    **C.    The Debtor's Loan with Canpartners.**

6         845 S. Flower and Canpartners are parties to a loan agreement dated as of July 31, 2008

7    (the "Loan Agreement"), pursuant to which Canpartners agreed to loan to 845. S. Flower the

8    amount of $84 million to provide financing for the construction of the Project.  845 S. Flower

9    executed and delivered to Canpartners a Promissory Note in the principal amount of $84 million

10   dated July 31, 2008 as evidence of the Loan.  A copy of the Loan Agreement is attached to the

11   Declarations of Richard Meruelo, John Charles Maddux and Lynn Beckmeyer filed in support of

12   the Debtor's First Day Motions (*Docket No. 22*) (the "First Day Declarations") as Exhibit "3".  845

13   S. Flower executed and delivered to Canpartners a Construction Deed of Trust, Security

14   Agreement, Assignment of Leases and Rents and Fixture Filing and an Absolute Assignment of

15   Leases Rents and Income with respect to the Property, each dated as of July 31, 2008 with respect

16   to the Project.  In addition, 845 S. Flower executed and delivered to Canpartners a Pledge

17   Agreement (Accounts).  845 S. Flower, Canpartners, and East West Bank are parties to that certain

18   Account Control Agreement dated as of July 31, 2008, with respect to the Construction Draw

19   Account.  845 S. Flower, Canpartners, and City National Bank are parties to that certain Account

20   Control Agreement dated as of July 31, 2008, with respect to the Tax and Insurance Reserve, the

21   Interest Reserve, the Additional Equity Reserve and the Construction Reserve Accounts.

22         As additional security for the substantial completion of the Project, Chinatown executed

23   and delivered to Canpartners a Deed of Trust, Security Agreement, Assignment of Leases and

24   Rents and Fixture Filing, dated as of July 31, 2008, granting Canpartners a lien on Chinatown's

25   real property located at 129 West College Street, Los Angeles, California (the "Chinatown

26   Property").  Pursuant to section 6.29 of the Loan Agreement, Canpartners is required to release its

27   lien and security interest in the Chinatown Property upon 845 S. Flower's receipt of an Acceptable

28   Temporary Certificate of Occupancy (as defined in the Loan Agreement) for the entire Project.

3

345296.05 [XP]    25293

1  The Debtor is in the process of preparing the documentation to substantiate that 845 S. Flower has

2  received an Acceptable Temporary Certificate of Occupancy and Canpartners is required to release

3  its lien on the Chinatown Property upon receipt of the Acceptable Temporary Certificate of

4  Occupancy.  Canpartners has filed an adversary proceeding seeking declaratory relief regarding its

5  obligation to release its lien on the Chinatown Property.  The Debtor and Chinatown dispute that

6  Canpartners has any basis for refusal to release its lien on the Chinatown Property.

7         In addition, MMPI executed and delivered to Canpartners a Completion Guaranty dated as

8  of July 31, 2008.   MMPI also executed and delivered to Canpartners a Repayment Guaranty also

9  dated as of July 31, 2008.[5]  Under the Loan Agreement, at the closing, Canpartners funded the

10  Initial Tranche of the Loan in the amount of $42 million.  The second and final Tranche of $42

11  million was funded into 845 S. Flower's various Reserve Accounts on January 31, 2009.  Under the

12  Loan Agreement, 845 S. Flower was required to design and construct the Project pursuant to the

13  Construction Budget attached as Exhibit C to the Loan Agreement and according to the

14  Construction Schedule attached as Exhibit 5.2 to the Loan Agreement.

15        As required under the Loan Agreement, 845 S. Flower established certain reserve accounts

16  to hold the loan proceeds in connection with the construction of the Project, denominated as a

17  Construction Reserve, a Tax and Insurance Reserve, an Interest Reserve and a Construction Draw

18  Account. These accounts were fully pre-funded in the name of 845 S. Flower, the owner of the

19  accounts.  The following chart shows the remaining funds in these accounts and the remaining

20  construction related uses for such funds.

21

22  _____

23  [5] The Loan Agreement, the Promissory Note, the Construction Deed of Trust, Security Agreement,
Assignment of Leases and Rents and Fixture Filing, the Absolute Assignment of Leases Rents and

24  Income, the Pledge Agreement (Accounts), the Account Control Agreements, the Chinatown Deed
of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing, the Completion

25  Guaranty, the Repayment Guaranty and all other documents, agreements and instruments executed
and delivered in connection with the Loan and as the same may have been amended or modified

26  shall be referred to herein as the "Loan Documents."  Capitalized terms used herein but not defined
herein shall have the meaning given to them in the Loan Agreement.

27

28

345296.05 [XP]     25293

| Account Type | Location | Number | Balance | Remaining Costs to Pay[6] | Excess |
|---|---|---|---|---|---|
| Construction Reserve | City National | 112950087 | $5,393,317 | $3,918,947 | $1,474,370 |
| Construction Reserve | City National | 113015039 | $195 | $195 | $0 |
| | | | | | |
| Construction Draw | East West | 0080360357 | $5,082,764 | $5,082,764 | $0 |
| | | | | | |
| Interest Reserve | City National | 112950060 | $4,292,156 | N/A | N/A |
| | | | | | |
| Tax and Insurance Reserve | City National | 112915036 | $22 | N/A | N/A |

As demonstrated above, the Debtor projects that it will have $1,474,370 in excess funds in its Construction Reserve after payment of remaining costs for completion of the Project, which funds are Debtor's loan proceeds and available for its use.

**D.    The Loan Agreement Contemplates The Sale of Condominium Units.**

The Loan Agreement clearly provides for the sale of condominium units by the Debtor once the Project has been completed. First, as part of the requirement of Substantial Completion, the Loan Agreement required the Debtor to establish the building as a condominium. In order to achieve Substantial Completion, the Loan Agreement requires that the Debtor complete the documents necessary to establish the building as a condominium, obtain approval of those documents from Canpartners and establish a valid condominium regime. See Sections 5.1(b) and 6.30 of the Loan Agreement, Exhibit 3 to the First Day Declarations. Section 5.1(b) (7) specifically addresses this issue and provides as a requirement of Substantial Completion:

Borrower shall have caused the Condominium Documents to be completed and

approved by Lender and shall have otherwise created a valid condominium regime

---

[6] This amount includes amounts owing to Mechanics' Lien Creditors.

5

345296.05 [XP]    25293

at the Property in compliance with <u>Section 6.30</u> hereof under the Condominium Act.

Section 6.30 of the Loan Agreement contains the general condominium covenants

and provides at section 6.30(b) as follows:

> Borrower shall submit the Property to the provisions of the Condominium Act and
> shall satisfy all of the requirements thereof and of any other applicable Law or
> restriction necessary to create a valid condominium regime, provided that the form
> and substance of the Condominium Documents, including the Condominium Unit
> designations, descriptions, floor plans, sales prices and proposed form of contract of
> sale for the Condominium Units, as well as the description of Comment (sic)
> Elements and breakdown of common interests appurtenant to each Condominium
> Unit, shall all be subject to the written approval of Lender prior to the recordation of
> the Condominium Declaration or the Condominium Map, which approval may be
> withheld in Lender's reasonable discretion. Lender shall respond to Borrower's
> request for approval of any Condominium Document within ten (10) Business Days
> after Borrower's written request for Lender's approval and delivery to Lender of the
> subject proposed Condominium Document. Borrower shall, upon receipt of the
> same, deliver to Lender a certified copy of the recorded Condominium Documents.

Thus, the Loan Agreement required the Debtor to comply with the provisions of the

Condominium Act (the Davis Sterling Common Interest Development Act, Cal. Civil Code

Sections 1350 et. seq.) and any other law required to establish a valid condominium regime in order

for the Project to be considered completed. This section also clearly contemplates that the Debtor

may establish sales prices and submit to Canpartners a proposed form of contract, both of which

are subject to Canpartners' approval in its reasonable discretion, as provided in the Loan

Agreement.

In addition, the Loan Agreement's definition of Condominium Documents clearly requires

that the Debtor be authorized to market and sell condominium units as an element of Substantial

Completion. Condominium Documents is defined in Section 1.1 of the Loan Agreement as

follows:

> "Condominium Documents" means all documents (and any amendments and
> supplements thereto) required under applicable Laws (a) to create a valid and
> operational condominium regime with respect to the Property, and (b) <u>to market and
> sell Condominium Units to the public</u> and all other documents (and all amendments
> and supplements thereto) otherwise relating to the submission of the Property to the
> provisions of the Condominium Act or to the regulations, operation, administration
> or sale thereof, including all surveys, floor plans and plot plans, the condominium
> declaration including the by-laws and rules and regulations attached thereto, and the

6

by-laws, articles of incorporation and rules and regulations of the condominium association to be established for the Project. (Emphasis added.)

Section 6.30(j) contains further support for the proposition that the Debtor may sell individual condominium units. Under that section, among other things, the Debtor covenanted that

the creation of the Condominium and the sale of the Condominium Units (i) will not constitute a sale of securities for purposes of any Law, (ii) will not constitute a regime that is regulated by any timeshare Laws and (iii) will comply with all applicable Laws, including the federal Interstate Land Sales Disclosure Act, if applicable, (and promptly furnish such evidence of compliance therewith as Lender may request). Without limiting the generality of the forgoing, (x) each prospective purchaser under a sales agreement approved by Lender shall timely be furnished with a property report prepared pursuant to the rules and regulations of the office of Interstate Land Sales Regulation, U.S. Department of Housing and Urban Development in advance of such prospective purchaser signing its purchase and (y) Borrower shall make all necessary filings with (and such filings, if any, shall be unconditionally approved) by the office of Interstate Land Sales Regulation, U.S. Department of Housing and Urban Development such that Borrower is exempt, under the federal Interstate Land Sales Disclosure Act from an outside date for delivering and closing sales under such sales agreement and otherwise deliver to the U.S. Department of Housing and Urban Development all documents required to be delivered thereto pursuant to applicable Law, including annual activity reports, financial statements and amendments and pay to the U.S. Department of Housing and Urban Development all amounts required to be paid thereto pursuant to applicable Law, including amendment fees.

Clearly, these provisions demonstrate the parties' intent and understanding that the Debtor may be authorized to sell individual condominium units in the building prior to repayment of the Canpartners' loan in full.

**E.      The Debtor's Plan to Sell Condominium Units and Retain KW to Market and Conduct the Sale Program and to Make Seller Financing Available to Purchasers.**

After interviewing auctioneers and brokers and reviewing its other options, the Debtor has determined that the best approach to maximize the value of the Project is to conduct a Sale Program for the Project involving the sale at an auction-style Initial Sale Event of approximately 48 condominium units, followed by a conventional sale program for the remaining units. The Debtor has decided to retain KW to conduct the Sale Program. KW will be retained pursuant to the KW Agreement and the KW involvement will end June 30, 2010, unless extended as requested herein. KW is being retained based on KW's experience and expertise in the sale of real estate and in

7

1   particular its success in the sale of multi-unit residential buildings including the Mercury building

2   in Koreatown and the recent successful event at The Dalton in Pasadena, California.  In addition,

3   because of its relationship with many lenders, KW brings to the table the ability to make more

4   financing options available to prospective purchasers of the condominium units and KW has

5   committed to assist in having a preferred lender available to pre-qualify potential purchasers for the

6   condominium units.

7        The terms of the Sale Program are:

8        • The Debtor will sell approximately 48 condominium units (six full floors) at the

9          Initial Sale Event which is scheduled to be held approximately 30 to 45 days after

10         entry of an order approving this Motion on a date selected by the Debtor, as may be

11         adjusted by the Debtor for the success of the Initial Sale Event.

12       • The Debtor will retain KW pursuant to the KW Agreement.  KW will market the

13         condominium units, conduct the Initial Sale Event and thereafter act as broker to

14         market and offer for sale up to an additional forty-eight (48) condominium units,

15         which number may be adjusted by the Debtor, for the period ending June 30, 2010,

16         as the same may be extended.

17       • The aggregate purchase price for the sale of  the first 48 condominium units will not

18         be less than $22.3 million.

19       • The Debtor may adjust the number of condominium units to be offered at the Initial

20         Sale Event and thereafter, provided that the aggregate purchase prices for the first

21         48 condominium units shall not be less than $22.3 million and the purchase price for

22         the sale of any subsequent condominium unit will not be less than $340 per square

23         foot (net of costs of sale).

24       • KW's sole compensation shall be a fee equal to three percent (3%) of the sales price

25         of the condominium.  Cooperating brokers may receive a fee of three percent (3%)

26         of the sales price as well.

27       • KW will conduct an auction marketing program that will begin with an advertising

28         and public relations campaign lasting approximately 30 to 45 days, with print and

8

1    other media advertising.  The advertising campaign may highlight the auction day

2    starting bid prices.  The marketing campaign and any starting bid prices will be

3    designed to generate the interest and volume of potential buyers necessary to create

4    competition for the limited number of condominium units for sale.  The amount

5    budgeted for the marketing campaign is $250,000.

6    • The starting bids may be in an amount less than the projected sales prices.

7    However, the Debtor will reserve the right to reject the otherwise highest bid for a

8    condominium at the Initial Sale Event if the pre-determined unpublished reserve

9    price, to be fixed by the Debtor, is not met.  In any event, the pre-determined

10    unpublished reserve prices, in the aggregate, will not be less than an amount

11    necessary to achieve the $22.3 million in aggregate purchase prices for the first 48

12    units to be sold.

13    • KW will assist in providing a preferred lender to pre-qualify buyers for the

14    condominium units.

15    • To enhance the sale process and due to the vagaries of the lending market, the

16    Debtor will offer seller financing to those purchasers who are unable to finance the

17    purchase of a condominium unit through another lender.  The purchaser will be

18    required to make a down payment of at least 20 percent of the purchase price.  The

19    purchaser will provide a promissory note for the remaining balance of the purchase

20    price.  The note will bear interest at the rate of six percent per annum, and interest

21    only will be due and payable monthly in arrears.  All principal and any outstanding

22    and unpaid interest and any other amounts owing will be due at the maturity date,

23    which will be five years after the date title passes to the purchaser.  The note will be

24    secured by a deed of trust on the purchaser's condominium unit.  The buyer will be

25    required to qualify for such financing based primarily on FHA underwriting

26    guidelines.  The Debtor will cap its seller financing program at $20 million in the

27    aggregate of the face amount of the notes.

28

9

1    The Debtor desires to schedule the Initial Sale Event as soon as possible following approval

2  of KW's engagement, the sale, and related relief.  KW will require an approximately 30 to 45 day

3  period for marketing the condominium units prior to the Initial Sale Event.  This will include open

4  houses and other events to highlight the unique aspects of the condominium units and the Project.

5  Following the Initial Sale Event, the Debtor and KW will engage in a conventional sales program

6  for approximately 48 additional units through June 30, 2010, unless extended as requested herein.

7  The Debtor and KW believe that by the termination date for its agreement with KW of June 30,

8  2010, approximately 45 percent of the units (approximately 96 or so) in the Project will be sold.

9  The Debtor believes that, at that point, if it is in the best interests of the estate, it will have the

10  ability to continue to sell condominium units at prices equal to or greater than the prices established

11  in the Initial Sale Event and the conventional sales program and that such sales activity will provide

12  Debtor with multiple options for paying creditors and to repay in full the debt to Canpartners (the

13  "Canpartners Debt") in accordance with its plan of reorganization including by potentially

14  refinancing the remaining balance of the Canpartners Debt.  KW is highly confident that the Debtor

15  will be able to obtain such financing because the Project will have favorable loan to value ratios

16  and because there will be a proven market for the sale of condominium units at the Project at prices

17  equal to or greater that those obtained during the Sale Program.

18    Moreover, based on KW's experience with sales of multi-unit residential properties and

19  based on recent sales in the South Park area of Los Angeles at the Concerto Lofts or Evo

20  condominium projects, KW believes that an auction and subsequent sales program for the Project

21  would generate average sales values of over $415 per square foot for each condominium, with

22  many units at or above $500 per square foot for each condominium. The Debtor projects that the

23  remaining units will sell for an even higher price per square foot than those in the Initial Sale

24  Event, but even assuming these conservative prices, if the remaining units in the Project were sold

25  at these initial prices on average, the sales would generate gross proceeds of $105,534,500 to

26  $127,150,000.  This range does not take into account the value in the 6,800 square feet of

27  commercial condominium space which has been earmarked for a high quality restaurant.  If prices

28  increase after the Initial Sales Event as expected, the value of the Project would exceed $131

10

1   million, which is the value the Debtor has placed on the Project as a realized project.  The debt

2   owing to Canpartners is only approximately $84,000,000, which equates to approximately $322 per

3   square foot (including the commercial space).  KW believes that such sales prices are attainable by

4   the Debtor because the Project is of superior quality to the Concerto Lofts and Evo projects and

5   because there have been increased sales of condominium units in the past six months resulting in a

6   reduction of available condominium inventory in the South Park submarket.

7   **F.**      **The Debtor's Proposed Use of Cash Collateral.**

8         The Debtor requests use of cash collateral for payment of expenses essential to the Sale

9   Program from the Debtor's loan proceeds held in the Reserve Accounts as follows:

10         • $250,000 to pay marketing expenses as set forth in the KW Agreement, including

11            Exhibit A-1 thereto.

12         • $250,000 to furnish models and provide an on-site marketing office as set forth in

13            the KW Agreement, including Exhibit A-2 thereto.

14         • Up to $500,000 for operating expenses for the Project for the period December 2009

15            through April 2010, the month when the sales from the Initial Sale Event are

16            expected to close.  The expenses are detailed in the Operating Budget attached to the

17            Declaration of Lynn Beckemeyer, filed concurrently herewith.

18         • $200,000 for partial payment of the fees of Debtor's professionals.

19         Sale proceeds (net of costs of sale, including broker commissions) will be deposited into a

20   new DIP operating account and the Debtor requests use of sale proceeds from the condominium

21   unit sales to pay the following necessary expenses:

22         • $883,170 to fund a reserve to cover six months of homeowners' association dues

23            (the "HOA Reserve"), which reserve will be held in escrow or as otherwise required

24            by the DRE, to replace the HOA Bond referenced herein. The HOA Reserve will not

25            be used to pay HOA dues until such time as the DRE permits its release, which is

26            generally in connection with the sale of 80 percent of the units.

27         • Homeowners Association Dues for Unsold Units of $686,394.

28         • Warranty Reserve of $2,140,000.

11

345296.05 [XP]     25293

1    • U.S. Trustee quarterly fees.

2    • Partial payment against the fees of Debtor's professionals in the amount of

3      $200,000.

4

5                                    **II.**

6                           **LEGAL ARGUMENT**

7    **A.    Jurisdiction**

8         This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is

9    a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicate for the relief sought

10   herein are sections 327, 363 and 364 of the Bankruptcy Code.

11   **B.    The Debtor Should Be Authorized to Employ KW and To Sell Individual**

12   **Condominium Units.**

13        Section 363(b) of the Bankruptcy Code provides that a trustee, and, therefore, a debtor-in-

14   possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

15   business, property of the estate." 11 U.S.C. § 363(b)(1).  The sale of estate property under section

16   363(b) will be approved if there is "some articulated business justification" for the proposed sale.

17   Walter v. Sunwest Bank (In re Walter), 83 B.R. 14, 19 (B.A.P. 9th Cir. 1988); Fulton State Bank v.

18   Schipper (In re Fulton State Bank), 933 F.2d 513, 515 (7th Cir. 1991).  Courts in this Circuit and

19   others will authorize sales where the decision to sell assets outside the ordinary cause of business

20   be based upon the sound business judgment of the debtors.  See In re 240 North Brand Partners,

21   Ltd. (240 North Brand Partners, Ltd. v. Colony GFP Partners, L.P., 200 B.R. 653, 659 (B.A.P. 9th

22   Cir. 1996) ("debtors who wish to utilize § 363(b) to dispose of property of the estate must

23   demonstrate that such disposition has a valid business justification") (citing In re Lionel Corp., 722

24   F. 2d 1063, 1070 (2nd Cir. 1983)).

25        Several courts have held that the "sound business judgment" test requires a debtor to

26   establish four elements in order to justify the sale of property outside the ordinary course of

27   business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the

28   ordinary course of business, (b) that adequate and reasonable notice has been provided to interested

345296.05 [XP]    25293

1    persons, (c) that the debtors have obtained a fair and reasonable price, and (d) good faith. See In re

2    W.A. Mallory, Inc., 214 B.R. 834, 836 (Bankr. E.D. Va. 1997) (citing Stephens Indus., Inc. v.

3    McClung, 789 F.2d 386, 390 (6th Cir. 1986); Lionel, 722 F.2d at 1071). A debtor's showing of a

4    sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to

5    justify the proposed disposition with sound business reasons." In re Baldwin United Corp., 43 B.R.

6    888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a

7    transaction depends upon the facts and circumstances of each case. Lionel,, 722 F.2d at 1071.

8    However, the court is not to substitute its business judgment for that of the debtor. See, e.g., In re

9    Ionosphere Clubs, Inc., 100 B.R. 670, 676 (Bankr. S.D.N.Y. 1989) (The Court will not substitute a

10   hostile witness' business judgment for debtor's [business judgment] unless testimony "established

11   that [the debtor] has failed to articulate a sound business justification for its chosen course").

12   Rather, the Court should ascertain whether the debtor has articulated a valid business justification

13   for the proposed transaction. See, e.g., Lewis v. Anderson, 615 F. 2d 778 (9th Cir. 1979), cert.

14   denied, 449 U.S. 869, 101 S. Ct. 206 (1980). This is consistent with "the broad authority to operate

15   the business of the debtor ... [which] indicates Congressional intent to limit court involvement in

16   business decisions by a trustee ... so that a court may not interfere with a reasonable business

17   decision made in good faith by a trustee." In re Airlift. Int'l Inc., 18 B.R. 787, 789 (Bankr. S.D. Fla.

18   1982).

19         **1.**     **A Sound Business Justification Exists for the Sale of Condominium Units.**

20         In this case, there is a sound business justification for the retention of KW and the proposed

21   sale of condominium units through the Sale Program. The Debtor and KW believe that a sale of

22   condominium units as proposed by the Debtor and KW is the best approach to maximize value for

23   the Project. This is due in part to the positive indications that the Debtor has received that the

24   residential multi-unit market is improving as evidenced by increased sales of condominium units in

25   the past six to nine months and the success of recent sales for the Concerto Lofts and Evo

26   buildings, each located in the South Park area of downtown Los Angeles. In addition, the

27   inventory of condominium units available for purchase in the downtown Los Angeles area has been

28

345296.05 [XP]      25293

1    decreasing. As a result, the Debtor believes that it is an opportune time to engage in the Sale

2    Program as advised by KW.

3            In addition, the Sale Program as proposed by the Debtor will maximize value for the estate

4    while protecting the interests of stakeholders in the valuable condominium assets. KW is an expert

5    at this type of sale program and it has had recent success in one-day sale events. The marketing

6    program and sales structure proposed by KW are expected to generate interest and increased

7    bidding for the available units. Further, the Debtor has established price protections that will

8    protect the interests of the Debtor, Canpartners, the other creditors and interest holders in the

9    condominium assets. After consultation with KW, the Debtor has established, and KW has agreed,

10   that the minimum aggregate purchase prices for the first 48 units must be at least $22.3 million.

11   The Debtor will maintain control of the sales by establishing a minimum unpublished reserve that

12   must be met with respect to the condominium units sold. The Debtor also has the flexibility to alter

13   the number of condominium units in the auction or post-auction sale process so that the Debtor can

14   react to the sales results in real time. This gives the Debtor the ability to increase value for the

15   estate and its creditors.

16           Moreover, the Sale Program provides the Debtor with the best opportunities for repayment

17   of the Canpartners Debt.  The Debtor believes that as of June 30, 2010, if it is in the best interests

18   of the estate, it will have the ability to continue to sell condominium units at prices equal or greater

19   than the prices established in Sale Program and that such sales activity will provide the Debtor with

20   multiple options for paying creditors and to repay in full the Canpartners Debt in accordance with

21   the Debtor's reorganization plan, including potentially by refinancing the remaining balance of the

22   Canpartners Debt. The Debtor and KW believe that by the termination date for its agreement with

23   KW of June 30, 2010, approximately 45 percent of the units (approximately 96 or so) in the Project

24   will be sold. KW is highly confident that the Debtor will be able to obtain replacement financing

25   because the Project will have favorable loan to value ratios and because there will be a proven

26   market for the sale of condominium units at the Project at prices equal to or greater that those

27   obtained during the initial phase of the Sale Program.

28

14

1        Moreover, the Debtor believes that an auction and subsequent sales program for the Project

2  would generate average sales values of over $415 per square foot for each condominium, with

3  many units at or above $500 per square foot for each condominium. The Debtor projects that the

4  remaining units will sell for an even higher price per square foot than those in the Initial Sale

5  Event, but even assuming these conservative prices, if the remaining units in the Project were sold

6  at these initial prices on average, the sales would generate gross proceeds of $105,534,500 to

7  $127,150,000. This range does not take into account the value in the 6,800 square feet of

8  commercial condominium space which has been earmarked for a high quality restaurant. If prices

9  increase after the Initial Sales Event as expected, the value of the Project would exceed $131

10  million, which is the value the Debtor has placed on the Project as a realized project. The debt

11  owing to Canpartners is only approximately $84,000,000, which equates to approximately $322 per

12  square foot (including the commercial space). KW believes that such sales prices are attainable by

13  the Debtor because the Project is of superior quality to the Concerto Lofts and Evo projects and

14  because there have been increased sales of condominium units in the past six months resulting in a

15  reduction of available condominium inventory in the South Park submarket. As a result, a sound

16  business justification exists for the Sale Program as outlined above.

17        **2.**    **The Notice was Adequate and Reasonable Under the Circumstances.**

18        The Motion is being heard on regular notice and was served on all parties entitled to notice

19  thereof pursuant to the order limiting notice in this case and a notice as required by the Federal

20  Rules of Bankruptcy Procedure and the Local Bankruptcy Rules will be sent to all creditors entitled

21  to notice thereof. Accordingly, adequate and reasonable notice has been provided.

22        **3.**    **The Minimum Bid and Initial Sale Event Will Result in Purchase Prices for**

23                 **the Condominium Units that Are Fair and Reasonable.**

24        For a sale to be approved under section 363(b), the purchase price must be fair and

25  reasonable. The debtor is given substantial discretion in this regard. In re Canyon Partnership, 55

26  B.R. 520 (Bankr. S.D. Cal. 1985). In addition, courts have broad discretion regarding sales under

27  section 363(b). See Big Shanty Land Corp. v. Comer Properties, Inc., 61 B.R. 272, 278 (Bankr.

28  N.D. Ga. 1985). In such sales, the purpose is to obtain the highest price for the property sold.

15

345296.05 [XP]    25293

1  Wilde Horse Enterprises, Inc., 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991) (citing In re Chung

2  King, Inc. 753 F.2d 547 (7th Cir. 1985); In re Alpha Industries, Inc., 84 B.R. 703, 705 (Bankr.

3  Mont. 1988)).

4      In this case, the condominium units will be sold at an auction-like sale event designed to

5  achieve optimal prices for the units through a bidding process. The sales will be well advertised

6  pursuant to the marketing plan prepared by KW and the sale process will be open, public, and

7  arms-length. The Initial Sale Event will be conducted by KW, an expert in the sale of

8  condominium units and an expert in conducting this type of sale event.  In addition, the Debtor and

9  KW have agreed that the aggregate purchase prices for the sale of the first 48 units will not be less

10  than $22.3 million or approximately $415 per square foot. The Debtor believes that this type of

11  process will result in sales at prices that are fair and reasonable.

12          **4.    The Sales Will Be the Product of Good Faith.**

13      Although Bankruptcy Code section 363(b) does not explicitly require good faith, courts

14  have required that a sale be made in good faith. In re Ewell (Ewell v. Diebert), 958 F. 2d 276, 281

15  (9th Cir. 1992). Whether a proposed sale is in "good faith" focuses principally on the element of

16  special treatment of the debtor's insiders in the sale transaction. Id.; In re Industrial Valley

17  Refrigeration and Air Conditioning Supplies, Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987). Because

18  of the manner in which the Initial Sale Event will be conducted and because the sales will include

19  an auction procedure and thereafter a public marketing program, there will be no fraud or collusion

20  in connection with the Initial Sale Event or with subsequent sales under the conventional sales

21  segment of the Sale Program.

22  **C.    The Debtor Should Be Authorized to Offer Seller Financing to Qualified Buyers of the**

23      **Condominium Units.**

24      As with the authorization to sell assets like the condominium units outside the ordinary

25  course of the Debtor's business, section 363(b) also governs the "use" of the debtor's assets to offer

26  seller financing to qualified third party purchasers. The Debtor may be authorized to use estate

27  property if there is "some articulated business justification" for the proposed use. In re Walter, 83

28

16

1  B.R. at 19; <u>Fulton State Bank v. Schipper (In re Fulton State Bank)</u>, 933 F.2d 513, 515 (7th Cir.

2  1991). <u>See</u> <u>supra</u> <u>Section II.B</u>.

3      KW will assist in providing a lender to pre-qualify potential purchasers for loans to

4  purchase condominium units at the Initial Sale Event and subsequent conventional sales on

5  reasonable terms to facilitate the sale of condominium units. In the Debtor's business judgment,

6  and due to the vagaries of the lending market today, sales will be maximized if the Debtor offers

7  seller financing to those purchasers who are unable to finance the purchase of a condominium unit

8  through other lenders. The terms of the seller financing are reasonable and purchasers will be

9  required to qualify for these loans as they would under FHA guidelines. Purchasers will be

10 required to make a down payment of at least 20 percent of the purchase price in order to obtain

11 seller financing of the balance. The Seller financing will be provided through a promissory note

12 for the remaining balance of the purchase price for the condominium unit. The note will bear

13 interest at the rate of six percent, and interest will be due and payable monthly. All principal and

14 any outstanding and unpaid interest or other charges will be due at the maturity date, which will be

15 five years after the closing. The note will be secured by a deed of trust on the condominium unit.

16     In addition, the availability of seller financing will expand the pool of potential purchasers

17 for the condominium units to include investors. Investors would not otherwise qualify for other

18 financing options which often require the residences to be owner occupied. With no such

19 limitation on the seller financing herein, investors may be interested in purchasing condominium

20 units in the Project. The KW marketing strategy is intended to target such investor groups in

21 addition to owner-occupied buyers.

22     Finally, the provision of seller financing will not impact the Debtor's ability to repay

23 Canpartners. Because the Debtor will cap its seller financing program at $20 million, and because

24 the Project is worth in excess of $131 million, the Debtor's seller financing will not affect

25 Canpartners' lien securing its $84 million note. As provided in the seller financing scenario in the

26 Seller Financing Projections attached to the Maddux Declaration as Exhibit "3", even with $20

27 million in seller financing, the Debtor still would be able to repay the Canpartners' debt in full with

28 interest, in which case, the Debtor, rather than Canpartners, will bear the risk of repayment of the

17

345296.05 [XP]    25293

1  notes.  Moreover, Canpartners will be protected by a lien on the Debtor's interest in the notes,

2  deeds of trust and other documents executed by the purchasers in connection with the seller

3  financing.  Finally, authorizing the Debtor to offer seller financing will provide the Debtor with the

4  flexibility to close sales to purchasers who qualify primarily under FHA underwriting guidelines

5  and who have a 20% down-payment, but are unable to secure financing from another lender.  The

6  seller-financed notes will provide the Debtor with a steady monthly income stream of up to

7  $100,000 per month over the five-year term of the notes and will provide a viable option for the

8  Debtor to monetize a portion of the Project.

9  **D.    The Court May Approve the Sale of Condominium Units Free and Clear of the Liens**

10  **of Canpartners and Other Creditors Asserting Liens.**

11       It has long been recognized that bankruptcy courts have the power to authorize the sale of

12  property free of liens with the liens attaching to the proceeds, with or without the consent of the

13  lienholder.  As the Second Circuit stated in In re Johns-Manville Corp.,

14       In Van Huffel v. Harkelrode, 284 US. 225, 76 L.Ed. 256, 52 S. Ct. 115 (1931) the
         Supreme Court explained that even absent express statutory authority, the
15       Bankruptcy Court has the inherent equitable power to sell a Debtor's property and to
         transfer third-party interests to the proceeds of the sale. 284 U.S. at 227-28.  See
16       also Ray v. Norseworthy, 90 US. (23 Wall.) 128, 134-35, 23 L.Ed. 116 (1874) (court
         may sell bankrupt's property encumbered by third-party claims as long as third
17       parties retain their respective priorities in the proceeds of the sale); Fierman v.
         Seward National Bank, 37 F.2d 11, 13 (2d Cir. 1930) ("When the bankrupt's
18       property was sold free of liens, the liens upon the property became rights against a
         substituted proceeds of sale, and claimants to this fund were obliged to assert their
19       rights by applying to the court in whose custody it was.") In re Penn Central
         Transportation Co., 383 F. Supp., 1128, 1130 (E.D. Pa. 1974) power of a
20       reorganization court to transfer interest in Debtor's property to the proceeds of a sale
         is well established).

21

22  In re Johns-Manville Corp., 837 F.2d 89, 93 (2nd Cir. 1988); see also In re WPRV-TV. Inc., 143

23  B.R. 315, 319 (D.P.R. 1991) ("The right to sell property free of liens has long been a part of the

24  bankruptcy power and dates back to the historic general equity powers of courts, as noted by

25  Justice Brandeis in Van Huffel v. Harkelrode, 284 U.S. 225, 227-228 (1931)").

26       Section 363(f) provides that a court may authorize a sale of estate property "free and clear

27  of any interest in such property of an entity other than the estate" if:

28

18