1  RICHARD K. DIAMOND (State Bar No. 070634)
   *rdiamond@dgdk.com*
2  JOHN J. BINGHAM, JR. (State Bar No. 075842)
   *jbingham@dgdk.com*
3  JULIA W. BRAND (State Bar No. 121760)
   *jbrand@dgdk.com*
4  DANNING, GILL, DIAMOND & KOLLITZ, LLP
   2029 Century Park East, Third Floor
5  Los Angeles, California 90067-2904
   Telephone:  (310) 277-0077
6  Facsimile:  (310) 277-5735

7  Attorneys for Debtor and Debtor-in-Possession,
   Meruelo Maddux - 845 S. Flower Street, LLC
8

9              **UNITED STATES BANKRUPTCY COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

11             **SAN FERNANDO VALLEY DIVISION**

12  In re                                )  Case No. 1:09-bk-21621-KT
                                         )
13  MERUELO MADDUX - 845 S. FLOWER       )  Chapter 11
    STREET, LLC,                         )
14                                       )  **DECLARATIONS OF RICHARD**
              Debtor and Debtor-in-Possession.  )  **MERUELO, JOHN CHARLES**
15                                       )  **MADDUX, LYNN BECKEMEYER AND**
                                         )  **RICHARD A. "RHETT" WINCHELL IN**
16                                       )  **SUPPORT OF  MOTION FOR ORDER**
                                         )  **AUTHORIZING SALE OF**
17                                       )  **CONDOMINIUM UNITS  FREE AND**
                                         )  **CLEAR OF LIENS, ETC.**
18                                       )
                                         )  Date:    December 9, 2009
19                                       )  Time:    9:30 a.m.
                                         )  Ctrm:    "301"
20                                       )           21041 Burbank Blvd.
                                         )           Woodland Hills, CA 91367
21  _____ )

22

23

24

25

26

27

28

                              -1-

# DECLARATION

## DECLARATION OF RICHARD MERUELO

I, Richard Meruelo, declare and state as follows:

1.      I am the Chief Executive Officer and Chairman of the Board of Directors of Meruelo Maddux Properties, Inc., a Delaware corporation ("MMPI").

2.      MMPI is the parent company of approximately 69 affiliated entities, including debtors Meruelo Maddux – 845 S. Flower Street, LLC ("845 S. Flower" or the "Debtor") and Meruelo Chinatown, LLC ("Chinatown"). On March 26 and 27, 2009, MMPI, and 53 other of the affiliated entities (collectively the "MMPI Debtors" or the "Company") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. 845 S. Flower and Chinatown filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on September 3, 2009. I am a designated officer of each of the affiliated entities, including 845 S. Flower and Chinatown, and am authorized to give this declaration.

3.      As a result of my being Chief Executive Officer of MMPI and a designated officer of 845 S. Flower, Chinatown, and each of the affiliated entities, and my review of relevant documents, I am familiar with the day-to-day operations of the MMPI Debtors, 845 S. Flower, and Chinatown, as well as their business affairs, and books and records, and the manner in which they are prepared. Except as otherwise noted, all facts set forth in this declaration are based on my personal knowledge, my discussions with other members of MMPI's senior management team, my review of relevant documents, or my opinion, based on, among other things, my experience and knowledge of the Debtors' operations and financial conditions.

     a.      This declaration is made in support of the Debtor's motion for order authorizing: (1) the sale of condominiums free and clear of liens; (2) the retention of Kennedy Wilson Auction Group, Inc. ("KW") as broker for the sale of condominiums and approval of the terms thereof including commissions to brokers; (3) use of cash collateral for payment of certain expenses with respect to the sale of condominiums; (4) use of sale proceeds and cash collateral for payment of operating and other expenses; and (5) provision of seller financing to condominium purchasers (the "Motion").

1    4.    I am experienced in the development, ownership and operation of real estate assets.

2 Attached as Exhibit "1" hereto and incorporated herein is my personal resume summarizing my

3 education, employment history, and expertise. The matters stated therein are true and correct.

4

5 **Personal Background and Qualifications, Nature of the Company's Business, and Other**

6 **Background Matters**

7    5.    I was introduced to the real estate development business as a child because my

8 parents, personally and through various business entities established by them, were in the business

9 of owning and developing real estate projects. My family has been in the real estate development

10 business for nearly forty years. In the early 1970s, after my parents moved to Los Angeles, they

11 purchased property in downtown Los Angeles where my mother operated a dress shop. Thereafter,

12 they started purchasing properties in areas like downtown Los Angeles where land was inexpensive

13 but presented good investment and development possibilities.

14    6.    I was in high school when I started investing in and developing real estate. The first

15 real estate project with respect to which I was significantly involved was a fixer-upper single-

16 family home in Huntington Park, California. I personally purchased the property, renovated it, and

17 then sold it for a profit.

18    7.    After high school I attended the University of Southern California ("USC"), where I

19 received a Bachelors of Science degree in Business Administration with an emphasis in Finance

20 and Real Estate. I went to USC for the purpose of going through the real estate program, and it was

21 my intention to become a full-time real estate developer after college. Even while I was in college,

22 I continued to participate in the family's real estate development business. I graduated from USC

23 in 1986.

24    8.    I negotiated my first solo development deal when I was 23 years old. I developed

25 on a build to suit basis a three-story medical office building in Los Angeles, California. I then sold

26 the building to one of the principal doctors. I was represented in the transaction by John Maddux,

27 who at the time was a young associate at O'Melveny and Myers.

28

345535.02 [XP]    25293

03

9.    From the time I graduated from college in 1986 to the time that MMPI was formed in 2006, I created numerous businesses which purchased properties in downtown Los Angeles and surrounding areas. I estimate that, directly or through entities that are or were controlled by me, I have purchased over 100 parcels comprising over 50 separate projects with an aggregate value of over $700 million, and sold numerous properties with an aggregate value of approximately $100 million.

10.    In total, I have more than 20 years of experience in identifying, acquiring, entitling, financing, developing and redeveloping real estate in downtown Los Angeles. In connection with these activities, I have read and studied hundreds of appraisal reports prepared by M.A.I. and other appraisers for properties located in downtown Los Angeles. I have attended numerous seminars concerning real estate development, valuation issues, and similar matters. I am a member, and in some cases an officer, of a number of local civic groups that track local real estate and commercial business conditions in downtown Los Angeles, including the Central City Association, the Central City East Association and the Los Angeles Central Industrial Redevelopment Project.

11.    Prior to MMPI's formation in 2006, its predecessor business' management team was one of only approximately thirteen designated groups participating in the California Urban Real Estate ("C.U.R.E.") program sponsored by the State of California Public Employee's Retirement System ("CalPERS"). CalPERS provided our business with capital through the C.U.R.E program in the form of a revolving credit facility in the principal amount of approximately $150 million. The CalPERS credit facility was obtained through a single borrower and the funds were disbursed among the entities collectively comprising the predecessor business.

12.    MMPI was formed in 2006 to develop and redevelop commercial and residential properties in downtown Los Angeles and other urban markets in California. When the Company (by which I refer not necessarily only to MMPI but also its direct and indirect subsidiaries) was formed, I contributed my interests in entities through which I had been developing properties, and which are now MMPI's subsidiaries. One of the reasons for forming MMPI was to hold an initial public offering of stock in order to, among other reasons, generate cash to pay off the then-existing

-3-

04

1    debt to CalPERS and raise funds the Company could use to continue growing through the

2    development of properties.

3        13.    In connection with MMPI's IPO, I traveled to numerous cities across the United

4    States and Europe and gave presentations to potential investors. I was already intimately familiar

5    with the real estate market in downtown Los Angeles because of my extensive development

6    activities prior to the IPO, and in connection with my presentations to investors I discussed, among

7    other things, the nature of the downtown Los Angeles real estate market generally, property values

8    in downtown Los Angeles, trends in terms of development and values in downtown Los Angeles,

9    properties that had been purchased by the predecessor business, and other properties for sale and

10    being developed in downtown Los Angeles.

11        14.    When MMPI was formed, the Company owned, leased with rights to purchase, and

12    had rights to buy approximately 52 development, redevelopment and stabilized projects. Almost

13    all of the properties contributed to the Company at the time of its formation had been purchased by

14    the predecessor business. I was personally involved in the negotiations for the purchase of each

15    such property, and am familiar with each of the properties.

16        15.    Like its predecessor business, MMPI's focus is on non-stabilized properties and

17    commercial land which we believe has alternate, more profitable uses that are achievable through

18    redevelopment or major renovation and ground-up development. The Company's properties are

19    used for diverse purposes, and include food industry, wholesale markets, small tenant industrial,

20    residential high rise and mixed-use "urban village" properties. The vast majority of the properties

21    are situated in downtown Los Angeles, which is our specialty.

22        16.    At the time that MMPI was formed, it owned or controlled approximately 80 acres

23    of land in downtown Los Angeles. By way of comparison, I understand that a 27-block area in the

24    financial district of downtown Los Angeles that contains the bulk of downtown's class A high-rise

25    office buildings and major hotels and retail properties is situated on approximately 143 acres.

26        17.    MMPI does not utilize the same business model as typical real estate investment

27    companies, many of which utilize real estate investment trusts ("REITs"), and I understand that our

28    business plan is distinctive among publicly traded companies. Many public real estate companies

-4-

1  focus on properties with stable occupancies at market rents or properties with stable occupancies at

2  below-market rents that may benefit from more efficient management or minor renovations. In

3  contrast, we focus on urban in-fill development and on finding different, more profitable uses for

4  existing urban properties. We look for properties that have value intrinsic to the property itself,

5  such as the property's location, whether there is an end user of the property on the horizon who

6  might want to purchase the property, how well the property will fit in with the growth patters of the

7  area and community in which it is situated, and other factors. Such properties may have substantial

8  vacancies, unstable occupancies, or require major renovations for a new use. MMPI's business

9  requires local and other special knowledge to identify viable alternative uses for urban property,

10  and presents higher potential returns than the returns that the property owner might otherwise

11  derive.

12       18.       Even at the time of the IPO, we knew that many of the Company's development

13  projects were still several years away from commencing. We also knew that before many of our

14  projects would generate substantial revenues, the Company would be required to incur substantial

15  costs. In the meantime, for some properties, we continued to lease all or portions of the properties

16  in order to, among other things, help defray the costs of holding the property and/or other expenses

17  incurred by the Company. Similarly, we continued to operate some of the properties as parking

18  lots, not because the parking lots were generating substantial income but because the land itself is

19  extremely valuable since it can be developed at an appropriate time in the future, and the parking

20  lot revenue provided some interim revenue. Some of these properties already have entitlements for

21  development.

22       19.       Moreover, in the ordinary course of business I regularly speak with real estate

23  professionals, brokers and others familiar with the downtown Los Angeles real estate market in

24  order to, among other things, expand my knowledge of the downtown Los Angeles real estate

25  market, evaluate properties available for sale that the Company may wish to purchase or that may

26  be comparable to properties that the Company holds, and keep apprised of trends in values and the

27  capital markets.

28

345535.02 [XP]    25293

1      20.      In fact, appraisers and others who specialize in the value of real estate in downtown

2  Los Angeles often contact *me* to ask for *my* opinion as to the value of such properties. The reason

3  they contact me is that I am one of the most qualified persons in Los Angeles who can offer

4  opinions as to downtown property values. The Company has a number of properties that are

5  occupied by commercial or residential tenants, and therefore I am familiar with the property values

6  that are derived from rental income. The Company also has undeveloped properties, including a

7  number of parking lots, and therefore I am familiar with the property values that are derived from

8  the land value. I negotiated the purchase of almost all of the Company's properties and I keep

9  apprised of property sales in the downtown market, and therefore I am familiar with the property

10  values that are derived solely from land sale cost. Over the years the Company has developed or

11  entered into agreements for the development of numerous commercial and residential properties,

12  and therefore I am familiar with property values that are derived from replacement costs.

13      21.      Since becoming a public company the Company has, among other things:

14  successfully completed approximately nine acquisitions or conversions of development projects to

15  rental projects; successfully completed, acquired, or placed in service four parcels attached to

16  current rental projects; and successfully completed the sale of five rental projects and three

17  development projects. In 2008, the Company sold more property in downtown Los Angeles than

18  any other landowner. With regard to the six properties that have been sold:

19          a.      on or about March 31, 2008, the Company sold a development project

20  located at 9901 Alameda in south Los Angeles for approximately $31.2 million;

21          b.      in a two-step sale culminating in or about August 2008, the Company sold a

22  rental project located at 2000 San Fernando Road just north of downtown Los Angeles for

23  approximately $35 million;

24          c.      on or about September 12, 2008, the Company sold a rental project located

25  at 1800 E. Washington Blvd. in downtown Los Angeles for approximately $14.2 million;

26          d.      on or about November 7, 2008, the Company sold a development project

27  located at 816 Stanford in downtown Los Angeles for approximately $1.0 million.

28

345535.02 [XP]    25293

1        e.     on or about November 14, 2008, the Company sold a rental project referred

2 to as the "Overland Terminal" in downtown Los Angeles for approximately $19.7 million;

3        f.     on or about November 21, 2008, the Company sold a development project

4 located at 801 E. 7th Street in downtown Los Angeles for approximately $9.5 million; and

5        g.     Since that time, the Company has negotiated and entered into six purchase

6 and sale agreements, of which several sales have already closed.

7    22.    In light of these transactions, I believe that the Company has sold more properties in

8 downtown Los Angeles than anybody else during the last two years. I was involved in negotiating

9 each of the above sales and pending sales on behalf of the Company. Further I am the person who

10 ultimately decided the sale price for each of the properties, largely because I am the person at the

11 Company who is the most knowledgeable as to the value of the Company's real estate. The fact

12 that the Company has engaged in so many recent sales and ongoing development activities is one

13 of the reasons I believe that I am one of the most qualified persons in Los Angeles to testify as to

14 the value of properties in downtown Los Angeles.

15    23.    In addition, other non-affiliate entities to which I am related recently sold property

16 in Los Angeles in this down market, including:

17        a.     Little Tokyo Shopping Center (formerly known as Yaohan Plaza), located at

18 333 S. Alameda, in downtown Los Angeles, on or about in May, 2008, for approximately $35.5

19 million.

20        b.     Family Ford Site, located at 12th & Figueroa, in downtown Los Angeles, on

21 or about March, 2009, for approximately $14,500,000.

22        c.     Chaffee Building, located at McGarry & Olympic, in downtown Los

23 Angeles, on or about July, 2009, for approximately $11,850,000.

24    24.    I was personally involved in negotiating each of these sales and I am the person who

25 ultimately decided the sale price for each of the properties.

26    25.    In addition, I have experience in connection with the development and construction

27 of multi-unit residential projects. The company has purchased properties for the purpose of

28 developing and constructing multi-unit residential buildings on such properties. I have obtained

345535.02 [XP]    25293

08

1  permits for the construction of multi-unit residential properties and the company has developed

2  architectural plans for the construction of such properties. The Debtor developed and constructed

3  the Union Lofts located at the corner of West 8th Street and South Hill Street in downtown Los

4  Angeles as a condominium project. That property is currently being leased.

5

6  **Valuation of the Debtor's Real Property**

7        26.     There are a number of factors which I consider when estimating the value of real

8  property, and the weight I give to one factor versus another will depend on, among other things, the

9  current condition and use of the property, and the use for which the property is best suited.

10        27.     One factor I may consider is the replacement cost of the property, which generally

11  looks to how much a buyer would pay for an otherwise equivalent substitute property. With

12  respect to the MMPI Debtors' properties and the property of Debtor 845 S. Flower, I am familiar

13  with the prices for which the properties were purchased, I am familiar with the prices for which

14  similar properties are being sold (particularly since the Company is often the one selling the

15  properties), I am familiar with the structures on the Debtors' properties, and I have a significant

16  amount of experience in the development of properties and therefore can estimate the expense that

17  would be incurred if someone had to rebuild the structures.

18        28.     Another factor I may consider relates to sale comparisons, which generally looks to

19  the prices for which comparable properties, adjusted for differences in location and such, are being

20  sold. Such values are often estimated in terms of price per square foot of land and price per square

21  foot of building. Again, I am familiar with the prices for which similar properties are being sold,

22  both in total and on a square footage basis, especially in the downtown Los Angeles market. In

23  fact, over the years I have observed that lender appraisals, when identifying comparable sales, often

24  are relying on sales of properties either purchased or sold by the Company.

25        29.     Another factor I may consider looks to the ability of the property to produce income,

26  typically in the form of rents. Present value may be estimated based on an evaluation of the

27  anticipated future income stream from the property, and then a capitalization rate is applied in order

28  to estimate the present value of the property.

345535.02 [XP]    25293

30.    As noted above, in the performance of my duties as Chairman and Chief Executive Officer of MMPI, I regularly speak with real estate professionals, brokers and others familiar with the downtown Los Angeles real estate market, the multi-unit residential real estate market and other markets in which the Company owns real property in order to, among other things, expand my knowledge of the markets, evaluate properties available for sale that the Company may wish to purchase, and keep apprised of trends in values and the capital markets. I incorporate the information obtained by me during the course of these discussions when I estimate the values of the Debtors' properties. I also have investigated and reviewed information regarding sales in the multi-unit residential market in Los Angeles over the past year, including but not limited to the sales occurring at the Evo and Concerto Lofts projects located in the South Park area of Los Angeles. I am familiar with the location of each of theses projects their building floor plan, lay-out and composition and the amenities available at the buildings and the sales and values received by the seller for condominiums in these buildings.

31.    Also, MMPI's management team has met weekly during recent years, particularly in 2008 and 2009, to discuss, among other things, real estate trends, growth patterns, market conditions, and particular properties and the factors that contribute to their value. These meetings have been conducted in order to, among other things, evaluate the prices to pay for the purchase of properties not presently owned by the Company, and prices for which the Company's properties may be sold. During these meetings, we discuss, among other things, space needs by tenants or end users, the condition and location of the properties, access to the properties and traffic patterns, the income stream, if any, generated by the property, growth patterns, community and area trends, comparable sales, expressions of interest by third parties in purchasing the Company's properties, and statements or expressions of value by commercial real estate brokers.

32.    The following paragraphs contain a brief description regarding the property owned by 845 S. Flower and my opinion as to the value of this property.

33.    845 S. Flower owns a 35 story residential tower at 705 West Ninth Street in downtown Los Angeles (the "Project"), a few blocks northeast of the Staples Center in the Southpark region of downtown Los Angeles. The Project is the tallest pure residential skyscraper

-9-

1   in Los Angeles and is comprised of 214 luxury residential units that total 254,300 square feet.

2   There is also 6,800 square feet of ground floor commercial space. 845 S. Flower is in negotiations

3   with two restaurant operators to open a restaurant at this location. 845 S. Flower expects these

4   negotiations to result in a lease of this commercial space in the near future. The Project is

5   capitalized by approximately $73 million of funds advanced by the Debtor and an $84 million

6   construction loan in favor of Canpartners Realty Holding Company IV LLC ("Canpartners") for

7   total capital of approximately $157 million.

8       34.    Pursuant to the Motion, the Debtor intends to engage in a sale program to sell

9   approximately 48 condominium units in the Project at a one day sale event (the "Initial Sale

10  Event"). Thereafter, the Debtor will engage in a conventional sales program for an additional 48

11  units. The Debtor has requested that the court approve the retention of Kennedy Wilson Auction

12  Group, Inc. ("KW") to assist the Debtor with marketing the Project and to conduct the Initial Sale

13  Event and the following conventional sales program through June 30, 2010, the termination date of

14  the proposed agreement between the Debtor and KW, and to authorize the Debtor to extend the

15  term of such agreement if the Debtor determines that to do so is in the best interest of the estate.

16  Depending on the timing of approval of the Motion by the Court, the Initial Sale Event is likely to

17  occur in the later part of January 2010 with the conventional sale program for the additional 48

18  units occurring thereafter through June 30, 2010.

19      35.    Based on my experience and my knowledge of the existing market for multi-unit

20  residential properties including information I have reviewed regarding the recent sales at the Evo

21  project and the Concerto Lofts project, it is my opinion that the 214 condominiums in the Project

22  could generate gross sale proceeds on average of $516 per square foot in today's market. This

23  equates to a value for all of the condominium units of $131,297,350. This value does not include

24  the 6,800 square feet of ground floor commercial space which the Debtor expects to lease to a

25  restaurant in the near future.

26

27

28

-10-

1    I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct.

3    Executed on November ___, 2009, at Los Angeles, California.

4

5

6    RICHARD MERUELO

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-11-

# DECLARATION

## DECLARATION OF JOHN CHARLES MADDUX

I, John Charles Maddux, declare and state as follows:

1.      I am the President and Chief Operating Officer of Meruelo Maddux Properties, Inc., a Delaware corporation ("MMPI").

2.      I have personal knowledge of the facts in this declaration, except as to those matters that are based upon information and belief, which matters I believe to be true.  If called as a witness, I could testify competently to these facts.

3.      MMPI is the parent company of approximately 69 affiliated entities, including Meruelo Maddux – 845 S. Flower Street, LLC  ("845 S. Flower" or the "Debtor") and Meruelo Chinatown, LLC ("Chinatown").  On March 26 and 27, 2009, MMPI, and 53 other of the affiliated entities (collectively the "MMPI Debtors" or the "Company") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  845 S. Flower and Chinatown each filed a voluntary petition for relief on September 3, 2009.  I am a designated officer of each of the affiliated entities, including 845 S. Flower and Chinatown and am authorized to give this declaration.

4.      As a result of my being Chief Operating Officer of MMPI and a designated officer of 845 S. Flower and Chinatown, and my review of relevant documents, I am familiar with the day-to-day operations of the MMPI Debtors, 845 S. Flower and Chinatown as well as their business affairs, and their books and records, and generally the manner in which they are prepared.  Except as otherwise noted, all facts set forth in this declaration are based on my personal knowledge, my discussions with other members of MMPI's senior management team, my review of relevant documents, or my opinion, based on, among other things, my experience and knowledge of the Debtor's operations and financial conditions.

5.      I am submitting this Declaration in support of the motion of the Debtor for an order authorizing [1] sale of condominium units free and clear of liens, claims and encumbrances; [2] retention of Kennedy Wilson Auction Group, Inc. as broker for the sale of the condominium units and approval of the terms thereof, including commissions for brokers; [3] use of loan proceeds and cash collateral to pay certain expenses with respect to the sale of condominium units and operating expenses; [4] use of sale proceeds and cash collateral to pay operating and other expenses; [5]

1

345155.03 [XP]        25293

1  provision of seller financing to condominium purchasers; and [6] 845 S. Flower to obtain a letter of

2  credit, bond or other security device ("HOA Bond") in connection with a required reserve for

3  homeowner's association dues and Chinatown granting a first priority, priming lien on its real

4  property as security for the HOA Bond.

5      6.      The Debtor owns a recently completed 35 story luxury residential building with 214

6  condominiums and 6,800 square feet of commercial space on the ground floor located at 705 W. 9th

7  Street in the South Park area of Los Angeles (the "Project"). The Debtor is negotiating with a

8  prominent restaurant operator for a restaurant to occupy the ground floor space. In addition, since

9  prior to filing its chapter 11 case, the Debtor has been actively investigating its options to maximize

10  the value of the 214 residences in the Project upon completion of construction. After interviewing

11  auctioneers and brokers and reviewing its options, the Debtor has determined that the best approach

12  to maximize the value of the Project is to conduct a sale program for the Project involving the sale

13  at an auction-style Initial Sale Event of approximately 48 condominium units, followed by a

14  conventional sale program for remaining units (collectively, the "Sale Program").

15      7.      The Debtor has decided to retain Kennedy Wilson Auction Group, Inc. ("KW") to

16  conduct the Sale Program. The KW involvement will run through June 30, 2010 and the Debtor

17  has requested authorization to extend the term of KW's involvement if the Debtor determines that

18  to do so is in the best interest of the estate. KW is being retained based on KW's experience and

19  expertise in the sale of real estate and in particular its success in the sale of multi-unit residential

20  buildings including the Mercury building in Koreatown and the recent successful events at The

21  Market Lofts located across the street from the Project in the South Park area of Los Angeles and

22  The Dalton in Pasadena, California. In addition, because of its relationship with many lenders, KW

23  brings to the table the ability to assist in making more financing options available to prospective

24  purchasers of the condominium units and KW has committed to assist in providing a lender to pre-

25  qualify potential purchasers for the condominium units.

26      8.      The terms of the Sale Program are:

27      •   The Debtor will sell approximately 48 condominium units (six full floors) at the

28          Initial Sale Event which is scheduled to be held approximately 30 to 45 days after

14

345155.03 [XP]    25293

1     entry of an order approving this Motion, as may be adjusted by the Debtor for the

2     success of the Initial Sale Event.

3  • KW will market the condominium units, conduct the Initial Sale Event and

4     thereafter act as broker to market and offer for sale up to an additional forty-eight

5     (48) condominium units for a period through June 30, 2010, as the same may be

6     extended.

7  • The aggregate purchase price for the sale of the first 48 condominiums will not be

8     less than $22.3 million.

9  • The Debtor may adjust the number of condominium units to be offered at the Initial

10    Sale Event and thereafter, provided the aggregate purchase prices for the first 48

11    condominium units shall not be less than $22.3 million and the purchase price for

12    any subsequent condominium unit sold will not be less than $340 per square foot

13    (net of costs of sale).

14 • KW's sole compensation shall be a fee equal to three percent (3%) of the sales price

15    of the condominium unit.  Cooperating brokers may receive a fee of three percent

16    (3%) of the sale price of the condominium unit.

17 • KW will conduct an auction marketing program that will begin with an advertising

18    and marketing campaign lasting approximately 30 to 45 days with print and other

19    media advertising.  The advertising campaign may highlight the auction day starting

20    bid prices.  The marketing campaign and any starting bid prices will generate the

21    interest and volume of potential buyers necessary to create a competition for the

22    limited number of condominium units for sale.  The budget for the marketing

23    program is $250,000.

24 • Starting bids may be in an amount less than the projected sales prices. However, the

25    Debtor will reserve the right to reject the otherwise highest bid for a condominium

26    unit at the Initial Sale Event if the pre-determined unpublished reserve price, to be

27    fixed by the Debtor, is not met.  In any event, the pre-determined unpublished

28

3

345155.03 [XP]     25293

1    reserve prices, in the aggregate, will not be less than an amount necessary to achieve

2    the $22.3 million in purchase prices for the first 48 units to be sold.

3    • KW will assist in providing a preferred lender to pre-qualify buyers for the

4    condominium units.

5    9.    To enhance the sale process and due to the vagaries in the lending market, the

6    Debtor will offer seller financing to those purchasers who are unable to finance the purchase of a

7    condominium unit through another lender. The purchaser will be required to make a down

8    payment of at least 20 percent of the purchase price. The purchaser will provide a promissory note

9    for the remaining balance of the purchase price. The note will bear interest at the rate of six

10    percent per annum, and interest only will be due and payable monthly. All principal and any

11    outstanding and unpaid interest and any other amounts owing will be due at the maturity date,

12    which will be five years after title passes to the purchaser. The note will be secured by a deed of

13    trust on the purchaser's condominium unit. The buyer will be required to qualify for such

14    financing based primarily on FHA underwriting guidelines. The Debtor will cap its seller

15    financing program at $20 million in the aggregate of the face amount of the notes.

16    10.    All of the purchases of units in the Project will be the result of an open and public

17    sale process and the sale transactions will be arms-length transactions through KW, a broker. The

18    Initial Sale Event will be a public auction and subsequent sales will be handled and negotiated

19    through KW.

20    11.    The Debtor believes that a sale of condominium units as proposed by the Debtor and

21    KW is the best approach to maximize value for the Project. This is due to the positive signs that

22    the residential multi-unit market in downtown Los Angeles is improving as evidenced by increased

23    sales of condominiums in the past six to nine months and the success of recent sales for buildings

24    located in the South Park area of Los Angeles, such as the Evo and Concerto Lofts buildings. In

25    addition, based on my conversations with Rhett Winchell of KW, I am informed and believe that

26    the inventory of condominiums available for purchase in the downtown Los Angeles area has been

27    decreasing. As a result, it is an opportune time to engage in a sale program as advised by KW.

28

16

345155.03 [XP]    25293

1    12.    The Debtor desires to schedule the Initial Sale Event as soon as possible following

2   approval of KW's engagement, the sale, and related relief. I am informed and believe that KW will

3   require a 30 to 45 day period for marketing the condominium units prior to the Initial Sale Event.

4   This will include open houses and other events to highlight the unique aspects of the condominium

5   units and the Project. Following the Initial Sale Event, the Debtor and KW will engage in a

6   conventional sale program for approximately 48 additional units. The Debtor believes that by the

7   termination date for its agreement with KW of June 30, 2010, approximately 45 percent of the units

8   (approximately 96 or so) in the Project will be sold. At that point, I am informed and believe that,

9   if it is in the best interests of the estate, the Debtor will have the ability to continue to sell

10  condominium units and that such sales activity will provide the Debtor with multiple options for

11  paying creditors and to repay in full the Canpartners Debt in accordance with the Debtor's

12  reorganization plan, including potentially by refinancing the remaining balance of the Canpartners

13  Debt. I am informed and believe that KW is highly confident that the Debtor will be able to obtain

14  such financing because the Project will have favorable loan to value ratios and because there will

15  be a proven market for the sale of condominium units at the Project at prices equal to or greater that

16  those obtained during the sale program.

17    13.    Pursuant to the Debtor's proposed agreement with KW (the "KW Agreement"), the

18  Initial Sale Event is expected to result in sale prices for the first 48 units of at least $22.3 million in

19  the aggregate. Sales of $22.3 million for the first 48 units are expected to yield net sale proceeds of

20  $17,661,703 (or $327 per square foot) after payment of closing costs and the reserves set forth

21  below, as indicated on the 6 Floor Scenario Projections attached hereto as Exhibit "2". I am

22  informed and believe that utilizing KW's expertise for the Sale Program, the condominium units

23  can generate sale prices on average in the range of $415 to $500 per square foot for the first 48

24  units. The Debtor projects that the remaining units will sell for an even higher price per square foot

25  than those in the Initial Sale Event, but even assuming these conservative prices, if the remaining

26  units were sold at these initial prices on average, the sales would generate gross proceeds of

27  $105,534,500 to $127,150,000 for all 214 condominiums in the Project, a premium far above the

28  Canpartners Debt of $84 million (which equates to $322 per square foot).

14.    Moreover, the provision of $20 million in seller financing to condominium unit purchasers will not have a negative effect on the repayment of the debt to Canpartners. Even with $20 million of seller financing, the Debtor would still be in a position to repay the Canpartners debt in full from projected sales of the condominium units, as set forth in the projections attached hereto as Exhibit "3". In essence, because the building is valued at in excess of $131 million, and that is the aggregate sale price the Debtor anticipates from the sale of all of the residential condominium units, there will be sufficient funds to repay Canpartners in full with interest from cash proceeds of the sales. The Debtor and its equity holders will bear the risk of repayment of the seller financing notes, not Canpartners.

15.    In order to achieve the anticipated sale results, the Debtor will need to fund from its Reserve Accounts the amount of $250,000 to KW for marketing expenses related to the Initial Sale Event. The marketing plan is provided on Exhibit A-1 to the KW Agreement. In addition, the Debtor will be required to fund $250,000 to KW to furnish model homes and to provide a sales office at the Project as provided in Exhibit A-2 to the KW Agreement. Payment of these expenses is necessary to promote the Initial Sale Event and ensure that the maximum number of purchasers register and appear to bid for an opportunity to purchase one of the condominiums. The Debtor also requires up to $500,000 for operating expenses for the Project for the period December 2009 through April 2010 when the sales from the Initial Sale Event are expected to close. The Debtor also requires $200,000 from the loan proceeds as partial payment of the fees of the Debtor's professionals. The professionals have provided substantial and valuable service to the Debtor from the date of filing the Petition through the Debtor's efforts to develop a plan of reorganization. The Debtor seeks to use cash collateral to pay such expenses.

16.    In addition, sale proceeds (net of closing costs, including broker commissions) will be deposited by the Debtor into a new DIP operating account and the Debtor requests use of such funds to pay the following necessary expenses:

- $883,170 to fund a reserve to cover six months of homeowners' association dues (the "HOA Reserve"), which reserve will be held in escrow or as otherwise required by the Department of Real Estate (the "DRE"), to replace the

6

18

345155.03 [XP]      25293

1    Homeowner's Bond referenced below.  The HOA Reserve will not be used to pay

2    HOA dues until such time as the DRE permits its release, which is generally in

3    connection with the sale of 80 percent of the units.

4    •    Homeowners Association Dues for unsold units of $686,394.

5    •    Warranty Reserve of $2,140,000.

6    •    U.S. Trustee quarterly fees.

7    •    Partial payment of Debtor's professional fees of $200,000.

8    17.    Each of these expenses is necessary to protect and maintain the value of the Project.

9    The Debtor believes that it is necessary to fund a warranty reserve in the amount of $2,140,000,

10    which equates to approximately $10,000 per unit to address warranty issues.  The Debtor also has

11    requested use of cash collateral of up to $686,394 for payment of the homeowners' association

12    dues for the unsold condominium units pursuant to the Homeowners' Association Budget approved

13    by the DRE (the "HOA Budget") a copy of which is attached hereto as Exhibit "4".  These

14    amounts must be paid to fund the necessary operation of the Project once occupied.  Payment of

15    such amounts is absolutely necessary to maintain the value of the Project for both present owners

16    and future purchasers.  The Debtor will be required to pay U.S. Trustee fees as during its case and

17    these nominal amounts should be funded from cash collateral.  Finally, the Debtor has received

18    substantial and valuable assistance from its counsel in moving this case toward a successful

19    reorganization through this sale process.  Funds should be allocated for partial payment of the

20    professional fees of Debtor's professionals from the sale proceeds of $200,000.

21    18.    Furthermore, to issue the White Report without condition, the DRE requires the

22    Debtor to post a bond, letter of credit or other security device on commercially reasonable terms

23    (the "HOA Bond").  The Debtor has requested authority to obtain the HOA Bond on commercially

24    reasonable terms from a surety, bank or other financial institution (the "Issuer") which HOA Bond

25    will be secured by a first priority, priming deed of trust on the real property of Meruelo Chinatown,

26    LLC ("Chinatown"), and which deed of trust shall be senior in priority to all existing liens and

27    encumbrances.

28

7

345155.03 [XP]    25293

19.     It is essential that the Debtor be able to obtain the HOA Bond to satisfy the DRE's requirement for an unconditional white report. The Debtor has sought an HOA Bond on an unsecured basis and based on providing a junior lien on the Debtor's property. However, the Debtor has not been able to locate a lender willing to provide financing other than through a senior lien on the real property of Chinatown.

20.     Obtaining the HOA Bond is a sound exercise of the Debtor's business judgment as to do so will enable the Debtor to satisfy the DRE requirements and will allow the Sale Program to proceed and sales to close. Moreover, since Chinatown's property is encumbered by a lien in favor of Canpartners as additional collateral with respect to the Debtor's $84 million loan, the granting of a senior lien in favor of the Issuer is a sound exercise of Chinatown's business judgment as well. Obtaining the HOA Bond will pave the way for sales to close and will provide 845 S. Flower with options for repayment of the Canpartners' debt through a plan of reorganization, which will inure to the benefit of Chinatown. Upon closing the sales necessary to fund the HOA Reserve as a cash reserve to be held in escrow as otherwise required by the DRE, the Debtor may seek a release of the HOA Bond and the priming lien on Chinatown's real property.

21.     Canpartners and the Mechanics' Lien Creditors will be adequately protected for the release of Liens on the condominium units that are sold pursuant to the Sale Program. Canpartners Liens will be transferred to the proceeds of the sale to the same extent and with the same validity and priority as such liens had in the condominium units immediately prior to the sale.

22.     Canpartners and the Lien Creditors will retain their Liens on the remaining unsold portions of the Project. The Debtor has valued the 214 residential condominium units at in excess of $131 million. This value does not include the commercial condominium space which is

///
///
///
///
///
///

8

345155.03 [XP]     25293

1    expected to be leased to a high quality restaurant. Thus, the Debtor asserts that the Lien Creditors

2    are adequately protected for the release of their liens.

3        23.     The Debtor proposes that adequate protection exists for the use of cash collateral as

4    provided herein as follows:

5           a.      There is a substantial equity cushion in the Project in light of its value in

6    excess of $131 million;

7           b.      Canpartners shall have a replacement lien on the cash proceeds of sale; and

8           c.      Canpartners shall have a replacement lien on the notes and deeds of trust and

9    other instruments arising from and received by the Debtor in providing seller financing to one or

10    more units.

11        24.     Under the Sale Program as outlined above, the Debtor believes that it will maximize

12    the value of the Project, will be able to repay the Canpartners Debt and create value for its other

13    creditors and equity holders.

14        I declare under penalty of perjury under the laws of the State of California and the United

15    States of America that the foregoing is true and correct.

16        Executed on November 18, 2009 at Los Angeles, California.

17

18                         _____

19                         John Charles Maddux

20

21

22

23

24

25

26

27

28

345155.03 [XP]    25293

# DECLARATION

## DECLARATION OF LYNN BECKEMEYER

I, Lynn Beckemeyer, declare and state as follows:

1.      I am an officer and the Executive Vice President of Development for Meruelo Maddux Properties, Inc., a Delaware corporation ("MMPI"). MMPI is the parent company of approximately 69 affiliated entities, including 845 S. Flower. I am a designated officer of 845 S. Flower, and am authorized to give this declaration.

2.      I am submitting this Declaration in support of the motion of Meruelo Maddux – 845 S. Flower Street, LLC ("845 S. Flower" or the "Debtor") for an order authorizing [1]the Debtor to sell condominium units free and clear of liens, claims and encumbrances; [2] the retention of Kennedy Wilson Auction Group, Inc. as broker for the sale of the condominiums and the terms thereof including payment of commissions; [3] the use of cash collateral from the Reserve Accounts to pay certain expenses with respect to the sale of condominium units; [4] the use of sale proceeds and cash collateral to fund operating and other expenses; and [5] provision of seller financing to purchasers of condominium units in an amount up to $20 million in aggregate face amount of the notes.

3.      As a result of my being made an officer and the Executive Vice President of Development for MMPI on January 30, 2007, and based upon my review of relevant documents, I am familiar with the day-to-day operations from and after that date of 845 S. Flower as well as its business affairs and its books and records, and the manner in which they are prepared as they relate to my duties. As the Executive Vice President of Development, I oversee work relating to development, entitlement, design, construction and asset stabilization for 845 S. Flower. In that regard, I oversee and am in charge of the above mentioned duties concerning the 35 story residential condominium project located at 705 West Ninth Street, Los Angeles, California (the "Project") owned by 845 S. Flower. Except as otherwise noted, all facts set forth in this declaration are based on my personal knowledge, my discussions with other members of MMPI's senior management team, my review of relevant documents, or my opinion, based on, among other things, my experience and knowledge of 845 S. Flower's operations and financial conditions.

1

22

344783.03 [XP]    25293

1       4.      845 S. Flower owns a 35 story residential condominium tower located at 705 W. 9th

2   Street in the Southpark region of downtown Los Angeles (the "Project").  The Debtor obtained a

3   temporary certificate of occupancy for the Project and anticipates securing the final certificate of

4   occupancy for the project by the end of 2009.

5       5.      The Debtor has obtained a recorded final tract map for condominium purposes.  The

6   Debtor anticipates recording the condominium plan and the condominium CC&R's in due course,

7   and to secure the final unconditional white report from the DRE prior to the Initial Sale Event.

8       6.      This building is a first class iconic structure in downtown Los Angeles.  Viewed

9   from the street, this curtain wall building is clad with various shades of green glass and has

10  numerous distinctive and attractive architectural features which include external balconies on all

11  four corners of the building, a seventh floor amenity deck with a landscaped garden and a premium

12  extended balcony and viewing deck located on the ninth floor.  The residential common area

13  interiors, including the amenity deck, were designed by Hirsch Bedner International, a noted

14  designer.

15      7.      The Project has an attractive location at the corner of Ninth and Flower Streets,

16  which is (a) across the street from the newly opened Ralphs supermarket, (b) a few blocks away

17  from the LA Live complex and the Staples Center, (c) on an all residential corner and (d) closer

18  than most other Southpark residences to the office core of downtown Los Angeles.  The building

19  has resident amenities that start at street level which include (a) a valet entrance area adjacent to the

20  lobby on Ninth Street, (b) two gated entrances that lead to above ground parking providing in

21  excess of one parking space for each one bedroom residence and two parking spaces for each two

22  bedroom residence, and (c) an efficient loading dock area for resident move-ins.

23      8.      There is a seventh floor amenity deck located on top of the six story parking facility.

24  The amenity deck clearly separates this building from its residential neighbors with its stunning

25  visuals and common area space.  This floor contains (a) a gym that overlooks the pool complete

26  with changing rooms and showers, (b) an approximately 70 foot lap pool with infinity features, (c)

27  a Jacuzzi pool, (d) a landscaped garden; and (e) a club room.  The club room amenities include (a)

28  a demonstration kitchen/catering area, (b) a Wii electronic gaming room, (c) a pool table, and (d)

1   several large flat screen TVs.  The amenity deck was also designed and furnished by the same

2   interior decorating firm that designed and decorated the other common areas.

3        9.     The building's residences are located on the twenty eight residential floors that start

4   on floor 7 and culminate with the four penthouses on floor 35.  The building's height puts it in lofty

5   company, as it is the third highest new construction residential project in Los Angeles behind the

6   ultra luxurious Ritz Carlton residences at LA Live and the high end "The Century" building in

7   Century City.  The typical floor features 8 private homes.  These 8 homes are comprised of 4 two

8   bedroom units (2 layouts) and 4 one bedroom units (2 layouts).  The layouts of all these units are

9   efficient and open.  Throughout the units in the building there are two interior color schemes which

10   are (a) white cabinets with espresso wood floors and silver grey travertine stone in the bathrooms

11   and (b) brown cabinets with walnut wood flooring and sand colored stone in the bathrooms.  All

12   units come with Bosch clothes washer/dryers and Jennair refrigerators, ovens, microwaves and

13   dishwashers.

14        10.    There is 6,800 square feet of ground floor commercial space that is designed for a

15   restaurant and the Debtor is in negotiation with a prominent restaurant operator to open a restaurant

16   in this location.

17        11.    The Project is capitalized by approximately $73 million of funds advanced by the

18   Debtor and an $84 million construction loan from Canpartners for total capital of approximately

19   $157 million.

20        12.    Pursuant to the Loan Agreement between 845 S. Flower Street and Canpartners

21   dated as of July 30, 2008, 845 S. Flower established certain reserve accounts to hold the loan

22   proceeds in connection with the construction of the Project. I am informed the Loan Agreement is

23   attached as Exhibit "3" to the Declarations of Richard Meruelo, John Maddux and Lynn

24   Beckemeyer in support of First Day Motions (Docket No. 22).  These accounts were fully pre-

25   funded in the name of 845 S. Flower, the owner of the accounts.

26        13.    As of the date of this Motion, the breakdown of the funds in the Reserve Accounts

27   and the uses of such funds from the Reserve Accounts is as follows:

28

344783.03 [XP]        25293

| Account Type | Location | Number | Balance | Remaining Costs to Pay | Excess |
|---|---|---|---|---|---|
| Construction Reserve | City National | 112950087 | $5,393,317 | $3,918,947 | $1,474,370 |
| Construction Reserve | City National | 113015039 | $195 | $195 | $0 |
| | | | | | |
| Construction Draw | East West | 0080360357 | $5,082,764 | $5,082,764 | $0 |
| | | | | | |
| Interest Reserve | City National | 112950060 | $4,292,156 | N/A | N/A |
| | | | | | |
| Tax and Insurance Reserve | City National | 112915036 | $22 | N/A | N/A |

14.    The Debtor has requested use of cash collateral to fund the marketing budget and provide funds to furnish models and provide an on-site sales office in the aggregate amount of $500,000.  In addition, the Debtor will need to use cash collateral from December 2009 through April 2010 to fund the operations of the Project while the Debtor engages in the sale program and until the Debtor closes sales of condominium units following the Initial Sale Event which is expected to occur in March to April of 2010.  An operating budget covering the necessary expenses for this time period is attached hereto as Exhibit "5", which shows that the Debtor will need up to $500,000 to cover these expenses for this time period.  Once the sales close, the cost of operating the Project will be paid primarily from the homeowners' association dues.   The Debtor also requires use of cash collateral from the loan proceeds in the amount of $200,000 to provide for a partial payment on the Debtor's professional fees.

15.    Based on my analysis of the Budget and the items remaining to be paid from the Construction Reserve in connection with Final Completion of the Project (completion of punch list items) and taking into account the excess funds available in the Construction Reserve, each as identified in paragraph 13 above, there are sufficient funds remaining from the Loan Proceeds in the Construction Reserve Accounts to fund these payments.

4

25

1    16.    Attached hereto as Exhibit "6" is a list of creditors who have recorded mechanics'

2  liens with respect to their work on the Project.  These amounts are covered in the Construction

3  Budget and each of these creditors will be paid for the work they performed from the funds on hand

4  (and earmarked for this purpose) in the Construction Reserve.

5    I declare under penalty of perjury under the laws of the State of California and the United

6  States of America that the foregoing is true and correct.

7    Executed on November 18, 2009 at Los Angeles, California.

8

9                                                                _____

10                                                               Lynn Beckemeyer

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

344783.03 [XP]      25293

# DECLARATION

# DECLARATION OF RICHARD A. "RHETT" WINCHELL

I, Richard A. "Rhett" Winchell declare and state as follows:

1.      I am the President of Kennedy Wilson Auction Group, Inc., (KW) a division of Kennedy Wilson Inc.  I submit this declaration on behalf of KW in support of the motion of Meruelo Maddux – 845 S. Flower Street, LLC ("845 S. Flower") for an order authorizing [1] sale of condominium units free and clear of liens, claims and encumbrances [2] authorizing the retention of Kennedy Wilson Auction Group, Inc. as auctioneer and broker for the sale of condominium units and approval of the terms thereof including commissions to brokers; [3] use of cash collateral for payment of certain expenses with respect to the sale of condominium units; [4] use of sale proceeds and cash collateral for payment of operating and other expenses; [5] provision of seller financing to condominium purchasers; and [6] obtaining letter of credit and granting of priming lien on Meruelo Chinatown LLC's property to act as security for HOA Bond on the terms provided in the Motion (the "Motion").

2.      I have personal knowledge of the facts stated herein, and if called as a witness, I could and would competently testify thereto.

3.      I am President of KW and have 26 years experience in the execution, analysis and administration of all phases of KW's auction business.  I am responsible for the oversight of all KW auction transactions throughout the West Coast.  My professional certifications, licenses and memberships include:

- Licensed Real Estate Broker, State of California License No. 00867471
- Certified Estate Specialist (CES)
- Member of Council of Residential Specialists (CRS)
- Licensed Realtor
- Member of the Los Angeles, Beverly Hills, and Southland Regional Associations of Realtors (MLS)

4.      I have organized and lead the marketing and operation of individual auctions with as many as 500 properties in a single auction-marketing program.  I have overseen over 10,000

345403.03 [XP]      25293

1  auctions of all types of properties.  I am the Contract Manager for KW's business with the Los

2  Angeles County Treasurer and Tax Collector for the auction sale of tax defaulted real properties

3  and Public Administrator/Public Guardian's probate estates throughout Los Angeles County.  In

4  this capacity, I have been called to testify as a witness and provide opinions regarding property

5  values for numerous court related sales.  I actively track property value data for real properties

6  located in Los Angeles County and Southern California through the data in Multiple Listing

7  Service and public records including title searches.  I actively follow local and national real estate

8  trends, news and developments by reading real estate industry trade publications such as Housing

9  Wire, Servicing Management, Western Real Estate Business and the publications distributed by the

10  National Auctioneer's Association and the National Association of Realtors.  Over the past three

11  years during the current real estate auction cycle, I have lead KW's auction business and directed

12  the teams responsible for auctions of over 2000 residential properties with auction sales of $420

13  million.

14      5.    KW and I have recent experience with the sale of multi-unit residential projects in

15  Los Angeles.  KW is the owner of The Mercury, a high rise condominium project located at 3810

16  Wilshire Boulevard in Koreatown.  KW purchased this building in June 2009 and since that time

17  has been engaged in the sale of condominiums in that building under a conventional brokered sale

18  program at this building.  KW's sale efforts have met with great success.  Since June 2009, KW has

19  sold 130 units and has closed the sales on 102 of those units.

20      6.    In addition, KW was the listing broker and auctioneer for The Dalton, a luxury loft-

21  style condominium project located in Pasadena.  The auction was held on August 16, 2009.  KW

22  offered and sold 34 units on Auction Day and all sales were accepted by the seller.  Before KW

23  was hired as the listing broker, the seller achieved only five (5) sales in approximately twelve (12)

24  months of conventional marketing.  After the auction, the seller continued with a conventional

25  marketing program and has experienced positive results on the heels of the auction.  At this time,

26  the project is almost sold-out.

27      7.    KW is the listing broker and auctioneer for another downtown Los Angeles

28  condominium project, Market Lofts.  Market Lofts is a neighboring property to 705 West 9th Street.

-2-

28

1   KW was retained to conduct an auction for 55 remaining unsold units. Although this project is

2   near in proximity to the Project, it is not in competition with it due to the difference in pricing and

3   amenities between the two projects. The onsite sales traffic and interest from potential buyers for

4   the Market Lofts property has been tremendous. The auction marketing program generated over

5   3,000 leads and more than 1,500 groups have visited and toured the property. The auction was

6   conducted on November 14, 2009. Prior to the auction, KW projected that the auction would

7   generate gross sales proceeds of approximately $21,500,000. At the auction all 55 units were sold

8   for an average price per square foot of $354, generating $21,574,000 in gross sale proceeds. These

9   results and KW's presence and experience in this market, demonstrate that KW has substantial

10  knowledge and experience with respect to the pricing of condominium units in this market.

11          8.      Subject to Bankruptcy Court approval, KW will be retained as marketing consultant

12  and broker for 845 S. Flower to develop and implement an auction (the "Initial Sale Event") to

13  optimize the marketing and sale of approximately 48 residential condominium units in the thirty-

14  five story high rise building located at 705 W. 9th, in the South Park section of downtown Los

15  Angeles (the "Project") and for the sale of condominium units on an individual basis thereafter

16  until June 30, 2010 pursuant to the agreement between KW and the Debtor a copy of which is

17  attached hereto as Exhibit "7" (the "KW Agreement"). The KW Agreement is the result of

18  negotiations between 845 S. Flower and KW and was negotiated at arms-length, in good faith and I

19  believe the terms are fair and reasonable.

20          9.      The KW Agreement shall commence upon entry of an order by the bankruptcy court

21  approving the Kennedy Wilson Agreement and shall continue until June 30, 2010. The Initial Sale

22  Event will be scheduled for a date approximately 30 to 45 days after court approval, subject to

23  adjustment by the Debtor as desirable and necessary to maximize value from the Initial Sale Event

24  for the estate. The Debtor desires to engage KW as its exclusive agent as broker for approximately

25  forty-eight (48) condominium units to be offered for sale at the Initial Sale Event. Following the

26  Initial Sale Event, the Debtor desires to engage KW as exclusive agent as broker to market and

27  offer for sale up to an additional forty-eight (48) condominium units. The Debtor may adjust the

28  number of condominium units to be offered at the Initial Sale Event and thereafter, provided the

345403.03 [XP]      25293

1  purchase prices for the first 48 condominium units would not be less than $22.3 million and the

2  purchase price for the sale of any subsequent condominium unit will not be less than $340 per

3  square foot (net of costs of sale). If this minimum pricing is not achieved, the Debtor will not

4  proceed with the sales or sale. KW's sole compensation shall be a fee equal to three percent (3%)

5  of the sales price of the condominium unit.

6      10.     Based on my 26 years of experience in real estate sales and on my knowledge of

7  current sales, pending and closed transactions and current trends in real estate, I believe that the

8  multi-unit residential market is in a stabilization phase after having experienced significant decline

9  over the previous three years. Consumer confidence regarding home ownership is increasing due

10  to relative price stability over the past six months. As a result, there has been a reduction in the

11  inventory of available condominiums in the South Park submarket and there appears to be

12  increased demand in the market among qualified potential buyers who have waited for the bottom

13  of the market before stepping up to purchase a first or replacement home. As a result, and based on

14  the sales we have conducted and the auctions or other bulk sales conducted by other real estate

15  firms that I have followed and am aware of, I believe that the universe of prospective purchasers

16  for the Project's condominiums is growing and the sale program as proposed by the Debtor and KW

17  will lead to increased bidding and higher sale prices for the condominiums than the Debtor would

18  have realized six months or a year ago.

19      11.     The results of recent sales from two local projects support this conclusion. Two

20  local projects in Downtown Los Angeles presented by other real estate companies have had recent

21  sales events and marketing programs over the past six to nine months. They are Concerto Lofts, a

22  7 story condominium project located across the street from the Debtor's Project and Evo, a 311 unit

23  condominium projected also located in the Southpark area of Los Angeles. Sales results from these

24  buildings suggest that an auction and subsequent sales program for the Project will be a successful

25  disposition method. I am informed and believe that Concerto Lofts sold all 77 units in the building

26  at a one day sale event on August 29, 2009. The Concerto sales event generated an average of

27  $368 per sellable square foot, with a high value of $429 per square foot and a low of $323 per

28  square foot. The gross sale proceeds were $30.8 million. The Concerto Lofts project is inferior to

1  the Debtor's Project because Concerto Lofts is a low-rise project lacking the views and complete

2  amenities package that the Debtor's Project has.

3      12.    Evo has been selling condominiums on a conventional individual sale basis and, for

4  the period March through September 2009, Evo has closed 111 sales generating gross sale proceeds

5  of $58.2 million.  On a sellable square foot basis, Evo's sales during this period generated proceeds

6  on average of $464 per sellable square foot, with a high value of $534 per square foot and a low of

7  $377 per square foot.  Seventeen one-bedroom units on floors 7 through 20 were sold at $474 per

8  sellable square foot on an average floor such as floor 11 in the building.  Seven two bedroom units

9  within the same floors were sold at $534 per sellable square foot on an average floor such as floor

10  12 in the building.  By comparison to the Project, these sales would be more comparable to sales on

11  the lower floors which would likely bring lower prices than sales on the upper floors with better

12  views of the surrounding area.

13      13.    I have inspected the Project and it is superior to the Market Lofts, the Concerto

14  Lofts or Evo condominium projects.  The Project is excellent in terms of quality, design and unit

15  views.  The Project is located in a most desirable section of downtown Los Angeles within walking

16  distance of LA Live, the Staples Center and the Nokia Theater and, most importantly, it is across

17  the street from the newly opened Ralph's Supermarket.  In my opinion, the Project should generate

18  sales at higher prices per square foot than those achieved at either the Concert Lofts or Evo projects

19  and based on my experience selling real estate over the past 26 years, an auction and subsequent

20  sales program should generate average sales values of $415 per square foot to $500 per square foot.

21  The remaining units are likely to sell for an even higher price per square foot than those in the

22  Initial Sale Event, but even assuming these conservative prices, if the remaining units in the Project

23  were sold at these initial prices on average, the sales would generate gross proceeds of

24  $105,534,500 to $127,150,000.  This range does not even take into account the value in the 6,800

25  square feet of commercial condominium space which has been earmarked for a high quality

26  restaurant.

27

28

14.     Moreover, based on my 26 years of experience in real estate sales, I believe that the Debtor will realize greater value through the sale of individual condominium units than through the sale of the building as a whole.

15.     KW proposes an auction marketing approach that begins with a 30 to 45 day advertising and public relations campaign with print and other media advertising.  The advertising campaign may highlight the auction day starting bid prices.  The marketing campaign and any starting bid prices will generate the interest and volume of potential buyers necessary to create a competition for a limited number of condominium units for sale.  The amount budgeted for the marketing program is $250,000.

16.     Starting bids may be in an amount less than the projected sale prices.  However, the Debtor will reserve the right to reject the otherwise highest bid for a condominium unit at the Initial Sale Event if the pre-determined unpublished reserve price, to be fixed by the Debtor, is not realized from the bid such bidder.  In any event, the pre-determined unpublished reserve price will not be less than an amount necessary to achieve purchase prices of $22.3 million in the aggregate for the first 48 units to be sold.  The Debtor's reserve price is consistent with reasonable and achievable market values for the particular product type and market.

17.     KW will assist in providing a preferred lender to pre-qualify purchasers of units at the Initial Sale Event and subsequent conventional sales to facilitate the sale of units.  In addition, I am informed and believe that the Debtor will offer seller financing to those purchasers who are unable to finance the purchase of a condominium unit through other lenders.  I understand that under the terms of such seller financing, the purchaser will be required to make a down payment of at least twenty percent (20%) of the purchase price and will provided a promissory note for the balance of the purchase price.  The note will bear interest at the rate of six percent, and interest only will be due and payable monthly.  All principal and any outstanding and unpaid interest and other amounts owing will be due at the maturity date, which will be five years after the date title passes to the purchaser.  The note will be secured by a deed of trust on the purchaser's condominium unit.  The buyer will be required to qualify for such financing based primarily on FHA underwriting

345403.03 [XP]      25293

1   guidelines.  The Debtor will cap its seller financing program at $20 million in the aggregate of the

2   face amount of the notes.

3      18.    I believe that the availability of the seller financing will enhance the Debtor's ability

4   to maximize the prices to be achieved at the sale.  The seller financing opens up the market to an

5   additional group of potential purchasers, such as real estate investors, who would not be able to

6   obtain loans under Fannie Mae or FHA programs, because those programs require the property to

7   be owner occupied.  KW intends that its marketing program also target potential purchasers who

8   would purchase condominium units for investment purposes.

9      19.    I am highly confident that following a successful sales program for the Project as

10  outlined in the KW Agreement, the Debtor should be able to refinance the remaining balance of the

11  debt to Canpartners.  This is so because the Project will have achieved a favorable loan to value

12  ratio following the sales of units as projected under the KW sale program and because the sale

13  history at the Project during the course of the sale program will demonstrate that there is a market

14  and established pricing structure for the remaining condominiums.  In June 2009, KW itself

15  obtained financing for its purchase of The Mercury building, a condominium project in Koreatown

16  that KW purchased with the intention of selling condominium units to the public.

17     20.    To the best of my knowledge, formed after due inquiry, neither I, KW, nor any

18  employee thereof has any connection with the Debtor or currently is employed by any creditors,

19  other parties in interest, the Office of the United States Trustee or any person employed by the

20  Office of the United States Trustee with respect to the matters upon which KW is to be engaged,

21  and KW does not, by reason of any direct or indirect relationship to, connection with, or interest in

22  the Debtor, hold or represent any interest adverse to the Debtor, the estate, or any class of creditors

23  or equity interest holders.

24     21.    To the best of my knowledge, neither KW nor I nor any member or associate of KW

25  has a prepetition claim against the Debtor.

26

27

28

-7-

33

345403.03 [XP]     25293

1       I declare under penalty of perjury under the laws of the State of California and the United

2 States of America that the foregoing is true and correct.

3       Executed on this 18th day of November, 2009, at Los Angeles, California.

4

5                                _____

6                                  RICHARD A. WINCHELL

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-8-

EXHIBIT 1

## RICHARD MERUELO

Richard Meruelo is the Chief Executive Officer and Chairman of the Board of Directors of Meruelo Maddux Properties, Inc. ("MMPI"). Mr. Meruelo graduated from the University of Southern California in 1986 with a Bachelors of Science degree in Business Administration, with an emphasis in Finance and Real Estate.

Mr. Meruelo served as chairman of MMPI's predecessor business from 1987 until MMPI was formed in 2006. During that time, Mr. Meruelo led the strategic planning for the business while managing project acquisitions, purchase negotiations and related financings totaling nearly $1.2 billion. Also, Mr. Meruelo was responsible for maintaining the business' relationships with its major lenders, as well as state and local governmental bodies that had land-use jurisdiction over the business' projects. Mr. Meruelo has served as MMPI's CEO and Chairman since its formation in 2006.

Mr. Meruelo currently serves as a board member for various associations dedicated toward revitalizing downtown Los Angeles, including the Central City Association, the Central City East Association and the Los Angeles Central Industrial Redevelopment Project.

EXHIBIT   1

EXHIBIT 2

## 6 Floor Scenario

| | 48 units - One Day Sales Event | |
| --- | --- | --- |
| | Minimum | Expected |
| Area | 53,959 | 53,959 |
| | | |
| Gross Proceeds | 22,330,000 | 24,576,197 |
| Gross Proceeds psf | 414 | 455 |
| HOA Reserve Reimb. | 196,776 | 196,776 |
| RE Tax Reimb. | 49,341 | 49,341 |
| | | |
| 3.0% KW Costs | (669,900) | (737,286) |
| 1.5% Other Sales/Closing Costs | (334,950) | (368,643) |
| Professional Fees | (200,000) | (200,000) |
| HOA Reserve | (883,170) | (883,170) |
| 6 months HOA - unsold | (686,394) | (686,394) |
| Warranty Reserve | (2,140,000) | (2,140,000) |
| | | |
| Net Proceeds | 17,661,703 | 19,806,821 |
| Net Proceeds psf | 327 | 367 |

**EXHIBIT** 2

36

EXHIBIT 3

| | Seller Financing Not provided Expected | Seller Financing Provided Expected |
|---|---|---|
| Gross Proceeds (a) | 131,297,350 | 131,297,350 |
| Net Proceeds (a) | 122,136,586 | 122,136,586 |
| | | |
| Lender Interest | 5,644,895 | 6,451,030 |
| Lender Principal | 84,000,000 | 84,000,000 |
| | | |
| Notes to Debtor | 0 | 20,000,000 |
| Cash to Debtor (a) | 32,491,692 | 11,685,556 |
| | | |
| Excess over Principal & Interest | 32,491,692 | 31,685,556 |

Notes

(a) Excludes cash/value associated with commercial condo, warranty reserves and HOA reserves.

EXHIBIT

3

# EXHIBIT 4

**VIGEN ONANY & ASSOCIATES, INC.**

2535 Foothill Boulevard Suite #101
La Crescenta, CA 91214

\* Condominium Budgets Preparation, Consulting
\* Reserve Studies for Community Associations

PROFORMA  OPERATING  BUDGET

FOR

# TRACT 53965-01-Res, 705 West Ninth Street Owners Association

# *RESIDENTIAL   BUDGET*

# A TWO HUNDRED FOURTEEN   UNIT RESIDENTIAL CONDOMINIUM

CITY OF LOS ANGELES, COUNTY OF LOS ANGELES

STATE OF CALIFORNIA

This budget is prepared: **June 23, 2009**

\* Office (818) 957-3195    \* Fax (818) 957-6974

**EXHIBIT    4**

38

## VIGEN ONANY & ASSOCIATES, INC.

2535 Foothill Boulevard Suite #101          * Condominium Budgets Preparation, Consulting
La Crescenta, CA  91214                     * Reserve Studies for Community Associations

June 23, 2009

## PROJECT   DESCRIPTION

705 West Ninth Street Owners Association
Tract #      53965-01-Res
Los Angeles, CA

The project consists of   One building.
There are    214 residential units &      1   commercial unit in this project.

Please note that the  insurance budgeted  is for the building, HOA and officers'
common area liability and officers' fidelity, but NOT the contents of each  unit.
Each  owner may  purchase a policy for the content of his/her unit.

Data used in preparing this budget is based on the information provided to me by
the developer.

For calculations detail and assumptions, please refer to the footnotes provided in  this
report.

Dollar amounts meet or exceed those of the current  Operating Cost Manual for
Homeowners Association published by the California Department of Real Estate.

This budget was prepared as of      June 23, 2009

Vigen Onany MSA

STATE OF CALIFORNIA

## BUDGET WORKSHEET

DEPARTMENT OF REAL ESTATE
BUDGET REVIEW

RE 623 (REV. 2/00) ID # 62300996B020

### GENERAL INFORMATION

This budget is a good faith estimate from plans prior to construction and/or completion (for new projects) or from a combination of plans and/or site inspections (for existing projects). For existing projects, there may have been historical data as support for some line items, but changes to the project may make historical data not applicable or reliable. This budget was prepared for the purpose of obtaining a public report. This association must adopt a budget in accordance with Califor-

nia Civil Code. If that budget is less than 10% or greater than 20% from this budget, you should contact the Department of Real Estate. The association may increase or decrease its budget. It is typical for costs to increase as the project ages. The association should conduct a reserve study after its first year of operation to adjust the reserve funding plan for any changes which may have taken place during construction.

| DRE FILE NUMBER (IF KNOWN) | MASTER DRE FILE # | DEPUTY ASSIGNED FILE (IF KNOWN) |
|---|---|---|
| | | |

### DIVISION IDENTIFICATION AND LOCATION

| NAME | | TRACT NUMBER |
|---|---|---|
| 705 West Ninth Street Owners Association | | 53965-01-Res |

| NAME TO BE USED IN ADVERTISING (IF DIFFERENT THAN NAME OR TRACT NUMBER) |
|---|
| |

| STREET ADDRESS (IF ANY) | CITY | COUNTY |
|---|---|---|
| 705 West Ninth Street | Los Angeles | Los Angeles |
| MAIN ACCESS ROAD(S) EAST / WEST: | NEAREST TOWN/CITY | MILES/DIRECTION FROM TOWN/CITY |
| NORTH /SOUTH: | Within City Limits | N/A |

### TYPE OF SUBDIVISION

| | |
|---|---|
| ☒ Condominium: Residential & Commercial | ☐ Planned Development Land Project |
| ☐ Condominium Conversion | ☐ Planned Development Mobile Home |
| ☐ Stock Cooperative | ☐ Community Apartment |
| ☐ Stock Cooperative Conversion | ☐ Out-of-State |
| ☐ Limited Equity Housing Corporation | ☐ Undivided Interest |
| ☐ Planned Development | ☐ Undivided Interest Land Project |

| NUMBER OF LOTS/UNITS | PHASE # | TOTAL # IN PROJECT | PERVIOUS DRE FILE # | # OF ACRES |
|---|---|---|---|---|
| 214 | 1 | 1 | | 0.633 |

### BUDGET PREPARER

| NAME | ATTENTION | TELEPHONE NUMBER |
|---|---|---|
| VIGEN ONANY & ASSOCIATES, INC. | Vigen Onany | Phone: (818) 957-8195 Fax: (818) 957-6974 |
| ADDRESS | CITY | ZIP CODE |
| 2535 Foothill Boulevard Suite #101 | La Crescenta, CA | 91214 |

#### Certification

*I declare under penalty of perjury that the representations and answers to questions in this document and all documents submitted as a part of the homeowners budget are true and complete to the best of my knowledge and belief.*

*"The undersigned certifies that this electronic recreation of Department of Real Estate form RE623 contains at least the same information as the DRE approved ID 62300996B020 ."*

| SIGNATURE OF BUDGET PREPARER | DATE |
|---|---|
| | June 23, 2009 |

40