ANDREW S. CLARE (SBN 050289)
aclare@loeb.com
LANCE N. JURICH (SBN 132695)
ljurich@loeb.com
DERRICK TALERICO (SBN 223763)
dtalerico@loeb.com
LOEB & LOEB LLP
10100 Santa Monica Boulevard, Suite 2200
Los Angeles, California 90067-4120
Telephone:   310-282-2000
Facsimile:   310-282-2200

LISA HILL FENNING (SBN 089238)
lisa.fenning@aporter.com
ARNOLD & PORTER LLP
777 S. Figueroa Street, 44th Floor
Los Angeles, CA  90017-5844
Telephone:   213-243-4000
Facsimile:   213-243-4199

Attorneys for Secured Creditor
CANPARTNERS REALTY HOLDING
COMPANY IV LLC

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re<br><br>MERUELO MADDUX - 845 S. FLOWER STREET, LLC,<br><br>            Debtor and Debtor-in-Possession. | Case No. 1:09-bk-21621-KT<br><br>Chapter 11<br><br>Assigned to Hon. Kathleen Thompson<br><br>**SUPPLEMENTAL DECLARATIONS OF JONATHAN ROTH AND MAI CERTIFIED APPRAISER SCOTT D. DELAHOOKE IN SUPPORT OF CANPARTNERS' REPLY BRIEF IN SUPPORT OF MOTION FOR RELIEF FROM STAY**<br><br>Date:  January 8, 2010<br>Time:  9:30 a.m.<br>Place:  Courtroom 301<br>         21041 Burbank Blvd.<br>         Woodland Hills, CA 91367 |

Loeb & Loeb
Limited Liability Partnership
Including Professional
Corporations

LA1920596.3
012794-10022

DECLARATIONS OF JONATHAN ROTH; & SCOTT D. DELAHOOKE

# DECLARATION OF JONATHAN ROTH

I, JONATHAN ROTH, declare as follows:

1.  I am a principal and member of the executive management team of Canpartners Realty Holding Company IV LLC, a Delaware limited liability company ("Canyon"), and have held that position since Canyon's creation in 2002. I have served in a similar capacity with various affiliates of Canyon since approximately 1997. I am, and at all times pertinent hereto have been, one of the primary people at Canyon responsible for all aspects of Canyon's real estate lending activities.

2.  I was personally involved in the negotiations and documentation leading to the making of Canyon's loan (the "Loan") to Meruelo Maddux – 845 S. Flower Street, LLC ("Debtor") that is the basis of Canyon's secured claim against Debtor. My ongoing involvement in the Loan includes communication on behalf of Canyon with Debtor concerning the Loan, monitoring performance of the Loan, as well as overseeing employees who perform the foregoing tasks.

3.  Each of the documents attached hereto are Canyon's business records and are true and correct copies from Canyon's files. These documents are made in the ordinary course of Canyon's business. These documents were prepared by persons with a business duty to Canyon to prepare such documents. I make this Declaration in support of Canyon's Reply to Debtor's Opposition to Canyon's Motion for Relief from the Automatic Stay. Accordingly, the following is of my own personal knowledge and, if called to testify in this matter, I could and would competently testify thereto.

## Default Interest is Calculated Correctly

4.  Under the Loan Documents, default interest is automatically triggered upon the occurrence of an Event of Default. There is no notice required, nor is it required that the loan be accelerated for Default Interest to begin accruing. Section 10.1(i)(iv) provides that if a guarantor "institutes or consents to any bankruptcy..." an Event of Default occurs. Meruelo Maddux Properties, Inc. ("MMPI") is a guarantor of the subject loan, and filed for bankruptcy protection on March 27, 2009. As a result, Canyon did in fact begin accruing

Loeb & Loeb
Limited Liability Partnership
Including Professional
Corporations

LA1920596.3
012794-10022

2

DECLARATIONS OF JONATHAN ROTH & SCOTT D. DELAHOOKE

default interest on March 27, 2009. A true and correct copy of the MMPI guaranty is attached hereto as Exhibit "A."

### Canyon's Prompt Notification of The Occurrence of an Event of Default

5.    It is undisputed that immediately upon the Guarantor filing bankruptcy, Canyon sent Debtor a default notice setting forth the existence of an Event of Default. Attached hereto as Exhibit "B" is a true and correct copy of a letter that was sent at my specific direction to Debtor, which notified Debtor of the Event of Default.

### Canyon Sent Second Letter to Debtor Affirming that Default Interest was Accruing From the Date of the Event of Default

6.    Under the terms of the Loan Agreement, Canyon was _not_ required to accelerate the loan in order for the Default Interest to be the applicable interest rate per the parties' agreement. On or about July 13, 2009, at my specific direction, Canyon sent a letter to Debtor reminding Debtor that interest was accruing at the Default Rate even though Canyon was only deducting contract interest from the Interest Reserve. Attached hereto as Exhibit "C" is a true and correct copy of Canyon's July 13, 2009 letter to Debtor.

### Canyon's Legal and Appraisal Fees to date.

7.    With respect to Loeb & Loeb LLP ("Loeb"), these charges reflect a 10% discount arrangement we have with Loeb. Through December 31, 2009, Loeb's fees and costs total $556,182.35. In addition, the fees for Arnold and Porter ("A&P") total $100,066.95 through December 31, 2009. Canyon also incurred $39,845.15 in fees from Sidley & Austin and approximately $40,000 in fees for Mr. Delahook for his appraisal. Smylie and Associates legal fees and costs totaled to $13,477.75. These fees and costs total 749,572.20.

### Calculation of Debt

8.    <u>Canyon's Debt Amount as of January 8, 2010</u>. As of January 8, 2010, Canyon's total current debt is not less than $91,484,927.33. The debt consists of $84,000,000 in principal, $2,413,498.83 in pre-petition interest ($84,000 contract interest

Loeb & Loeb
Limited Liability Partnership
Including Professional
Corporations

LA1920596.3
012794-10022

3

DECLARATIONS OF JONATHAN ROTH & SCOTT D. DELAHOOKE

plus $2,329,498.83 default interest), $749,572.20 in pre-petition and post-petition professionals' fees (as more particularly itemized in the preceding paragraph), $3,788,128.47 in post-petition interest ($1,921,094.38 contract interest plus $1,867,034.09 default interest through January 8, 2010), and $533,727.83 for late fees.

9. On December 1, 2009, Canyon received a request from Debtor to apply $889,375.72 from the Interest Reserve Account held at City National Bank. On December 3, 2009, Canyon received this amount, and the above debt calculation as of January 1, 2010, reflects this payment. On December 31, 2009, Canyon received a second request from Debtor to apply $923,598.08 from the Interest Reserve at City National Bank. On said date, Canyon received this amount, and the above calculation as of January 8, 2010 reflects this second payment.

10. Currently, there is approximately $2,483,132.41 left in the Interest Reserve Account. If Debtor continues to instruct Canyon to draw on this account to pay interest at the non-default rate in January, February, and March, the funds in the Interest Reserve account will be fully depleted by April 1, 2010.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 4th day of January, 2010, at Los Angeles, California.

_____
JONATHAN ROTH

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA1920596.3
012794-10022

4

DECLARATIONS OF JONATHAN ROTH & SCOTT D. DELAHOOKE

# DECLARATION OF SCOTT D. DELAHOOKE

I, SCOTT D. DELAHOOKE, declare as follows:

1. I am a Certified General Appraiser certified by the State of California. My certificate number is #AG002796. I have an MAI designation from the Appraisal Institute and have been a real estate appraiser for over 25 years. I have extensive experience in site valuations, property valuations, market data research and feasibility studies. I am a principal and owner of the Delahooke Appraisal Company, 225 South First Avenue, Suite 201, Arcadia, California, which is a full service commercial real estate appraisal company. I have been qualified as an expert and have testified as a real estate appraisal expert in more than 35 cases in state and federal courts across California including the United States Bankruptcy Court for the Central District of California.

2. I make this Declaration at the request of counsel for Canpartners Realty Holding Company IV LLC ("Canyon") in Canyon's Reply to debtor Meruelo Maddux – 845 S. Flower Street, LLC's ("Debtor") Opposition to Canyon's Motion for Relief from Stay (the "Opposition"). I have reviewed the Opposition and the Declarations of Messrs. Meruelo and Beckemeyer made in support of Debtor's Opposition. The following is of my own personal knowledge, and if called as a witness, I would competently testify thereto.

3. On or about October 15, 2009, I completed an Appraisal Report (the "Appraisal") of the property located at 717 W. 9th Street, Los Angeles, California 90017 (a.k.a 705 W. 9th Street and f.k.a 845 S. Flower Street) (the "Project"). The Appraisal was prepared using the methodology and assumptions as set forth therein. A true and correct copy of the Appraisal is attached to my Declaration submitted in support of Canyon's Motion for Relief from Stay as Exhibit "1."

4. Debtor's statement that gross sales proceeds could perhaps generate $129 million in the future is not a current "fair market value" according to any acceptable appraisal methodology. Future streams of income can be part of the basis for a current valuation analysis, but are not in and of themselves a current value. This is because a gross sales proceeds figure does not factor in the costs of sales, profit, time value of

Loeb & Loeb
Limited Liability Partnership
Including Professional
Corporations

LA1920596.3
012794-10022

5

DECLARATIONS OF JONATHAN ROTH & SCOTT D. DELAHOOKE

money, discount rate, present value, or risk, all of which are essential attributes of fair market value analysis. A current market value for the Project cannot be established without accounting for these offsets. Potential buyers of the subject property would start with projected gross sales and then deduct for all costs associated with procuring those sales, and discount back into a present worth all net future cash flows to allow for profit which is the most basic requirement of any real estate investment.

5.  The quarterly Fixed Expense line item of the sales comparison analysis on page 66 of the Appraisal was inadvertently entered into the analysis at the annual rate, resulting in an overstated expense deduction. Correction of this mis-entry with other appropriate adjustments results in a $3,220,000 net adjustment to valuation. Debtor claims this adjustment results in a $4 million dollar increase in value which is inaccurate because along with this corrected input to the cash flow model an additional adjustment needs to be inserted for the cost to the project developer of paying the monthly homeowner's dues for the unsold units during the holding period. Thus, the indicated value of the cash flow model would be a net upward adjustment of approximately $3,220,000.

6.  Debtor suggests the 15% profit margin built into the discounted cash flow analysis on p. 66 of the Appraisal is more appropriate for a project that is being built from the ground up, and that a buyer of the Project would only seek a 10% profit. I disagree. I believe a 15% profit margin is an accurate assumption, and reflects the type of return a buyer of the subject property would require given the current state of instability in the downtown Los Angeles real estate market and the corresponding risk associated with that market instability.

7.  Debtor challenges the 12% discount rate I applied on pages 65 and 66 of the Appraisal. A 12% discount rate is appropriate. As explained on page 65 of the Appraisal, a 12% discount rate, combined with 15% percent developer's profit combines for an internal rate of return of approximately 27%, which is within the range of yield rates published by the Korpacz Real Estate Investor Survey. In my opinion, an internal rate of

Loeb & Loeb
Limited Liability Partnership
Including Professional
Corporations

LA1920596.3
012794-10022

6

DECLARATIONS OF JONATHAN ROTH & SCOTT D. DELAHOOKE

return above the average is appropriate considering the current risks in the downtown Los Angeles real estate market.

8.  Debtor criticizes the Appraisal as flawed for failing to include a value for the commercial space. To be clear, the Appraisal does assign value to the commercial space to a buyer who would operate the Project as rental apartments, but the Appraisal specifically withholds assigning any value to the commercial space in a sales comparison valuation of condominium sales. The reason for this is because an investor looking to rent apartments can value the commercial space as an income stream, but the investor looking to sell condominiums will also want to sell the commercial space, and such buyer would be hesitant to assign any value to this space at all because of the lack of current market for this type of space, the marketing time required to find a buyer and the construction cost required to finish the space in a manner which would make it marketable to a potential buyer. Indeed, I could not find any sales of similar-sized comparable commercial spaces sold to a retail user in the subject market area during 2009. Currently, there are both a dearth of commercial tenants in the subject market area, and even fewer potential buyers of commercial condominium space. It is my opinion that a buyer of the entire project who would plan to sell the individual residential condominium units would view the commercial space as having nominal contributory value.

9.  Nevertheless, should the value assigned to the commercial space in the income approach to valuation (leasing units as apartments) be applied to the comparable sales approach, it would add only $1.73 million to the appraised value, not $4.45 million as Debtor contends. Debtor comes to its $4.45 million value by incorrectly applying a 7.0% capitalization rate to the $311,520 per year estimate of modified gross income in the Appraisal. But $311,520 is a modified gross income stream, not net income. Adjustments must be made for vacancy (7%, at $21,805 per year), and expenses ($.70 per square foot per month or $73,920 per year), resulting in a net operating income of $215,795 per year.

Loeb & Loeb
Limited Liability Partnership
Including Professional
Corporations

LA1920596.3
012794-10022

7

DECLARATIONS OF JONATHAN ROTH & SCOTT D. DELAHOOKE

10. An 8% capitalization rate is more appropriate than a 7% capitalization rate in valuing the commercial condominium space in my opinion because of the increased risk for this type tenancy when looked at separate and apart from the larger project.

11. Applying an 8% capitalization rate yields a value of $2.7 million, from which tenant improvements and rent loss during an absorption/tenant improvement build-out period must still be deducted. Depending on the tenant, improvements could significantly exceed $1.0 million. However I have assumed an average tenant improvement expense of $680,000 (which represents $100/sq.ft. for the ground floor space). As for a lag time before a tenant is in place and rent payments begin, I expect it would take at least a year to find a tenant, complete tenant improvements, move the tenant in and begin receiving rent because of the current downtown real estate market and long-term marketing time for vacant commercial space. The cost of this one year lag is calculated as the cost of one years' net operating income ($215,795 plus the expenses not being paid by the tenant during lease-up of $73,920 or say $290,000 total). Each additional year the space remains vacant, this same adjustment would be required. The resulting income-oriented theoretical "value" for the commercial space is $1.73 million, not the $4.45 million asserted by Mr. Myers.

12. Debtor claims the comparable sales used in the Appraisal are stale and are of "limited or no comparability." I strongly disagree with Debtor's claims. The comparables used in the Appraisal were, in fact, appropriate. I drew from the most recent sales available as of the date of the Appraisal (August 5, 2009). Concerto Loft sales had not yet occurred as of the date of value, and complete data on those sales is not yet publicly available. However, considering the reported average price paid for the Concerto Lofts by Mr. Winchell ($368/sf), as well as the average price paid for the Market Lofts ($354/sf) which took place in November of 2009, both projects support the estimated values in my appraisal for the lowest floor units in the subject property (8th Floor, with an average of $389/sf for the one bedroom units and $357/sf for the two bedroom units). The values for the subject Project were adjusted upward for each level above the 8th Floor. The sales of

Loeb & Loeb
Limited Liability Partnership
Including Professional
Corporations

LA1920596.3
012794-10022

8

DECLARATIONS OF JONATHAN ROTH & SCOTT D. DELAHOOKE

units in the EVO project are also appropriate to consider for the valuation of the subject property, however they have to be viewed based on the respective sizes for each unit type (one bedroom and two bedroom), and also based on the sales from other competitive projects in the South Park market area of downtown Los Angeles. For example, many of the EVO two bedroom units are over 20% smaller than the 1,400sf average two bedroom size in the subject project. As a unit size decreases, the price/sq.ft. tends to increase. Thus, simply applying a price/sq.ft. for the subject units based on the comparables sales that are significantly smaller in size would lead to overstated value estimates for the larger units being valued. In my opinion, it is more appropriate to look at the total price being paid for a two bedroom unit, and make an appropriate upward adjustment to the subject units for their larger size. I believe this is much more in keeping with how buyers of individual residential condominium units make purchasing decisions.

13.  Debtor claims the Appraisal is somehow invalid because it does not assign value to the storage space. This statement demonstrates that Debtor's advisors lack command of fundamental market principals. The Appraisal did not assign value to the 26,000 square feet of storage space for good reason. At least one-third of this space houses equipment for operation of the building (fire/water/life safety), while another 2,000sf is set-aside for the restaurant tenant. The remaining space is open and unfinished. In order to have additional contributory value to the project, it would need to be partitioned into smaller secured space for individual tenant/occupant use. It is my opinion that the cost of this build-out would more than off-set the potential value increase from rental revenue to individual tenants who could rent this storage space. This space is not readily marketable to outside tenants, since all access points are from within secured sections of the Project (one elevator and one stairway).

14.  Debtor summarily concludes that unless valuation of the Project as a rental investment is calculated on a sales comparison approach, such valuation is flawed. I disagree. Buyers of this type of property would rely primarily on the income approach when making potential purchase decisions, as the cash flow and return on investment is the

Loeb & Loeb
Limited Liability Partnership
Including Professional
Corporations

LA1920596.3
012794-10022

9

DECLARATIONS OF JONATHAN ROTH & SCOTT D. DELAHOOKE

primary valuation tool. While a separate sales comparison approach was not used for the apartment valuation section, there were sale comparables presented (page 50 of the appraisal report) with a corresponding price/unit shown in the sixth column to give parameters for this type of analysis. While as of the date of value sales of larger apartment buildings in Los Angeles and Orange counties were very limited, several additional sales have taken place in September, October and November of 2009 which support both the capitalization rate utilized in the Appraisal and the indicated price per apartment unit estimated in the income approach.

15.     Debtor again summarily concludes that analysis of rent comparables on a per square foot basis is the most relevant method of valuing the Project on a rental basis. I disagree. In my experience, rent comparables are best viewed based on a total rent/unit basis. Tenants looking for apartment units to rent do not analyze them on a rental rate/sq.ft. basis, but rather on the cost of the entire unit per month. Utilizing a rent/sq.ft. is an acceptable analytical technique to attempt to understand the rental patterns for certain unit types, but it is the appraiser's responsibility to analyze rental revenues or unit purchase prices based on methods most commonly used by buyers and sellers in the marketplace (for instance, when a developer is marketing apartment units for rent, they do not advertise the units as being "$2.50/sf for a one bedroom unit," but rather as being "$2,350 for a one bedroom unit").

16.     Debtor states that the Appraisal does not consider physical variances in analyzing comparables. This suggestion is false. The Appraisal <u>does</u> consider differences in size, amenities, views and finish between the Project and comparables. The estimated value for the individual condominium units does assign value based on a typical unit. There are three one-bedroom units on the lower floors which are somewhat larger than the typical 900sf, and one could argue that some upward adjustment is warranted for these three units. However, there are roughly 38 two bedroom units which face west (Floors #8-#27) with bedrooms facing directly into an existing office building (thus, there is no view, and there is loss of privacy). A downward adjustment would be appropriate for these

Loeb & Loeb
Limited Liability Partnership
Including Professional
Corporations

LA1920596.3
012794-10022

10

DECLARATIONS OF JONATHAN ROTH & SCOTT D. DELAHOOKE

units, however one was not assigned. On balance, it is my opinion that the average price/unit applied to the Project on a per floor basis is both appropriate and reasonable.

17. Debtor criticizes the selection of the "Santa Monica building" as a comparable to estimate expenses for the Project. The Santa Monica building was one of three sources used to support the expense estimate in the income approach section of the report, and involves a building which is generally similar in size to the subject.

18. Debtor finds fault in that the Appraisal does not account for profit to be earned by the owner in selling utilities to the residents under a Ration Utilities Billing System ("RUBS") program. The Appraisal does not assign value for a RUBS program because it does not appear that such a program could be employed in the Project. Buildings with a RUBS allow the owner to pay for the buildings' utilities in bulk, and then submeter/sell them to the occupants at a profit. However, each unit in the Project is individually metered for electricity, which typically indicates that occupants pay their utility expenses directly to the utility provider.

19. Debtor suggests the revenue and expense growth rates utilized in the Appraisal are engineered to result in a low valuation. Nothing could be further from the truth. In the income approach, and specifically the cash flow model, the revenue growth assumptions I applied are appropriate, and if anything, are overstated. It is commensurate with the market to expect revenue to be flat through the first 3 years of building operations, and in fact, it is possible that in the short-run, rents may continue to fall (for example, several building managers indicated rents have fallen over the past twenty-four months, and were not sure if they have stabilized). Nevertheless, I held revenue level through the first three years and then applied a 2% annual increase. Expense growth at 3% (except for taxes at 2%), is also reflective of the market. Utility costs alone have increased more than 3% per year over the past several years. The Korpacz Investor Survey (2nd Quarter, 2009) which was used as a source of information in my appraisal report indicated that investors of large apartment projects are projecting expenses to increase on average 2.75% per year in their cash flow models. The adjustment applied to the commercial space lease rate was

Loeb & Loeb
Limited Liability Partnership
Including Professional
Corporations

LA1920596.3
012794-10022

11

DECLARATIONS OF JONATHAN ROTH & SCOTT D. DELAHOOKE

completely appropriate as it allowed the income/expense analysis to be on an "apples to apples" basis (the lease basis of the residential and commercial space was consistent, allowing proper application of expenses to the entire project as designed).

20. Debtor charges that the capitalization rate employed by the Appraisal is inconsistent with the very comparables referenced as part of the process by which I determined the appropriate capitalization rate. The capitalization rate used in the Appraisal is not inconsistent with the comparables presented. To begin with, the comparables on page 50 of the Appraisal are older, and therefore were given less weight than the survey and published rates put forth on page 51. The 7.00% capitalization rate is actually on the low end of the range of where the more recent survey and published rates fall. This rate is well supported by additional sales that have taken place subsequent to the date of value.

21. My estimated gross retail price for all 214 residential units is $106,320,000. If I were to assume future cash flows from condominium sales were to be $129 million and applied those cash flows to the discounted cash flow model on page 66 of the Appraisal, the resulting value would be $85,990,000, which includes $1.73 million on account of the commercial space. I strongly disagree that $129 million could be achievable, and make the assumption here solely for the purpose of illustrating the net affect such future gross cash flows would have on a present valuation.

22. I am hereby revising the sales comparison valuation in the Appraisal to $70,870,000. This revised valuation reflects a $3.22 million upward adjustment on account of the fixed expense calculation revisions, and $1.73 million on account of the commercial space (assuming the ultimate purchaser will assign value to this space, although I am not certain a potential buyer of the subject Project who plans to sell individual condominium units would assign any value to this space). Based on my observation of market activity, the limited financing sources, the diminished number of potential buyers and the uncertainty in the condominium sale market, I still have the same concerns that caused me to give more weight to the apartment use value. In light of these

Loeb & Loeb
Limited Liability Partnership
Including Professional
Corporations

LA1920596.3
012794-10022

12

DECLARATIONS OF JONATHAN ROTH & SCOTT D. DELAHOOKE

same concerns, I hereby revise the final value estimate for the subject property to $65,000,000.

23.  The downtown housing market remains soft, and may continue to fall. I have analyzed the auction sale prices for the Market Lofts condominium project which is adjacent-east to the subject property. The best way to analyze market trends is through a "paired sale" study, which matches identical properties which sold at varying time patterns. If the prices are increasing, it will clearly show by comparing the time periods. Based on comparing eight sets of sale pairings, it becomes clear that the prices have actually been declining over the past several months (one of the eight pairings shows a slight upward trend, while the other seven show a clear downward trend). The paired sale support is attached hereto as Exhibit "D." This type of information would be considered by prospective buyers of the subject property, as it indicates both market instability and the potential for future condominium unit price declines.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 4th day of January, 2010 at Los Angeles, California.

_____
SCOTT D. DELAHOOKE, MAI

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA1920596.3
012794-10022

13

DECLARATIONS OF JONATHAN ROTH & SCOTT D. DELAHOOKE