1  ANDREW S. CLARE (SBN 050289)
   aclare@loeb.com
2  LANCE N. JURICH (SBN 132695)
   ljurich@loeb.com
3  DERRICK TALERICO (SBN 223763)
   dtalerico@loeb.com
4  LOEB & LOEB LLP
   10100 Santa Monica Boulevard, Suite 2200
5  Los Angeles, California 90067-4120
   Telephone:   310-282-2000
6  Facsimile:   310-282-2200

7  LISA HILL FENNING (SBN 089238)
   lisa.fenning@aporter.com
8  ARNOLD & PORTER LLP
   777 S. Figueroa Street, 44th Floor
9  Los Angeles, CA  90017-5844
   Telephone:   213-243-4000
10 Facsimile:   213-243-4199

11 Attorneys for Secured Creditor
   CANPARTNERS REALTY HOLDING
12 COMPANY IV LLC

13

UNITED STATES BANKRUPTCY COURT

14

CENTRAL DISTRICT OF CALIFORNIA

15

SAN FERNANDO VALLEY DIVISION

16

| | |
|---|---|
| In re | Case No. 1:09-bk-21621-KT |
| MERUELO MADDUX - 845 S. FLOWER STREET, LLC, | Chapter 11 |
| | Assigned to Hon. Kathleen Thompson |
| Debtor and Debtor-in-Possession. | **SUPPLEMENTAL BRIEF OF CANPARTNERS' IN SUPPORT OF ITS MOTION FOR RELIEF FROM STAY, AND CONFIRMABILITY OF DEBTOR'S PROPOSED PLAN** |
| | Date: February 5, 2010<br>Time: 9:30 a.m.<br>Place: Courtroom 301<br>21041 Burbank Blvd.<br>Woodland Hills, CA 91367 |

LA1923951.7
012794-10022    SUPPLEMENTAL BRIEF RE CONFIRMABILITY OF PLAN

## I. INTRODUCTION

Canpartners Realty Holding Company IV LLC ("Canyon") is entitled to relief from the automatic stay under section 362(d)(1) of the Bankruptcy Code for cause because the proposed plan cannot be confirmed as a matter of law under all of the circumstances of this case. In addition, if – upon analysis of the separate brief filed herewith addressing the issues and deficiencies of Debtor's appraisal – this Court concludes that Debtor has no realizable equity in this Project, then it should also grant relief from stay under section 362(d)(2).[1] Debtor's proposed plan calls for an auction and sale process so risky and speculative that it cannot be confirmed[2] and this Court must grant relief from stay.

This conclusion holds true *even if* the Court were to accept Debtor's $101 million appraisal of the Project[3] without adjustment.[4] Relief must be granted under section 362(d)(1) for "cause" because Meruelo Maddux – 845 S. Flower Street, LLC ("Debtor") cannot confirm its proposed plan as a matter of law because (i) Debtor will not be able to obtain the impaired consenting class necessary to support a cramdown over Canyon's objection to the proposed plan, and (ii) even if an impaired class consented, Debtor's proposed plan is neither fair nor equitable as to Canyon under section 1129(b)(2)(A). Additionally, if the Court were to find that Debtor's $101 million appraisal requires adjustments to account for errors and for overly aggressive assumptions, Canyon would be

---

[1] Canyon agrees that because Debtor commenced making interest payments at the non-default rate (out of Canyon's interest reserve) and filed a plan of reorganization <u>after</u> Canyon filed its RFS Motion, no separate grounds for relief from stay presently exist under section 362(d)(3). However, the interest reserve will be fully depleted by April and the proposed plan as filed is unconfirmable.

[2] Canyon notes that proposed plan is unconfirmable due to the denial of the 363 Sale Motion upon which it depended for feasibility for cash flow. Debtor has not yet filed an amended plan providing for any other source of funding. This is yet another reason to conclude that relief from stay should be granted.

[3] Capitalized terms not defined herein shall have the meanings ascribed to them in the RFS Motion.

[4] In arguing that Canyon is entitled to relief from the automatic stay assuming a $101 million valuation, Canyon is not in any manner suggesting that the $65 million appraisal by Mr. Delahooke is not the best and most accurate valuation of the Project.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA1923951.7
012794-10022

1

SUPPLEMENTAL BRIEF RE CONFIRMABILITY OF PLAN

undersecured and would dominate any unsecured class, thereby blocking confirmation by its unsecured vote and cramdown objections.

## II. RELIEF FROM STAY MUST BE GRANTED EVEN IF DEBTOR'S APPRAISAL IS ACCEPTED WITHOUT ADJUSTMENT.

As mere estimations and not actual sales, judicial determinations of value are inherently uncertain. David Gray Colson, *Undersecured Claims Under Bankruptcy Code Section 506(a) and 1111(b): Second Looks at Judicial Valuation of Collateral*, 6 Bankr.Dev.J. 253, 263 (1989) ("Valuations are merely predictions of the price a future auction will bring. Unless the collateral is highly fungible and stable in price, valuations are inherently uncertain."). Here, the valuations are even more uncertain than usual, due to extraordinary market conditions. The fact that Debtor's appraisal is 55% higher than Canyon's – a remarkable divergence of two opinions of value by MAI certified appraisers – underscores the inherent uncertainty of any judicial valuation and should cause this Court to be highly skeptical of the <u>significant shifting of risk</u> from Debtor to Canyon that the proposed auction process represents.

Debtor's appraiser acknowledges he could not identify valid comparable sales of buildings like this one, and therefore it is necessary to value the individual units of the building in order to establish a current market value of the entire building on a comparable basis. Each unit has a market value as both a condominium for purchase, and as an apartment for rent. Both appraisers valued the Project based on the income that could be generated on condominium sales prices established by comparison to other individual condominium sales in the market. Mr. Delahooke also valued the income that could be generated by operating the Project as apartments. Debtor's appraisal fails to even consider the Project's value on an apartment basis without explanation, thereby instantly discrediting the certainty and objectivity of Debtor's appraisal. (Declaration of Scott Delahooke ¶ 12.)

Nevertheless, despite Debtor's Appraisal's shortcomings in methodology, even if this Court were to accept every single aggressive assumption made by Debtor's appraiser,

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

LA1923951.7
012794-10022

2
SUPPLEMENTAL BRIEF RE CONFIRMABILITY OF PLAN

and concluded that as of today, Debtor does indeed have a sliver of equity in the Project, after 5.5% costs of sale are accounted for, Canyon is still entitled to relief from the automatic stay because Debtor cannot confirm any plan.

To confirm a plan over Canyon's objection, Debtor's proposed plan must do two things: (1) have an impaired consenting class of creditors that votes to approve the plan; and (2) be "fair and equitable" to Canyon. Debtor's proposed plan does neither.

### A. No Impaired Consenting Class of Creditors Should Exist.

Throughout this case, Canyon has consistently authorized the payment of all construction-related expenses from the construction reserves, as requested by Debtor in its draw requests. Debtor acknowledges that the funds in the construction account (and line items in the budget) are sufficient to pay all third-party creditors who either filed proofs of claim or are listed on the schedules for this case. Without any remaining creditors other than Canyon, Debtor would not have an impaired consenting class of creditors, and would not comply with section 1129(a)(10). Absent an impaired consenting class, this Court cannot confirm the proposed plan over Canyon's objection.

Other than Canyon, this construction project had two potential categories of prepetition creditors: (1) those asserting mechanics' lien rights ("Group A"), and (2) those providing services that do not qualify for statutory liens – such as marketing firms – but who provided services of the type for which Debtor is entitled to draw and pay from the construction reserves funded by Canyon ("Group B"). Debtor acknowledges that Group A will be paid in full through draw requests before plan confirmation. Similarly, no good reason exists why Group B would not be paid in full under the plan: the construction reserves are sufficient to pay those claims in full and in cash on the Effective Date. Debtor, however, proposes to gerrymander the Group B creditors solely for the purpose of fabricating a consenting impaired class. This bad faith gambit should not be permitted by this Court. See, *In re Barakat*, 99 F.3d 1520, 1526 (9th Cir. 1996); *In re Moorpark Adventure*, 161 B.R. 254 (Bankr. C.D.Cal. 1993).

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

LA1923951.7
012794-10022

3
SUPPLEMENTAL BRIEF RE CONFIRMABILITY OF PLAN

Canyon estimates that by the time a confirmation hearing on the proposed plan could be held, less than fifteen creditors will fall into Group B and are likely to hold less than $325,000 of claims in the aggregate. Those creditors should not be artificially impaired by the Debtor as a gerrymandered class but instead should be paid in full on or before the effective date of any plan. Canyon consents to paying those creditors from its cash collateral. If the Group B claims are properly treated as unimpaired, then no consenting impaired class will exist.

### B. Even if an Impaired Consenting Class Exists, Debtor's Plan Fails the Fair and Equitable Test as to Canyon.

Absent an impaired consenting class, Debtor cannot even attempt to cramdown Canyon. But even if that prerequisite were satisfied, Debtor cannot confirm its proposed plan because it is not "fair and equitable" as to Canyon as required by section 1129(b)(1), and therefore relief from stay should be granted under section 362(d).

Section 1129(b)(2)(A) sets forth three cramdown standards, any one of which if satisfied will allow a court to determine a plan is "fair and equitable" per section 1129(b)(1) despite the objection of an impaired secured creditors. The proposed plan does not provide for Canyon to retain its lien on all of its collateral, so it does not purport to satisfy the first prong of the "fair and equitable" tests. Nor is the second prong available because the proposed plan does not purport to give Canyon a right to credit bid. The only way the proposed plan can satisfy the "fair and equitable" standard is by the third prong: if the proposed plan provides Canyon with the "indubitable equivalent" of its claim. It does not.

#### 1. The proposed plan does not provide Canyon with the indubitable equivalent of its claim.

The "indubitable equivalent" test originates from Judge Learned Hand's holding in *In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir. 1935), and was later incorporated into Section 1129 (b)(2)(A)(iii) of the Bankruptcy Code. Judge Hand stated:

> It is plain that "adequate protection" must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA1923951.7
012794-10022

4

SUPPLEMENTAL BRIEF RE CONFIRMABILITY OF PLAN

> Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence.

*Id.* at 942. The Ninth Circuit has unequivocally endorsed this strict standard, holding that, for a secured creditor to be provided with the "indubitable equivalent" of its collateral, the substitute collateral must not subject the secured creditor to an increased risk. *In re Mariner Industries, Inc.,* 734 F.2d 426, 433 (9th Cir. 1984) ("[the substitute collateral] clearly must both compensate for present value and insure the safety of principal."); see also, *In re Arnold & Baker Farms*, 85 F.3d 1415, 1422 citing *In re Keller*, 157 B.R. 680, 683-84 (Bankr. E.D. Wash. 1993) ("[T]o the extent a debtor seeks to alter the collateral securing a creditor's loan, providing the 'indubitable equivalent' requires that the substitute collateral not increase the creditor's risk exposure."); see also, *In re Wiersma*, 227 Fed.Appx. 603, 606-07 (9th Cir. 2007) (secured creditor should not bear increased risk with substituted collateral in the context of indubitable equivalent); see also, *Monarch Beach*, 166 B.R. at 434 (strict standard applies to determination of indubitable equivalence).[5]

Debtor has the burden of proof to demonstrate that Canyon's treatment in the proposed plan does not create any reasonable doubt that Canyon will receive the full value of its collateral as of the date of the plan. Debtor fails to meet this burden.

### a.    Canyon's replacement collateral.

Canyon currently has a lien on the entire 845 S. Flower building, including all amenities and common areas, and approximately $2.4 million in cash collateral.[6] If

---

[5] See Canyon's earlier briefs for a full discussion on the facts and holdings of these cases.

[6] $2.4 million is the approximate balance of the Interest Reserve Account, which is expected to be reduced by approximately $928,370 by the time of this hearing. (Roth Decl. ¶ 6). Other than the Interest Reserve Account, there is little or no other cash collateral after construction creditors are paid per Debtor's assumptions in its prior filings.

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

LA1923951.7
012794-10022

5
SUPPLEMENTAL BRIEF RE CONFIRMABILITY OF PLAN

Canyon were to foreclose, it would be able to do so in a single proceeding against Debtor, and would be entitled to credit bid its loan amount in the foreclosure sale of the whole building. As the successful bidder, it would take possession and full control of the entire building. It would have no obligations to a homeowners' association, no exposure to construction warranty claims asserted by purchasers of individual condominium units, and no restrictions upon its ability to sell the entire building to a new buyer in the future. <u>Canyon would lose all of these rights if its collateral is dismembered as is contemplated under Debtor's proposed plan</u>.

For each individual condominium sale that closes under Debtor's proposed plan, Canyon would receive only (a) a fraction of the proceeds of each sale, and (b) a lien on the unsold remainder of the Project. If Canyon later was forced to foreclose on its lien on the units that remain, it would not be able to obtain full possession and control of the building and its cash collateral, because (i) some condominium units would be owned by individual buyers, (ii) the homeowners' association ("HOA") would control the common areas and amenities, and (iii) some of the cash proceeds will have been siphoned off by Debtor to pay for operations, fund the HOA and warranty reserves, and to fund the risky auction and sales program. The replacement lien thus does not capture all of the value of Canyon's collateral.

      **b. Application of indubitable equivalent standard.**

Debtor cannot prove that condominium unit sales over time – with part of Canyon's collateral being siphoned off before Canyon is paid in full – are the indubitable equivalent of capturing the current value of the Project as a whole. Strict application of the indubitable equivalent standard leads inexorably to the conclusion that the proposed plan does not provide Canyon the indubitable equivalent of its claim. In a case involving proposed individual sales of condominiums – presenting the same piecemeal sale issues – the court in *Sparks* drew upon Judge Hand's decision in *Murel* in concluding that:

> Two attributes of the substituted collateral, its <u>value</u> and the <u>degree of risk</u> that it imposes on the secured creditor, determine whether the new collateral is sufficiently "safe" and "<u>completely compensatory</u>." New collateral with a value less than the value of the original collateral cannot be "completely

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

LA1923951.7
012794-10022

6
SUPPLEMENTAL BRIEF RE CONFIRMABILITY OF PLAN

compensatory." Similarly, new collateral with a value projected to be equal to, or even more than, the original collateral is not "completely compensatory" if the new collateral is so much riskier than the original collateral that there is a substantially greater likelihood that the secured creditor will not be paid.

*In re Sparks*, 171 B.R. 860, 866 (Bankr. N.D. Ill. 1994). [Emphasis added.]

Debtor flunks the indubitable equivalent test at the threshold. Here, the substituted collateral is *per se* not "completely compensatory" for the original collateral because the proposed plan would not give Canyon a lien on 100% of the proceeds of each condominium sale and does not offer any additional collateral in lieu of the collateral Debtor would keep for itself, use to pay its restructuring professionals, or deliver to the HOA. While Canyon strongly believes there is no equity whatsoever, under even Debtor's overly aggressive appraisal, any purported equity is so thin that no further inquiry should be required.

This is not a case where the lender is secured by collateral that is worth two or three times the amount of its debt, where a reduction in collateral will have little practical impact on the risk of the secured creditor receiving less than full repayment on its loan. More than $20 million of future sales proceeds would be denied to Canyon before it could even in theory be paid in full, effectively zeroing-out any equity over and above Canyon's $92 million claim. The hemorrhaging of a portion of the proceeds during the proposed auction further undercuts any possible argument that the "indubitable equivalent" standard has been met on its face.

A more comprehensive analysis of the difference in risks confirms that the proposed plan seriously impairs Canyon's collateral and fails the "indubitable equivalent" test. Canyon faces two significant risks if condominium sales are allowed: (1) the risk that Debtor's sales program fails, leaving Canyon to foreclose upon a "broken condo" building; and (2) an immediate reduction in pro-rata fair market value of each remaining unsold unit because the option to lease apartments becomes of limited value, thereby eliminating a potential "best use" option for the Project.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA1923951.7
012794-10022

7
SUPPLEMENTAL BRIEF RE CONFIRMABILITY OF PLAN

Under the proposed plan, Canyon bears all of the risk of failure on the auction program. Debtor's proposed plan does not provide Canyon with the indubitable equivalent of its lien, and violates binding Ninth Circuit precedent.

**(1)  Broken condominium risk.**

If Debtor's sales program fails, the Project will become what is commonly referred to as a "broken condo." A broken condo is a building in which an investor is unable to sell-out a condominium building, and is forced to take on the role of a long-term property owner of a fractionalized building with numerous individual condominium owners. Should Canyon become the owner/landlord of the remaining units in a broken condo, Canyon would face additional legal risks and obligations that it would not have as an owner of the unitary building, including:

- Potential direct liability for construction defects due to the loss of the limited lender statutory protections of Civil Code § 3434.
- Potential direct obligations and liabilities under SB 800, the CA Right to Repair Law, for strict construction defect liability.
- Potential liability for warranty claims, including for appliances.
- Obligation to fund monthly HOA assessment payments for unsold units
- Potential fiduciary duty to levy a special assessment on all units, if the HOA needs funds to operate, meaning lenders often find it necessary to advance shortfalls in the budget.
- Potential obligation to fund adequate operating reserves.

These kinds of problems are well recognized, and have been the subject of numerous articles warning about the significant risks in foreclosing upon broken condos. Copies of several recent articles which explain the serious risks of broken condos are attached to the Compendium of Articles Concerning "Broken Condo" Scenario filed concurrently herewith.

In addition to the liability and funding exposure attendant to a broken condo, is the decrease in market value of unsold units as compared to those same units if they were part

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA1923951.7
012794-10022

8
SUPPLEMENTAL BRIEF RE CONFIRMABILITY OF PLAN

of a unitary building. Mr. Delahooke demonstrates in his Supplemental Briefs Declaration that capitalization rates for the unsold units in broken condos are 20% higher than capitalization rates for the acquisition of comparable unitary buildings. (Declaration of Scott Delahooke ¶ 13.) If Debtor's sales efforts fail, resulting in a 20% decrease to the market value of the remaining unsold units, Canyon would not recover the full amount of its debt. Canyon's replacement collateral has risks its original collateral does not.

Debtor's proposed plan simply *assumes* a successful sell-out at artificially high prices and at an ultra-fast pace. But a successful sell-out is far from a foregone conclusion, and Canyon would assume the risk of failure. The proposed plan does not provide for the possibility that the sales program will fail, nor does it provide any protections for Canyon in the event of such failure. The indubitable equivalent test bars such a shifting of the risk of failure to the secured creditor. See *In re Monarch Beach Venture Blvd.*, 166 B.R. 428, 436 (C.D. Cal. 1993) (plan to convert from rental apartments to condominium units and use net sales proceeds to pay claims in full with interest within 3 years held not "fair and equitable" to secured creditor because it shifted and imposed an unreasonable risk of failure on the secured creditor.), see also, *In re Investment Company of the Southwest, Inc.*, 341 B.R. 298, 319 (10th Cir. 2006) ("New collateral with a value less than the value of the originally-pledged collateral cannot be 'completely compensatory.' Similarly, new collateral with a value projected to be equal to, or even more than, the original collateral is not 'completely compensatory,' if the new collateral is so much riskier than the original collateral that there is a substantially greater likelihood that the secured creditor will not ultimately be paid.").

### (2) Limited best-use options.

As Mr. Delahooke concludes in his appraisal, the current best-use of the Project is as an apartment building, not a condominium project. If Debtor is allowed to commence condominium sales (which is a wholly new venture for this Debtor and not authorized under the parties' Loan Documents), it would effectively remove the option of fully monetizing the building on a rental basis (the entire premise of the subject loan was to

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA1923951.7
012794-10022

9
SUPPLEMENTAL BRIEF RE CONFIRMABILITY OF PLAN

1 lease units), because of the loss of control of the amenities and common areas, and the
2 inability to manage the building as a whole.  Thus, under Debtor's speculative plan,
3 Canyon alone would bear the risk that the "best use" of the Project would no longer be
4 available at a future time when Canyon has foreclosed upon the Project and is looking to
5 sell it in the market.  Even if the best use of the Project is as a condominium building
6 today, there is no certainty as to what the best-use will be in the future – and Canyon bears
7 the risk that the future best-use (and maximum value) of the building will no longer be
8 available.

### 2. The proposed plan denies Canyon the right to credit bid its full claim.

11     The Court's supplemental tentative ruling memorandum requested further attention
12 to the question of under what circumstances a debtor may sell real property without
13 affording the creditor the right to credit bid.  Two circumstances are relatively obvious: if
14 the proceeds from the sale are used to pay the debt immediately in full, or if the sale is
15 subject to the original lien (in other words, the criteria of section 1129(b)(2)(A)(i) is
16 satisfied).  A third is where the secured creditor is provided with the indubitable equivalent
17 of its lien in satisfaction of section 1129(b)(20(A)(iii), as discussed above.  None of these
18 three pertain here.

19     Two leading cases arising out of this district hold unequivocally that secured
20 creditors must either be afforded the right to credit bid under section 1129(b)(2)(A)(ii) or
21 the plan must satisfy the indubitable equivalent test of section 1129(b)(2)(A)(iii).  If the
22 secured creditor does not have the option to retain a lien on its original collateral in a sale
23 scenario, then it must have the right to credit bid.  Satisfaction of the second test under
24 section 1129(b)(2)(A)(ii) requires that any sale of collateral "free and clear" of liens is
25 "subject to section 363(k)."  See, *In re California Hancock, Inc.*, 88 B.R. 226 (9th Cir.
26 BAP 1988); accord, *In re Monarch Beach,* 166 B.R. at 433 (holding that secured creditor's
27 right to credit bid may not be taken away; vacating and remanding order confirming
28

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

LA1923951.7
012794-10022

10
SUPPLEMENTAL BRIEF RE CONFIRMABILITY OF PLAN

chapter 11 plan in a single asset real estate case where secured creditor was not allowed to credit bid).

In *California Hancock*, the Bankruptcy Appellate Panel affirmed the bankruptcy court's ruling granting relief from stay in a single asset real estate case on the ground that the proposed plan calling for a sale was unconfirmable due to its failure to allow the secured creditor the right to credit bid. *Id.* at 228. The court stated that, "[f]airness requires that the [secured creditor] who holds a non-recourse note, be allowed the full amount of *any* value in the property. Allowing the [secured creditor] to credit bid under §363(k) would protect the [secured creditor's] interest in the full value of the property." *Id.* at 231 (emphasis in the original).

Debtor points to a number of cases (not one in the Ninth Circuit), which it contends conclude that a sale of secured collateral can be crammed down upon a secured creditor under section 1129(b)(2)(A)(iii). In its Reply to Debtor's Opposition to Canyon's RFS Motion, Canyon lays out in detail why the cases cited by Debtor are fully distinguishable and are wholly inapplicable here. Just one case actually supports Debtor's position: the highly controversial district court decision in *In re Philadelphia Newspapers, LLC.*, 418 B.R. 548 (E.D. Penn. 2009). The denial of the undersecured creditors' right to credit bid would have been irreversible if the sale proceeded without allowing the credit bid, so the Third Circuit immediately stayed the sale and heard the appeal on an extremely expedited schedule, with a ruling expected at any time. After oral argument, the Third Circuit left the stay in place to preclude a sale from occurring without providing the secured creditor with a 363(k) credit bid right. Canyon believes that the Third Circuit is likely to reverse the denial of credit bid rights, but even if it affirms the district court ruling, such ruling would not be binding on this Court, would stand in direct opposition to *Monarch Beach* and *California Hancock,* and should not be followed by this Court.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA1923951.7
012794-10022

11
SUPPLEMENTAL BRIEF RE CONFIRMABILITY OF PLAN

### 3. The existence of section 1111(b) election rights does not affect Canyon's right to credit bid or to vote a deficiency claim.

Debtor suggests that the "election" afforded to undersecured creditors pursuant to section 1111(b) provides a fourth way to get around the section 363(k) credit bid right, in addition to the three prongs of section 1129(b)(2)(A). It does not.

Debtor argues that somehow section 1111(b)'s grant of the express right for an undersecured creditor to elect to be treated as if fully secured (a) eliminates Canyon's right to credit bid under section 1129(b)(2)(A)(ii) and (b) automatically eliminates Canyon's deficiency claim. This is a warped, impermissible reading of sections 1111(b) and 1129. The existence of a possible 1111(b) election to be treated as fully secured is operative only if the secured creditor is allowed to keep its liens on the original collateral consistent with the first of the three fair and equitable tests – and therefore the lender has the opportunity to be paid in full over time while retaining its liens on the original collateral. If it is not paid in full, then it would still have the right to foreclose on the original collateral.

The 1111(b) election allows an undersecured creditor to have its claim treated as if it is fully secured by the collateral, thereby forgoing an unsecured deficiency claim. The 1111(b) election was the result of a congressional overruling of the decision in *Great Nat'l Life Ins. Co. v. Pine Gate Associates, Ltd.*, 2 B.C.D. 1478 (Bankr. N.D. Ga. 1976). The purpose of the legislative fix was to *help, not hurt* undersecured creditors protect their collateral and their liens by barring debtors from cramming down non-recourse mortgages at the bottom of the market. Cases interpreting the interplay between sections 1111(b), 363(k), and 1129(b0(2)(A)(ii) emphasize that section 1111(b) only achieves its purpose of protecting the secured creditor's interest in the long-term upside potential of the property (by electing to have its full lien attach) if the undersecured creditor were also protected from having the property sold or transferred out from under its lien by credit bidding in any sale under sections 363 or 1129. *See, e.g.*, *In re Woodridge North Apts., Ltd.*, 71 B.R. 189, 191-192 (Bankr. N.D. Cal. 1987) ("The purpose of section 1111(b) also requires that a lienholder be required to credit bid"); *In re Matrix Development Corp.*, 2009 WL

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

LA1923951.7
012794-10022

12
SUPPLEMENTAL BRIEF RE CONFIRMABILITY OF PLAN

2169717, *8 (Bankr. D. Or., July 16, 2009) (§1111(b) was included to protect secured creditors deprived of their right to credit bid because no sales were conducted in the bankruptcy case nor intended to be conducted at the time of confirmation of the plan of reorganization, in furtherance of "Congress's goal of ensuring that each individual secured creditor retain the benefit of its bargain.").

In any event, Canyon's original collateral is proposed to be sold piecemeal and *not* subject to Canyon's lien, so Canyon cannot effectively exercise an 1111(b) election. However, under the terms of the plan, Canyon is not allowed to credit bid. This result is prohibited by the Code unless Debtor can satisfy the indubitable equivalent standard, and it cannot.

Debtor also argues that the existence of the right to an 1111(b) election – even if unexercised – automatically bars Canyon from voting a deficiency claim in the unsecured class. This makes no sense. The *California Hancock* court analyzed and rejected the same kind of convoluted 1111(b) argument that Debtor makes here. Furthermore, if this were the case, no undersecured creditor would ever have a deficiency claim. That would mean that cases like *In re Barakat*, 99 F.3d 1520, 1526 (9th Cir. 1996) (barring separate classification of deficiency claim), and *In re Moorpark Adventure*, 161 B.R. 254 (Bankr. C.D.Cal. 1993) (disallowing separate classification of unsecured deficiency claim from other unsecured claims), would never arise. Thus, if Canyon is undersecured and this proposed plan were to proceed to voting, Canyon will control the unsecured class and will vote no.

### III. CONCLUSION.

Canyon respectfully requests this Court grant Canyon full and immediate relief from stay because Debtor cannot confirm the proposed plan even assuming the Project is currently worth $101 million.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA1923951.7
012794-10022

13

SUPPLEMENTAL BRIEF RE CONFIRMABILITY OF PLAN

1  Dated:  January 21, 2010

LOEB & LOEB LLP
Andrew S. Clare
Lance N. Jurich
Derrick Talerico

ARNOLD & PORTER LLP
Lisa Hill Fenning

By:   /s/  Lance N. Jurich
       Lance N. Jurich
       Attorneys for Secured Creditor
       CANPARTNERS REALTY HOLDING
       COMPANY IV LLC

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

LA1923951.7
012794-10022

14

SUPPLEMENTAL BRIEF RE CONFIRMABILITY OF PLAN