1  JOHN J. BINGHAM, JR. (State Bar No. 075842)
   *jbingham@dgdk.com*
2  JOHN N. TEDFORD, IV (State Bar No. 205537)
   *jtedford@dgdk.com*
3  JULIA W. BRAND (State Bar No. 121760)
   *jbrand@dgdk.com*
4  DANNING, GILL, DIAMOND & KOLLITZ, LLP
   2029 Century Park East, Third Floor
5  Los Angeles, California 90067-2904
   Telephone:  (310) 277-0077
6  Facsimile:  (310) 277-5735

7  Attorneys for Debtor and Debtor-in-Possession,
   Meruelo Maddux-845 S. Flower Street, LLC

8

9              UNITED STATES BANKRUPTCY COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11             SAN FERNANDO VALLEY DIVISION

12  In re                          ) Case No. 1:09-bk-21621-KT
                                    )
13  MERUELO MADDUX - 845 S. FLOWER  ) Chapter 11
    STREET, LLC,                    )
14                                  ) **NOTICE OF MOTION AND MOTION FOR**
           Debtor and Debtor-in-    ) **ORDER AUTHORIZING SALE OF REAL**
15         Possession.              ) **PROPERTY FREE AND CLEAR OF LIENS;**
                                    ) **MEMORANDUM OF POINTS AND**
16                                  ) **AUTHORITIES AND DECLARATIONS OF**
                                    ) **JOHN CHARLES MADDUX AND**
17                                  ) **RICHARD MERUELO IN SUPPORT**
                                    ) **THEREOF**
18                                  )
                                    ) [APPLICATION FOR ORDER SHORTENING
19                                  ) TIME FILED CONCURRENTLY HEREWITH]
                                    )
20                                  ) Date:   April 19, 2010
                                    ) Time:   9:30 a.m.
21                                  ) Ctrm:   "301"
                                    )         21041 Burbank Blvd.
22                                  )         Woodland Hills, CA 91367
                                    )
23  _____ )

24  **TO THE HONORABLE KATHLEEN THOMPSON, UNITED STATES BANKRUPTCY**

25  **JUDGE, CANPARTNERS REALTY HOLDING COMPANY IV, LLC, THE MECHANICS**

26  **LIEN CREDITORS, THE UNITED STATES TRUSTEE AND ALL PARTIES IN**

27  **INTEREST:**

28

# **TABLE OF CONTENTS**

**Page**

I.    STATEMENT OF FACTS ................................................................................................ 5

    A.    The Bankruptcy Case .................................................................................... 5

    B.    The Project ..................................................................................................... 5

    C.    The Proposed Sale ......................................................................................... 6

    D.    Liens of Canyon and Mechanics' Lien Creditors on the Project ................. 6

II.   LEGAL ARGUMENT .................................................................................................... 8

    A.    Jurisdiction .................................................................................................... 8

    B.    The Debtor Should be Authorized to Sell the Project to the Buyer ............. 8

    C.    The Court May Approve the Sale of Free and Clear of the Liens of
         Canyon and Other Creditors Asserting Liens. ........................................... 10

    D.    The Buyer is Entitled to Good Faith Purchaser Status Pursuant to
         Section 363(m) of the Bankruptcy Code ................................................... 11

III.  CONCLUSION ............................................................................................................. 12

-i-

348920.06A [XP]    25293

# TABLE OF AUTHORITIES

Page(s)

## Cases

Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot),
    94 B.R. 343 (E.D. Pa. 1988) ................................................................. 10

Fulton State Bank v. Schipper (In re Fulton State Bank) ,
    933 F.2d 513 (7th Cir. 1991) ................................................................. 8

In re 240 North Brand Partners, Ltd. (240 North Brand Partners, Ltd. v. Colony GFP
    Partners, L.P.,
    200 B.R. 653 (B.A.P. 9th Cir. 1996) ....................................................... 8

In re Abbotts Dairies of Pennsylvania. Inc.,
    788 F. 2d 143 (3d Cir. 1986) ................................................................. 11

In re Airlift. Int'l Inc.,
    18 B.R. 787 (Bankr. S.D. Fla. 1982) ....................................................... 9

In re Baldwin United Corp.,
    43 B.R. 888 (Bankr. S.D. Ohio 1984) ..................................................... 9

In re Exennium. Inc., 715 F. 2d 1401 (9th Cir. 1983) ..................................... 11

In re Ionosphere Clubs, Inc.,
    100 B.R. 670 (Bankr. S.D.N.Y. 1989) ..................................................... 9

In re Lionel Corp.,
    722 F. 2d 1063 (2nd Cir. 1983) ........................................................... 8, 9

In re Rock Indus. Mach. Corp.,
    572 F. 2d 1195 (7th Cir. 1978) ............................................................. 11

In re W.A. Mallory, Inc.,
    214 B.R. 834 (Bankr. E.D. Va. 1997) ..................................................... 9

Lewis v. Anderson,
    615 F. 2d 778 (9th Cir. 1979), cert. denied, 449 U.S. 869, 101 S. Ct. 206
    (1980) .............................................................................................. 9

Stephens Indus., Inc. v. McClung,
    789 F.2d 386 (6th Cir. 1986) ................................................................. 9

Tavlor v. Lake (In re Cada Invs.),
    664 F. 2d 1158 (9th Cir. 1981) ............................................................. 11

Walter v. Sunwest Bank (In re Walter),
    83 B.R. 14 (B.A.P. 9th Cir. 1988) .......................................................... 8

348920.06A [XP]    25293

# TABLE OF AUTHORITIES (cont.)

Page(s)

**Statutes**

11 U.S.C. Section 363(b), ........................................................................................ 4, 8

11 U.S.C. Section 363(f) ............................................................................................ 4

11 U.S.C. Section 363(m) .......................................................................................... 4

11 U.S.C., Section 1107(a) ........................................................................................ 5

11 U.S.C., Section 1108 ............................................................................................. 5

11 U.S.C., Section 363 ............................................................................................... 8

11 U.S.C., Section 363(b)(1) ..................................................................................... 8

11 U.S.C., Section 363(f) ........................................................................................ 10

11 U.S.C., Section 363(f)(5) .................................................................................... 10

11 U.S.C., Section 363(m) ....................................................................................... 11

11 U.S.C., Section 364 ............................................................................................... 8

28 U.S.C., Section 1334 ............................................................................................. 8

28 U.S.C., Section 157 ............................................................................................... 8

28 U.S.C., Section 157(b)(2) ..................................................................................... 8

**Rules**

Fed. R. Bankr. P. 6004(h) .......................................................................................... 4

348920.06A [XP]    25293

**PLEASE TAKE NOTICE THAT** debtor Meruelo Maddux - 845 S. Flower Street, LLC (the "Debtor")[1] will and hereby does move this Court for an order pursuant to 11 U.S.C. §§ 363(b), (f) and (m), and Federal Rule of Bankruptcy Procedure 6004, authorizing the Debtor to sell its 34-story luxury residential tower located at 705 W. 9th Street in the South Park area of Los Angeles (the "Project") to Watermarke Properties, Inc., a California corporation, or its assignee (the "Buyer") for a purchase price of $110,000,000 (subject to a $500,000 purchase price credit described below) pursuant to the Purchase and Sale Agreement and Joint Escrow Instructions between the Debtor and the Buyer dated February 5, 2010 as amended by the First Amendment to Purchase and Sale Agreement and Joint Escrow Instructions (the "First Amendment") dated March 5, 2010 and the Second Amendment to Purchase and Sale Agreement and Joint Escrow Instructions (the "Second Amendment") dated as of April 1, 2010, and the Post-Closing Agreement ("Post-Closing Agreement") dated as of April 1, 2010, (collectively, the "Purchase Agreement"), a copy of which is attached to the Declaration of John Charles Maddux as Exhibit A. The proposed sale is not subject to overbid. A hearing on the Sale Motion will be held on April 19, 2010 at 9:30 a.m..

The Buyer is a privately owned real estate investment company that acquires, develops and operates a diverse portfolio of apartments, retail, office and industrial properties. The Buyer's address is 410 N. Main Street, Corona, California 92880. All contingencies have been waived by the Buyer and all conditions to closing have been satisfied or waived other than obtaining an order of the Bankruptcy Court approving this sale and other standard closing conditions (such as performance by the seller at closing). The Buyer has provided a $5 million deposit in escrow which is non-refundable provided the remaining conditions to closing are satisfied. There is a $500,000 purchase price credit in consideration of the Debtor not having to purchase or install window coverings. The Buyer is required to close the sale no later than five business days after entry of an order of the Bankruptcy Court approving the sale which order is not subject to a stay of enforcement.

---

[1] References to the Debtor include its estate created on the filing of the petition unless the context indicates otherwise.

1       Pursuant to this motion, the Debtor requests that the Court authorize the sale of the Project

2 free and clear of all liens, claims, interests and encumbrances (collectively, the "Liens") of

3 Canpartners Realty Holding Company IV LLC ("Canyon") and all other creditors of the Debtor

4 asserting Liens, including those creditors asserting mechanics' liens or who may assert mechanics'

5 liens and rights (collectively, the "Mechanics' Lien Creditors")[2] receiving notice hereof, with such

6 Liens to attach to the Remaining Claims Fund (as defined below) to the same extent and with the

7 same validity and priority as such Liens had in the Project immediately prior to the sale. The

8 purchase price exceeds the aggregate amount of all Liens on the Project and the proposed sale will

9 result in sufficient proceeds to pay all creditors in full. The Debtor has negotiated the resolution of

10 its disputes with Canyon. The settlement is contained in a settlement agreement dated April 12,

11 2010 (the "Canyon Settlement Agreement") which is the subject of a separate motion and Canyon

12 supports the sale to the Buyer. Canyon will receive payment of the agreed amount of its claim

13 under the Canyon Settlement Agreement from escrow at closing.

14       At closing, the Debtor shall establish a segregated account to hold funds for payment of the

15 unpaid or disputed Mechanics' Lien Claims and unsecured claims against the Debtor's estate (the

16 "Remaining Claims") and payment of fees and expenses incurred by Canyon in connection

17 therewith as provided in the Canyon Settlement Agreement (the "Remaining Claims Fund"). At

18 closing, the Remaining Claims Fund shall be funded in an amount not to exceed $10,313,477,

19 comprised of $8,735,898 representing the maximum amount of all unpaid or disputed Mechanics

20 Lien Claims (which amount shall be reduced by any Mechanics' Lien Claims paid after entry of this

21 order but prior to closing of the sale), $100,000 for payment of unsecured claims, and $1,500,000

22 as provided in the Canyon Settlement Agreement. The Remaining Claims Fund shall be funded

23 with the remaining funds from the Debtor's construction reserve accounts plus proceeds of the Sale

24 sufficient to fully fund the account. The Liens of all creditors of the Debtor asserting Liens against

25 the Project, including but not limited to Canyon (pursuant to the Canyon Settlement Agreement)

26

27 [2] A list of the Mechanics' Lien Creditors is attached to the Declaration of John Charles Maddux as
     Exhibit "B".

28

1 | and the Mechanics Lien Creditors, shall attach to the Remaining Claims Fund.

2 |      The Debtor requests that the fourteen-day stay of enforcement of an order approving this

3 | sale set forth in Federal Rule of Bankruptcy Procedure 6004(h) be waived, and the terms and

4 | conditions of such order be immediately effective and enforceable upon its entry so that the Buyer

5 | may close the transaction as soon as possible following entry of an order approving this sale.

6 |      WHEREFORE, pursuant to 11 U.S.C. §§ 363(b), (f), and (m), the Debtor respectfully

7 | requests that this Court enter an order as follows:

8 |      1.    Approving the Purchase Agreement and authorizing the sale of the Project to

9 | Watermarke Properties, Inc., or its assignee, free and clear of all Liens with Liens of the Mechanics

10 | Lien Creditors to attach to the Remaining Claims Fund, to the same extent and with the same

11 | validity and priority as they had immediately prior to the sale as provided herein, and payment to

12 | Canyon at closing in accordance with the Canyon Settlement Agreement;

13 |      2.    Waiving the fourteen-day stay of enforcement set forth in Rule 6004(h) of the Federal

14 | Rules of Bankruptcy Procedure;

15 |      3.    Determining that the Buyer is a good faith purchaser subject to the benefits afforded

16 | under Section 363(m); and

17 |      4.    For such other relief as necessary to effectuate the sale.

18 |

19 | Dated: April 13, 2010           DANNING, GILL, DIAMOND & KOLLITZ, LLP

20 |

21 |      By: _Julia W Brand_

22 |      Julia W. Brand
Attorneys for Debtor and Debtor-in-

23 |      Possession, Meruelo Maddux - 845 S.
Flower Street, LLC

**MEMORANDUM OF POINTS & AUTHORITIES**

**I.**

**STATEMENT OF FACTS**

**A.**    **The Bankruptcy Case**

On September 3, 2009, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Meruelo Maddux Properties, Inc. ("MMPI") is the ultimate parent of the Debtor. MMPI and 53 affiliated entities (collectively, the "MMPI Debtors") filed for relief under chapter 11 of the Bankruptcy Code on March 26 and 27, 2009. The Debtor has continued in possession of its property and has continued to operate its business as debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner and no official committee has yet been appointed in this case.

Pursuant to First Day Motions filed by the Debtor, the Court authorized use of the loan proceeds, cash collateral held in the Debtor's reserve accounts to complete construction of the Project. In addition, the Court authorized the Debtor to use such proceeds to make deposits with certain utilities, to obtain an appraisal of the Project and to pay the 2009-2010 real property taxes.

**B.**    **The Project**

845 S. Flower owns the Project, a 34-story residential tower in the South Park region of downtown Los Angeles. The building is comprised of 214 luxury residential units totaling approximately 254,300 square feet and an approximately 6,800 square foot commercial unit on the ground floor. This building is a first class iconic structure in downtown Los Angeles. Viewed from the street, this curtain wall building is clad with various shades of green glass and has numerous distinctive and attractive architectural features which include external balconies on all four corners of the building, a seventh floor amenity deck with a landscaped garden area and a premium extended balcony and viewing deck located on the ninth floor.

The Project has an attractive location at the corner of Ninth and Flower Streets, which is (a) across the street from the newly opened Ralphs supermarket, (b) a few blocks away from the LA Live complex and the Staples Center, (c) on an all residential corner and (d) closer than most other

5

1  South Park residences to the office core of downtown Los Angeles.  The building has resident

2  amenities that start at street level which include (a) a valet entrance area adjacent to the lobby on

3  Ninth Street, (b) two gated entrances that lead to above ground parking providing in excess of one

4  parking space for each one bedroom residence and two parking spaces for each two bedroom

5  residence, and (c) an efficient loading dock area for resident move-ins.  The building's residences

6  are located on the twenty eight residential floors that start on floor 7 and culminate with the four

7  penthouses units on floor 35.

8

9  **C.**      **The Proposed Sale**

10       The Debtor proposes to sell the Project to Watermarke Properties, Inc., a California

11  corporation, or its assignee (the "Buyer") for a purchase price of $110,000,000 cash pursuant to the

12  Purchase Agreement, subject to a $500,000 purchase price credit to the Buyer as described below.

13       The Buyer is a privately owned real estate investment company that acquires, develops and

14  operates a diverse portfolio of apartments, retail, office and industrial properties.  All contingencies

15  to the sale have been satisfied or waived and all conditions to closing have been satisfied or waived

16  other than obtaining an order from the Bankruptcy Court approving the sale and other standard

17  closing conditions (such as performance by Seller at closing).  The Buyer has provided a $5 million

18  deposit in escrow which is non-refundable provided the remaining closing conditions are satisfied.

19  There is a $500,000 purchase price credit in consideration of the Debtor not having to purchase or

20  install window coverings.  The Buyer is required to close the sale no later than five business days

21  after entry of an order of the Bankruptcy Court approving the sale, which order is not subject to a

22  stay of enforcement.

23

24  **D.**      **Liens of Canyon and Mechanics' Lien Creditors on the Project**

25       On April 12, 2010, the Debtor has entered into a settlement with Canyon, which is the

26  subject of a separate motion.  Pursuant to the settlement, Canyon has agreed to accept $86,521,389

27  from escrow at closing in satisfaction of its Lien and has agreed to the release of its Lien on the

28  Project, on the Debtor's bank accounts and the Debtor's other personal property and on the real

348920.06A [XP]                                                                                    25293

1  property owned by the related debtor Meruelo Chinatown, LLC. The Settlement Amount of

2  $86,521,389 presumes Canyon will be paid on or before April 30, 2010. If Canyon is paid after

3  April 30, 2010, the Settlement Amount will increase at a rate of at least $30,000 per day. There are

4  additional consequences under the Canyon Settlement Agreement if the Settlement Amount is not

5  paid by May 10, 2010.

6        Furthermore, Mechanics' Lien Creditors have asserted, or may assert, Liens against the

7  Project. Exhibit B to the Declaration of John Charles Maddux sets forth the amounts owing to the

8  Mechanics' Lien Creditors, as of the date of this Motion, according to the Debtor's books and

9  records and in many cases, by agreement of the parties as to amount. To the extent there is a

10 dispute regarding the amount of the claim or services performed, Exhibit B identifies the full

11 amount asserted by the Mechanics' Lien Creditor as owing to it, without reduction for the Debtor's

12 defenses and claims. The Debtor has objections to certain of these claims and reserves all rights

13 and defenses thereto. As set forth on Exhibit B, the aggregate amount owing to the Mechanics'

14 Lien Creditors, as of the date of this Motion is between $4,179,157 and $8,733,944. As such

15 claims are resolved, the Mechanics' Lien Claims will be paid from the construction reserve

16 accounts prior to the closing of the sale (which, as of April 9, 2010, hold $7,139,319) or, after the

17 closing, from the Remaining Claims Fund as provided below.

18       At closing, the Debtor shall establish the Remaining Claims Fund as a segregated account at

19 City National Bank to hold funds for payment of the unpaid or disputed Mechanics' Lien Claims

20 and unsecured claims against the Debtor's estate (the "Remaining Claims") as provided in the

21 Canyon Settlement Agreement. At closing, the Remaining Claims Fund shall be funded in an

22 amount not to exceed $10,313,477, comprised of $8,735,898 representing the maximum amount of

23 all unpaid or disputed Mechanics Lien Claims (which amount shall be reduced by any Mechanics'

24 Lien Claims paid after entry of this order but prior to closing of the sale), $100,000 for payment of

25 unsecured claims, and $1,500,000 as provided in the Canyon Settlement Agreement. The

26 Remaining Claims Fund shall be funded with the remaining funds from the Debtor's construction

27 reserve accounts plus proceeds of the Sale sufficient to fully fund the account.

28

348920.06A [XP]

25293

1    The Debtor requests an order that the Liens of the remaining Mechanics' Lien Creditors

2    attach to the Remaining Claims Fund and that the balance of the sale proceeds be determined and

3    be ordered to be free and clear of all liens.  Canyon will also have a Lien in the Remaining Claims

4    Fund pursuant to the Canyon Settlement Agreement.

5

6                                          **II.**

7                              **LEGAL ARGUMENT**

8    **A.    Jurisdiction**

9          This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is

10   a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicate for the relief sought

11   herein is Section 363 of the Bankruptcy Code.

12

13   **B.    The Debtor Should be Authorized to Sell the Project to the Buyer**

14         Section 363(b) of the Bankruptcy Code provides that a trustee, and, therefore, a debtor-in-

15   possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

16   business, property of the estate." 11 U.S.C. § 363(b)(1).  The sale of estate property under section

17   363(b) will be approved if there is "some articulated business justification" for the proposed sale.

18   Walter v. Sunwest Bank (In re Walter), 83 B.R. 14, 19 (B.A.P. 9th Cir. 1988); Fulton State Bank v.

19   Schipper (In re Fulton State Bank), 933 F.2d 513, 515 (7th Cir. 1991).  Courts in this Circuit and

20   others will authorize sales where the decision to sell assets outside the ordinary course of business

21   be based upon the sound business judgment of the debtors.  See In re 240 North Brand Partners,

22   Ltd. (240 North Brand Partners, Ltd. v. Colony GFP Partners, L.P., 200 B.R. 653, 659 (B.A.P. 9th

23   Cir. 1996) ("debtors who wish to utilize § 363(b) to dispose of property of the estate must

24   demonstrate that such disposition has a valid business justification") (citing In re Lionel Corp., 722

25   F. 2d 1063, 1070 (2nd Cir. 1983)).

26         Several courts have held that the "sound business judgment" test requires a debtor to

27   establish four elements in order to justify the sale of property outside the ordinary course of

28   business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the

348920.06A [XP]                            8                                    25293

1  ordinary course of business, (b) that adequate and reasonable notice has been provided to interested

2  persons, (c) that the debtors have obtained a fair and reasonable price, and (d) good faith.  See In re

3  W.A. Mallory, Inc., 214 B.R. 834, 836 (Bankr. E.D. Va. 1997) (citing Stephens Indus., Inc. v.

4  McClung, 789 F.2d 386, 390 (6th Cir. 1986); Lionel, 722 F.2d at 1071).  A debtor's showing of a

5  sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to

6  justify the proposed disposition with sound business reasons."  In re Baldwin United Corp., 43 B.R.

7  888, 906 (Bankr. S.D. Ohio 1984).  Whether or not there are sufficient business reasons to justify a

8  transaction depends upon the facts and circumstances of each case.  Lionel, 722 F.2d at 1071.

9  However, the court is not to substitute its business judgment for that of the debtor.  See, e.g., In re

10 Ionosphere Clubs, Inc., 100 B.R. 670, 676 (Bankr. S.D.N.Y. 1989) (The Court will not substitute a

11 hostile witness' business judgment for debtor's [business judgment] unless testimony "established

12 that [the debtor] has failed to articulate a sound business justification for its chosen course").

13 Rather, the Court should ascertain whether the debtor has articulated a valid business justification

14 for the proposed transaction.  See, e.g., Lewis v. Anderson, 615 F. 2d 778 (9th Cir. 1979), cert.

15 denied, 449 U.S. 869, 101 S. Ct. 206 (1980).  This is consistent with "the broad authority to operate

16 the business of the debtor ... [which] indicates Congressional intent to limit court involvement in

17 business decisions by a trustee ... so that a court may not interfere with a reasonable business

18 decision made in good faith by a trustee." In re Airlift. Int'l Inc., 18 B.R. 787, 789 (Bankr. S.D. Fla.

19 1982).

20         The proposed sale is clearly an exercise of the sound business judgment of the Debtor.  The

21 Debtor obtained several offers for the sale of the Project and the Buyer's offer was the highest and

22 best offer.  The proposed sale provides sufficient funds for payment in full of all claims against the

23 estate, thus allowing the Debtor to exit bankruptcy.  There can by no question that this sale is in the

24 sound exercise of the Debtor's business judgment.

25

26

27

28

348920.06A [XP]                                                                                              25293

**C.** **The Court May Approve the Sale of Free and Clear of the Liens of Canyon and Other Creditors Asserting Liens.**

Section 363(f) provides that a court may authorize a sale of estate property "free and clear of any interest in such property of an entity other than the estate" if:

    (1)  applicable non-bankruptcy law permits sale of such property free and clear of such interests;

    (2)  such entity consents;

    (3)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    (4)  such interest is in bona fide dispute; or

    (5)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

§363(f).   Section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met. Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988).   Canyon consents to the sale; thus the sale is authorized as to Canyon' Lien under Section 363(f)(2).   In addition, the Court should authorize the sale of the Project free and clear of the liens of Canyon and all other Lien Creditors under Section 363(f)(3) because the purchase price is greater than the aggregate value of all liens on the Project.   Assuming the maximum possible amount of Mechanics' Liens, such Liens total $8,733,944.   Adding this amount to the amount to be paid to Canyon of $86,512,389, the total possible liens on the Project equal less than $96,000,000.   The proposed sale price exceeds this amount by approximately $14 million.   Accordingly, the Court should approve the sale free and clear of the Liens of Canyon and the Mechanics' Lien Creditors.   In addition, the unsecured claims against the Estate are approximately $100,000.   Therefore the proposed sale provides sufficient funds for payment in full of all claims against the Debtor's estate.

348920.06A [XP]

25293

**D.**  **The Buyer is Entitled to Good Faith Purchaser Status Pursuant to Section 363(m) of the Bankruptcy Code**

The good faith requirement under Bankruptcy Code Section 363(m) focuses primarily on the disclosure of material sale terms and the absence of fraud or collusion between the purchaser and other bidders or the trustee/debtor in possession. See In re Abbotts Dairies of Pennsylvania. Inc., 788 F. 2d 143, 147 (3d Cir. 1986) (citing In re Rock Indus. Mach. Corp., 572 F. 2d 1195, 1198 (7th Cir. 1978); Taylor v. Lake (In re Cada Invs.), 664 F. 2d 1158, 1162 (9th Cir. 1981)). The Buyer should have assurance that its purchase will not be subject to future attack by objecting creditors, if any. Lack of good faith for purposes of Bankruptcy Code Section 363(m) is generally determined by the existence of fraudulent conduct during the sale process. See, e.g., In re Exennium. Inc., 715 F. 2d 1401 (9th Cir. 1983). The Buyer is a good faith purchaser. The Debtor obtained several offers to purchase the Project and negotiated with the Buyer and other potential purchasers regarding the purchase of the Project. The Debtor selected the bid of the Buyer as the highest and best bid for the Project and negotiated a Purchase Agreement with the Buyer. The Debtor has no connection with the Buyer and the Purchase Agreement was negotiated at arms-length between third parties. There is no fraud or collusion with respect to this transaction and the Buyer should be determined to be a good faith purchaser.

### III.

### CONCLUSION

Based on the foregoing, the Debtor requests that the Court grant the Motion as requested herein and enter an order in substantially the same form as that attached as Exhibit "C" hereto.

Dated:  April 13, 2010

Respectfully submitted,

DANNING, GILL, DIAMOND & KOLLITZ, LLP

By: _Julia W Brand_

Julia W. Brand
Attorneys for Debtor and Debtor-in-Possession, Meruelo Maddux - 845 S. Flower Street, LLC

348920.06A [XP]                                                                                      25293

## DECLARATION OF JOHN CHARLES MADDUX

I, John Charles Maddux, declare and state as follows:

1.      I am the President and Chief Operating Officer of Meruelo Maddux Properties, Inc., a Delaware corporation ("MMPI").

2.      I have personal knowledge of the facts in this declaration, except as to those matters that are based upon information and belief, which matters I believe to be true.  If called as a witness, I could testify competently to these facts.

3.      MMPI is the parent company of approximately 69 affiliated entities, including Meruelo Maddux – 845 S. Flower Street, LLC ("845 S. Flower" or the "Debtor").  On March 26 and 27, 2009, MMPI, and 53 other of the affiliated entities (collectively the "MMPI Debtors" or the "Company") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  845 S. Flower filed a voluntary petition for relief on September 3, 2009.  I am a designated officer of each of the affiliated entities, including 845 S. Flower and am authorized to give this declaration.

4.      As a result of my being Chief Operating Officer of MMPI and a designated officer of 845 S. Flower, and my review of relevant documents, I am familiar with the day-to-day operations of the MMPI Debtors, 845 S. Flower as well as their business affairs, and their books and records, and generally the manner in which they are prepared.  Except as otherwise noted, all facts set forth in this declaration are based on my personal knowledge, my discussions with other members of MMPI's senior management team, my review of relevant documents, or my opinion, based on, among other things, my experience and knowledge of the Debtor's operations and financial conditions.

5.      I am submitting this Declaration in support of the motion of the Debtor for an order authorizing the sale of the Project free and clear of liens, claims, interests and encumbrances.

6.      The Debtor owns a recently completed 34-story luxury residential building with 214 units and approximately 6,800 square feet of commercial space on the ground floor located at 705 W. 9th Street in the South Park area of Los Angeles (the "Project").  This building is a first class iconic structure in downtown Los Angeles.  Viewed from the street, this curtain wall building is clad with various shades of green glass and has numerous distinctive and attractive architectural

348920.06A [XP]

12

25293

1 | features which include external balconies on all four corners of the building, a seventh floor

2 | amenity deck with a landscaped garden area and a premium extended balcony and viewing deck

3 | located on the ninth floor.

4 |       7.       The Project has an attractive location at the corner of Ninth and Flower Streets,

5 | which is (a) across the street from the newly opened Ralphs supermarket, (b) a few blocks away

6 | from the LA Live complex and the Staples Center, (c) on an all residential corner and (d) closer

7 | than most other South Park residences to the office core of downtown Los Angeles. The building

8 | has resident amenities that start at street level which include (a) a valet entrance area adjacent to the

9 | lobby on Ninth Street, (b) two gated entrances that lead to above ground parking providing in

10 | excess of one parking space for each one bedroom residence and two parking spaces for each two

11 | bedroom residence, and (c) an efficient loading dock area for resident move-ins. The building's

12 | residences are located on the twenty eight residential floors that start on floor 7 and culminate with

13 | the four penthouse units on floor 35.

14 |       8.       The Debtor proposes to sell the Project to Watermarke Properties, Inc., a California

15 | corporation, or its assignee (the "Buyer") for a purchase price of $110,000,000, subject to the

16 | $500,000 credit discussed below, pursuant to the Purchase and Sale Agreement and Joint Escrow

17 | Instructions between the Debtor and the Buyer dated February 5, 2010 as amended by the First

18 | Amendment to Purchase and Sale Agreement and Joint Escrow Instructions (the "First

19 | Amendment") dated March 5, 2010 and the Second Amendment to the Purchase and Sale

20 | Agreement and Joint Escrow Instructions (the "Second Amendment") dated April 1, 2010 and the

21 | Post-Closing Agreement ("Post-Closing Agreement") dated as of April 1, 2010 (collectively, the

22 | "Purchase Agreement"), a true and correct copy of which is attached hereto as Exhibit A. There is

23 | no broker's commission for this transaction. The sale is not subject to overbid. The Debtor has not

24 | been  contacted by any potential overbidder and, in the Debtor's business judgment, at this time

25 | there are no viable alternative purchasers for a price in excess of the purchase price offered by the

26 | Buyer.

27 |       9.       The Buyer is a privately owned real estate investment company that acquires,

28 | develops and operates a diverse portfolio of apartments, retail, office and industrial properties. The

348920.06A [XP]                                                                                   25293

1    Buyer's address is 410 N. Main Street, Corona, California 92880. All contingencies have been

2    waived by the Buyer and all conditions to closing have been satisfied or waived other than

3    obtaining an order of the Bankruptcy Court approving this sale and other standard closing

4    conditions (such as performance by the Seller at closing). The Buyer has provided a $5 million

5    deposit in escrow which is non-refundable provided the remaining conditions to closing are

6    satisfied. There is a $500,000 purchase price credit in consideration of the Debtor not having to

7    purchase or install window coverings. The Buyer is required to close the sale no later than five

8    business days after entry of an order of the Bankruptcy Court approving the sale which order is not

9    subject to a stay of enforcement.

10        10.    The Debtor has requested that the Project be sold free and clear of all creditors with

11   Liens on the Project, including Canyon and the Mechanics' Lien Creditors.

12        11.    On April 12, 2010, the Debtor has entered into a settlement with Canyon, which is

13   the subject of a separate motion. Pursuant to the settlement, among other things, Canyon has

14   agreed to accept $86,521,389 at closing in satisfaction of its Lien and has agreed to the release of

15   its Lien in the Project. Such amount will be paid to Canyon out of escrow at closing from the

16   proceeds of the sale.

17        12.    The Canyon Settlement Amount of $86,521,389 presumes Canyon will be paid on

18   or before April 30, 2010. If Canyon is paid after April 30, 2010, the Settlement Amount will

19   increase at a rate of at least $30,000 per day. There are additional consequences under the Canyon

20   Settlement Agreement if the Settlement Amount is not paid by May 10, 2010.

21        13.    The Debtor is in the process of resolving outstanding Mechanics' Lien Claims.

22   Attached hereto as Exhibit "B" is a chart that sets forth the amount (both pre-petition and post-

23   petition) that the Debtor asserts is owing to each Mechanics' Lien Creditor, based on the Debtor's

24   books and records and as set forth in the Debtor's Joint First Amended Disclosure Statement and

25   Joint First Amended Plan, and the projections attached thereto. For each Mechanics' Lien Creditor

26   where the Debtor is aware that the Mechanics' Lien Creditor disputes the Debtor's amount, Exhibit

27   "B" also identifies the amount asserted to be owing by the Mechanics' Lien Creditor. The amount

28   owing to the Mechanics' Lien Creditors, as of the date of this Motion is between $4,179,157 and

348920.06A [XP]                                                                      25293

1    $8,733,944 in the aggregate.  As such claims are resolved, the Mechanics' Lien Claims will be paid

2    from the Debtor's construction reserve accounts prior to closing, which, as of the date of April 9,

3    2010, hold $7,139,319 or after closing, from the Remaining Claim Fund (described below) to be

4    established by the Debtor.

5        14.     At closing, the Debtor shall establish a segregated account to hold funds for

6    payment of the unpaid or disputed Mechanics' Lien Claims and unsecured claims against the

7    Debtor's estate (the "Remaining Claims") as provided in the Canyon Settlement Agreement (the

8    "Remaining Claims Fund").  At closing, the Remaining Claims Fund shall be funded in an amount

9    not to exceed $10,333,944, comprised of $8,733,944 representing the maximum amount of all

10   unpaid or disputed Mechanics Lien Claims (which amount shall be reduced by any Mechanics'

11   Lien Claims paid after entry of this order but prior to closing of the sale), $100,000 for payment of

12   unsecured claims and $1,500,000 as provided in the Canyon Settlement Agreement.  The

13   Remaining Claims Fund shall be funded at closing with the remaining funds from the Debtor's

14   construction reserve accounts plus proceeds of the sale sufficient to fully fund the account.

15

16       I declare under penalty of perjury under the laws of the State of California that the

17   foregoing is true and correct.

18       Executed this 13th day of April, 2010, at Los Angeles, California.

19

20                          /s/ John C. Maddux

                             John Charles Maddux

21

22

23

24

25

26

27

28

348920.06A [XP]                                                  25293

## DECLARATION OF RICHARD MERUELO

I, Richard Meruelo, declare and state as follows:

1.    I am the Chief Executive Officer and Chairman of the Board of Directors of Meruelo Maddux Properties, Inc., a Delaware corporation ("MMPI").

2.    MMPI is the parent company of approximately 69 affiliated entities, including Meruelo Maddux – 845 S. Flower Street, LLC ("845 S. Flower") and Meruelo Chinatown, LLC ("Chinatown") (collectively the "Debtors"). On March 26 and 27, 2009, MMPI, and 53 other of the affiliated entities (collectively the "MMPI Debtors" or the "Company") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. 845 S. Flower and Chinatown did not file at that time. I am a designated officer of each of the affiliated entities, including 845 S. Flower and Chinatown, and am authorized to give this declaration.

3.    As a result of my being Chief Executive Officer of MMPI and a designated officer of 845 S. Flower, Chinatown, and each of the affiliated entities, and my review of relevant documents, I am familiar with the day-to-day operations of the MMPI Debtors, 845 S. Flower, and Chinatown, as well as their business affairs, and books and records, and the manner in which they are prepared. Except as otherwise noted, all facts set forth in this declaration are based on my personal knowledge, my discussions with other members of MMPI's senior management team, my review of relevant documents, or my opinion, based on, among other things, my experience and knowledge of the Debtors' operations and financial conditions. This declaration is made in support of the Notice of Motion and Motion for Order Authorizing Sale of Real Property Free and Clear of Liens.

4.    As an alternative to the Debtor's condominium unit sale program, the Debtor, sought purchasers for the sale of the Project as a whole. The Company received several offers to purchase the Project. After negotiations with the Buyer, Watermarke Properties, Inc., and other potential purchasers, the Debtor determined to proceed with the offer from Watermarke Properties, Inc. In my opinion and judgment this was the highest and best offer for the Project and is the best price that the Debtor can achieve at this time under the distressed circumstances of this case. In my opinion it was appropriate and a sound exercise of the Debtor's business judgment to accept this

348920.06A [XP]                                                                                                    25293

1  offer which provides proceeds sufficient to pay all allowed claims in full in order to move this case

2  toward a consensual resolution.    The Debtor has no connection with Watermarke Properties and

3  the Purchase Agreement with the Buyer was negotiated at arms length.

4

5      I declare under penalty of perjury under the laws of the State of California that the

6  foregoing is true and correct.

7      Executed this 13th day of April, 2010, at Los Angeles, California.

8

9                                     [SIGNATURE TO FOLLOW]

                                      Richard Meruelo

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

348920.06A [XP]

25293

# EXHIBIT "A"

.1 [XP] 0705



## PURCHASE AND SALE AGREEMENT
## AND JOINT ESCROW INSTRUCTIONS

THIS PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS ("**Agreement**") is made as of February 5, 2010 by and between MERUELO MADDUX – 845 S. FLOWER STREET, LLC, a Delaware limited liability company, debtor and debtor-in-possession ("**Seller**"), and WATERMARKE PROPERTIES, INC., a California corporation ("**Buyer**"), with reference to the following facts:

### RECITALS

A.      Seller is the owner of that certain real property, including all improvements, tangible personal property and fixtures located thereon, commonly known as 705 W. Ninth Street, Los Angeles, CA, and more particularly described in Exhibit A attached hereto and all right, title and interest, if any, that Seller may have in and to all rights, privileges and appurtenances pertaining thereto including all of Seller's right, title and interest, if any, in and to all rights-of-way, open or proposed streets, alleys, easements, strips or gores of land adjacent thereto ("**Property**"). The Property consists of approximately 29,742 square feet of land on which is located a thirty-four story tower containing 214 apartment units on levels 7 through 35, an amenity deck on level 7, an approximately 6,800 square foot commercial unit on the ground floor, and a parking podium containing 357 parking spaces on levels 1-6.

B.      On September 3, 2009, Seller filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court for the Central District of California ("**Bankruptcy Court**"), case number 1:09-bk-21621-KT ("**Bankruptcy Case**"). Seller is operating its business as debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

C.      Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, the Property on the terms and conditions set forth in this Agreement.

D.      Seller's and Buyer's obligations to consummate the purchase and sale of the Property under this Agreement are conditioned on Seller obtaining entry of an order from the Bankruptcy Court approving the sale of the Property on the terms and conditions set forth in this Agreement, or entry of an order confirming a Chapter 11 reorganization plan filed or to be filed by Seller that, among other things, would permit the sale of the Property, including on terms and conditions as set forth in this Agreement (either of which is "**Bankruptcy Approval**").

NOW, THEREFORE, with reference to the foregoing Recitals, which are incorporated herein by reference, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Seller and Buyer hereby agree as follows:

### ARTICLE 1 – PURCHASE AND SALE OF THE PROPERTY

Subject to and in accordance with the terms and conditions set forth in this Agreement, Seller agrees to sell to Buyer, and Buyer agrees to purchase from Seller, the Property. The purchase price to be paid by Buyer for the Property shall be One Hundred Ten

{E0158 / P0180 / 00008474.DOC V3}

Million Dollars ($110,000,000) ("**Purchase Price**"), payable in all cash at Closing to Seller, inclusive of the Deposit required to be made pursuant to Article 3 below, and subject to the adjustments and prorations provided in Article 7 below. Notwithstanding anything to the contrary contained herein, Seller's and Buyer's obligations to consummate the purchase and sale of the Property under this Agreement are conditioned on Seller obtaining Bankruptcy Approval. Seller shall seek to obtain, and Buyer will cooperate with and support Seller's efforts to obtain, Bankruptcy Approval.

## ARTICLE 2- BUYER'S DUE DILIGENCE; AS-IS PURCHASE

2.1    Property Documents. Buyer acknowledges receipt of copies of the documents and other materials listed on Exhibit B attached hereto ("**Property Documents**"). The Property Documents shall also include such other documents, materials and information that Seller may provide to Buyer prior to the Contingency Expiration.

2.2    Contingency Period. Buyer shall have until 5:00 p.m. (Los Angeles time) on March 4, 2010 ("**Contingency Expiration**") to conduct all inspections and reviews (other than title review which is governed by Paragraph 2.3) of the Property and Property Documents as Buyer deems appropriate, subject to the terms of this Agreement. If Buyer disapproves of the Property, its condition, or any matter related thereto, Buyer may terminate this Agreement by written notice of such termination ("**Termination Notice**") which must be received by Seller no later than the Contingency Expiration. If Seller does not receive the Termination Notice by the Contingency Expiration, Buyer shall be deemed to have approved the Property, its condition, and all matters related thereto, subject to Seller's representations and warranties as provided in Article 4, and there shall be no further conditions or contingencies to Buyer's obligation to purchase the Property pursuant to this Agreement other than the Buyer's Conditions provided in Article 5, and the provisions of Article 9. If Seller receives the Termination Notice by the Contingency Expiration, then this Agreement shall terminate and Escrow Holder shall return to Buyer the Deposit, and any interest thereon, and Seller and Buyer shall be released from any further obligation and liability to the other under this Agreement (except for Buyer's obligations and liabilities that may have arisen under Paragraph 2.4).

2.3    Title. Buyer shall have until 5:00 p.m. (Los Angeles time) on the day that is ten (10) days after the date of this Agreement ("**Title Review Expiration**") within which to review the Preliminary Title Report referenced as part of the Property Documents or such other preliminary title report as Buyer may obtain ("**PTR**"), a copy of which shall be promptly delivered to Seller. For purposes of this Agreement, the "**Title Company**" shall be Chicago Title Company or other title company mutually acceptable to Buyer and Seller. No later than the Title Review Expiration, Buyer shall deliver to Seller a written notice as to any exceptions in the PTR that Buyer disapproves ("**Objection Notice**"); provided that Buyer shall be deemed to have approved the Deemed Approved Exceptions (defined below) and shall be deemed to have disapproved, and Seller shall remove as of Closing, the Deemed Disapproved Exceptions (defined below). If Seller does not receive the Objection Notice by the Title Review Expiration, Buyer shall be deemed to have approved all exceptions in the PTR other than the Deemed Disapproved Exceptions. Seller shall utilize its commercially reasonable efforts (but without material cost to Seller) prior to the Contingency Expiration to cure any exceptions Buyer disapproves in a timely served Objection Notice (other than the Deemed Disapproved Exceptions

which will be removed by Seller at Closing). At least one (1) business day prior to the Contingency Expiration, Seller shall deliver written notice to Buyer as to whether Seller has cured or agrees to cure as of Closing each such disapproved exception. If Seller does not notify Buyer that it has cured or agrees to cure as of Closing each such disapproved exception, Buyer may either terminate this Agreement by delivering the Termination Notice by the Contingency Expiration, or proceed to Closing as contemplated by this Agreement, in which case, each disapproved exception that Seller has not cured or agreed to cure as of Closing shall be deemed approved by Buyer. For purposes hereof, the term **"Deemed Disapproved Exceptions"** means all monetary liens encumbering the Property other than Deemed Approved Exceptions. For purposes hereof, the term **"Deemed Approved Exceptions"** means (i) the Title Company's standard printed exceptions, (ii) the lien(s) of any nondelinquent general or special taxes or assessments, (iii) any water rights exception provided the Title Company is willing to issue a CLTA 103.5 or similar endorsement, and (iv) any exceptions or matters created by, through or under Buyer or its affiliates or their respective contractors, consultants, or other persons or entities controlled by Buyer. For purposes hereof, the term **"Permitted Exceptions"** means the Deemed Approved Exceptions and any other exceptions that Buyer approves or is deemed to approve as provided in this Agreement.

2.4    Access. Commencing on the date of this Agreement and continuing until the Contingency Expiration or any earlier termination of this Agreement, Seller shall allow Buyer and its authorized agents and representatives to enter upon the Property for the purpose of conducting Buyer's due diligence with respect to its purchase of the Property, subject to the following conditions:

2.4.1    Conditions to Entry. Neither Buyer nor its agents or representatives may enter upon the Property for the purpose of inspecting or testing any portion thereof or for any other reason without having given Seller notice of its intention to enter the Property at least twenty-four (24) hours before such entry. Seller may impose reasonable conditions and restrictions on Buyer's right to enter the Property under this Agreement, including insurance requirements, and Buyer agrees to comply with any such conditions and restrictions in exercising its rights hereunder. In no event may Buyer drill or bore through or disturb the surface of the land or any improvements or conduct any other invasive testing of the Property without first obtaining the written consent thereto of Seller, which consent may be withheld in Seller's sole and absolute discretion. After making any tests and inspections, Buyer shall promptly restore the Property to its condition as it existed immediately prior to such tests and inspections (which obligation shall survive the Closing or any termination of this Agreement).

2.4.2    Indemnification. Buyer shall keep the Property free from all liens and indemnify, defend and hold harmless Seller and its members, parent entities, and affiliates, and their respective officers, shareholders, directors, members, managers, partners, representatives and agents (collectively, the **"Seller Parties"**) from and against all claims, actions, losses, liabilities, damages, costs and expenses (including attorneys' fees and costs) incurred by or claimed against Seller or any of the Seller Parties by reason of any damage to the Property or injury to persons (including Buyer's employees) caused by Buyer and/or its agents, employees or contractors in connection with their entry upon the Property and/or the performance of any inspections, tests or other due diligence

{E0158 / P0180 / 00008474.DOC V3}    3

related thereto. This indemnity shall survive the Closing or any termination of this Agreement.

2.5    <u>AS-IS PURCHASE</u>. BUYER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT SELLER IS SELLING AND BUYER IS PURCHASING THE PROPERTY ON AN "AS IS" BASIS AND THAT, EXCEPT AS EXPRESSLY SET FORTH IN ARTICLE 4, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, AS TO ANY MATTERS CONCERNING THE PROPERTY, INCLUDING: (i) the quality, nature, adequacy and physical condition and aspects of the Property, (ii) the development potential of the Property, or the Property's use, habitability, merchantability or fitness, or the suitability, value or adequacy of the Property for any particular purpose, (iii) the zoning or other legal status of the Property, or (iv) the economics of the operation of the Property. This <u>Paragraph 2.5</u> shall survive the Closing.

2.6    <u>Release</u>. Effective as of the Closing, except for any claims arising out of a breach by Seller of any of Seller's representations and warranties as provided in <u>Article 4</u>, Buyer, on behalf of itself and its successors and assigns, waives its right to recover from, and forever releases and discharges Seller and each of the Seller Parties from any and all claims, actions, losses, liabilities, damages, costs and expenses (including attorneys' fees and costs), whether direct or indirect, known or unknown, foreseen or unforeseen, that may arise on account of or are in any way related to the Property, including the physical, environmental and structural condition of the Property or any law or regulation applicable thereto. With respect to the waiver and release set forth herein relating to unknown and unsuspected claims, such waiver is made with the full knowledge, understanding and agreement that California Civil Code Section 1542 provides as follows, and that the protections afforded by said code section are hereby waived:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

_____
Buyer's Initials

Buyer acknowledges, stipulates and agrees that this <u>Paragraph 2.6</u> is a material factor in Seller's decision to enter into this Agreement and to sell the Property to Buyer for the Purchase Price. This <u>Paragraph 2.6</u> shall survive the Closing.

## ARTICLE 3 – DEPOSIT

Within two (2) business days after full execution of this Agreement, Buyer shall deposit with Escrow Holder cash, either certified or wire-transferred funds, in the amount Five Million Dollars ($5,000,000) ("**Deposit**"). Unless this Agreement is terminated on or before the

Contingency Expiration, the Deposit shall become nonrefundable to Buyer and fully earned by Seller, except to the extent Closing fails to occur as a result of Seller's default or breach or a failure of Buyer's Conditions set forth in Article 5, or as otherwise provided in Article 9. The Deposit shall be invested by Escrow Holder in an interest bearing account acceptable to Buyer with all interest accruing for benefit of the party entitled to the Deposit. The Deposit, and any interest earned thereon, shall be applied to the Purchase Price at Closing.

## ARTICLE 4 - REPRESENTATIONS AND WARRANTIES

4.1    Representations and Warranties of Seller. Subject to the provisions of Paragraph 4.5, Seller represents and warrants to Buyer that the following statements are true and correct as of the execution of this Agreement (unless otherwise stated) and will also be true and correct as of the Closing:

4.1.1    Entity Existence. Seller is duly formed and validly existing under the laws of the State of Delaware.

4.1.2    Authorization and Validity. Subject to Seller obtaining Bankruptcy Approval, this Agreement is duly authorized, executed, and delivered by Seller, and is and will be legal, valid, and binding obligations of Seller enforceable against Seller in accordance with its terms (except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, moratorium and other principles relating to or limiting the right of contracting parties generally).

4.1.3    Leases and Other Agreements. Except as disclosed in the PTR, there are no leases, no unrecorded claims against the Property, or other agreements that will be binding against the Property or Buyer after Closing other than as set forth in Exhibit C attached hereto or as disclosed to Buyer in writing at least five (5) days prior to the Contingency Expiration.

4.1.4    Hazardous Materials. To Seller's Knowledge, and except as disclosed in the Property Documents, the Property is not in violation of any federal or state law relating to hazardous materials applicable to the Property.

4.1.5    Building and Safety Codes. To Seller's Knowledge, and except as disclosed in the Property Documents, the Property is not in violation of any building or safety code or ordinance applicable to the Property.

4.1.6    Litigation. Seller and the Property are subject to the Bankruptcy Case and there may be other existing litigation or proceedings affecting Seller and/or the Property but which are stayed by the Bankruptcy Case. As of Closing, there shall be no litigation or proceeding (unless caused by Buyer) that shall be binding against the Property or Buyer.

4.2    Representations and Warranties of Buyer. Buyer represents and warrants to Seller that, as of the execution of this Agreement and as of the Closing, this Agreement is duly authorized, executed, and delivered by Buyer, and is and will be legal, valid, and binding obligations of Buyer enforceable against Buyer in accordance with its terms (except to the extent

that such enforcement may be limited by applicable bankruptcy, insolvency, moratorium and other principles relating to or limiting the right of contracting parties generally).

4.3     Definition of Seller's Knowledge. All references in this Agreement to the phrase "Seller's Knowledge" or words of similar import shall refer only to the actual knowledge of Lynn Beckemeyer, Executive Vice President of Development (the "**Designated Employee**") and shall not be construed to refer to the knowledge of any other officer, manager, agent or employee of Seller. There shall be no personal liability on the part of the Designated Employee arising out of any representations or warranties made herein.

4.4     Survival of Seller's Representations. The representations and warranties made by Seller in this Agreement shall survive the Closing and not be merged therein for a period of one (1) year, and Seller shall only be liable to Buyer hereunder for a breach of a representation or warranty made in this Agreement with respect to which a claim is made by Buyer against Seller on or before one (1) year after the date of the Closing.

4.5     Limited Recourse against Seller; Assignment of Warranties. Notwithstanding anything to the contrary in this Agreement, including any of Seller's representations and warranties in this Article 4, Buyer agrees that it shall look solely to the applicable contractors, manufacturers, suppliers and/or others who provided or performed any scope of the work in the development of the Property ("**Contractors**"), and that Buyer shall have no recourse against Seller or any of the Seller Parties, with respect to any claims or other issues in any way relating to such scope of work performed or provided by any such Contractors. At Closing, Seller shall assign to Buyer, subject to reservations of rights by Seller, all warranties that Seller may have from any Contractors, as further provided in the Bill of Sale and Assignment of Warranties attached hereto as Exhibit F. The provisions of this Paragraph 4.5 shall survive Closing.

## ARTICLE 5 - CONDITIONS TO CLOSING

5.1     Conditions to Buyer's Obligations. Buyer's obligation to consummate the purchase and sale transaction contemplated by this Agreement is subject to the satisfaction or waiver of the following conditions (the "**Buyer's Conditions**"):

5.1.1     Title Policy. The Title Company shall be ready, willing and able to issue, at the Closing, a CLTA Owner's Policy of Title Insurance to Buyer, in the amount of the Purchase Price, without any exceptions to coverage other than the Permitted Exceptions. Seller may elect at its option and at its sole cost to obtain ALTA extended coverage or endorsements to the title policy.

5.1.2     No Breaches. Seller shall have timely delivered the items described in Paragraph 6.3 and Seller shall not have materially breached any of Seller's other obligations set forth in this Agreement.

5.1.3     Accuracy of Representations and Warranties. None of Seller's representations and warranties in Article 4 shall be untrue or inaccurate in any material respect as of the Closing.

5.1.4   <u>Bankruptcy Approval</u>. Bankruptcy Approval has been obtained and shall not be subject to any stay of enforcement; provided if Bankruptcy Approval is subject to a stay of enforcement, the Closing Date (defined below) shall automatically be extended to occur on or before two (2) business days after such stay expires, is lifted or otherwise terminates. Notwithstanding the foregoing, if Bankruptcy Approval has not been obtained or any stay of enforcement thereof has not expired, been lifted or otherwise terminated by August 4, 2010, either Buyer or Seller shall have the right to terminate this Agreement by written notice to the other party, in which event, Escrow Holder shall return to Buyer the Deposit, and any interest thereon, and Seller and Buyer shall be released from any further obligation and liability to the other under this Agreement (except for Buyer's obligations and liabilities that may have arisen under <u>Paragraph 2.4</u>).

The Buyer's Conditions are solely for the benefit of Buyer and may be waived only by Buyer. Buyer shall not act or fail to act for the purpose of permitting or causing any of the Buyer's Conditions to be unsatisfied as of the Closing Date. If a Buyer's Condition is not satisfied on the Closing Date, then Buyer may, at its sole option, (i) waive the unsatisfied condition and proceed to close the transaction without any reduction in the Purchase Price, or (ii) if the failed Buyer's Condition is a Seller default or breach, proceed in accordance with <u>Paragraph 10.1</u>, or (iii) if the failed Buyer's Condition is not a Seller default or breach, terminate this Agreement by delivering written notice thereof to Seller no later than the Closing Date.

5.2   <u>Conditions to Seller's Obligations</u>. Seller's obligation to consummate the purchase and sale transaction contemplated by this Agreement is subject to the satisfaction of the following conditions (the "**Seller's Conditions**"):

5.2.1   <u>No Breaches</u>. Buyer shall have timely delivered the items described in <u>Paragraph 6.4</u> and Buyer shall not have materially breached any of Buyer's other obligations set forth in this Agreement.

5.2.2   <u>Accuracy of Representations and Warranties</u>. None of Buyer's representations and warranties in <u>Article 4</u> shall be untrue or inaccurate in any material respect as of the Closing.

5.2.3   <u>Agreement with Lender</u>. Seller shall have entered into an agreement with its construction lender that is satisfactory to Seller in its sole and absolute discretion.

5.2.4   <u>Bankruptcy Approval</u>. Bankruptcy Approval has been obtained and shall not be subject to any stay of enforcement; provided if Bankruptcy Approval is subject to a stay of enforcement, the Closing Date (defined below) shall automatically be extended to occur on or before two (2) business days after such stay expires, is lifted or otherwise terminates. Notwithstanding the foregoing, if Bankruptcy Approval has not been obtained or any stay of enforcement thereof has not expired, been lifted or otherwise terminated by June 4, 2010, either Buyer or Seller shall have the right to terminate this Agreement by written notice to the other party, in which event, Escrow Holder shall return to Buyer the Deposit, and any interest thereon, and Seller and Buyer shall be

released from any further obligation and liability to the other under this Agreement (except for Buyer's obligations and liabilities that may have arisen under Paragraph 2.4).

The Seller's Conditions are solely for the benefit of Seller and may be waived only by Seller. Seller shall not act or fail to act for the purpose of permitting or causing any of the Seller's Conditions to be unsatisfied as of the Closing Date. If a Seller's Condition is not satisfied on the Closing Date, then Seller may (i) waive the unsatisfied condition and proceed to close the transaction, or (ii) terminate this Agreement by delivering written notice thereof to Buyer no later than Closing.

## ARTICLE 6- ESCROW AND CLOSING

6.1     Opening of Escrow.  Buyer and Seller have selected Chicago Title Company ("**Escrow Holder**") to act as the escrow holder with respect to the transaction contemplated by this Agreement.  Within one (1) business day after execution of this Agreement by Seller and Buyer, Buyer and Seller shall deposit a duplicate original or copy of this Agreement with Escrow Holder.  This Agreement, together with such further instructions, if any, as the parties shall provide to Escrow Holder by written agreement, shall constitute the escrow instructions with respect to the escrow for the transaction contemplated by this Agreement (the "**Escrow**").  If any requirements relating to the duties or obligations of Escrow Holder hereunder are not acceptable to Escrow Holder, or if Escrow Holder requires additional instructions, the parties agree to make such deletions, substitutions and additions hereto as counsel for Buyer and Seller shall mutually approve, which additional instructions shall not materially alter the terms of this Agreement unless otherwise expressly agreed to by Seller and Buyer.

6.2     Closing Date.  The purchase and sale transaction contemplated by this Agreement shall close no later than five (5) business days after the later of (i) the Contingency Expiration, and (ii) the date of Bankruptcy Approval (the "**Closing Date**").  For purposes of this Agreement, the "**Closing**" shall be deemed to occur as of the date and time that the Deed is recorded in the Official Records of Los Angeles County.

6.3     Seller's Deliveries to Escrow.  At least one (1) business day prior to the Closing Date, Seller shall deliver or cause the following items to be delivered to Escrow Holder or the Title Company, as appropriate:

6.3.1     Deed.  One (1) original grant deed in the form of Exhibit D executed by Seller and acknowledged by a notary (the "**Deed**");

6.3.2     Certificate of Non-Foreign Status.  One (1) original affidavit in the form of Exhibit E and one (1) original California Form 593-W, each executed by Seller (collectively, the "**Certificate of Non-Foreign Status**");

6.3.3     Bill of Sale and Assignment of Warranties.  Two (2) originals of the Bill of Sale and Assignment of Warranties ("**Sale Assignment**"), duly authorized and executed by Seller, in the form of **Exhibit "F"** attached hereto;

6.3.4     Title Company Requirements.  Such documents and instruments as the Escrow Holder or Title Company may reasonably require for Closing; and

6.3.5    Other Documents.  Any other documents, instruments or agreements reasonably necessary to effectuate the transaction contemplated by this Agreement.

6.4    Buyer's Deliveries to Escrow.  At least one (1) business day prior to the Closing Date, Buyer shall deliver or cause the following items to be delivered to Escrow Holder or the Title Company, as appropriate:

6.4.1    Funds.  The Purchase Price, less the Deposit already deposited with Escrow Holder, together with such other sums as Escrow Holder shall require for Buyer to pay Buyer's share of the closing costs, prorations, reimbursements and adjustments as set forth in Article 7, in immediately available funds ("**Buyer's Funds**");

6.4.2    Bill of Sale and Assignment of Warranties.  Two (2) originals of the Bill of Sale and Assignment of Warranties ("**Sale Assignment**"), duly authorized and executed by Buyer, in the form of **Exhibit "F"** attached hereto;

6.4.3    Title Company Requirements.  Such documents and instruments as the Escrow Holder or Title Company may reasonably require for Closing; and

6.4.4    Other Documents.  Any other documents, instruments or agreements reasonably necessary to effectuate the transaction contemplated by this Agreement.

6.5    Disbursements and Other Actions by Escrow Holder.  Upon the Closing, Escrow Holder shall promptly undertake all of the following:

6.5.1    Recordation of Deed.  Cause the Deed to be recorded in the Official Records of Los Angeles County and obtain conformed copies thereof for distribution to Buyer and Seller.

6.5.2    Calculation and Disbursement.  Disburse the remainder of Buyer's Funds as follows:

(a)    first, deduct all items chargeable to the account of Seller pursuant to Article 7;

(b)    next, disburse the balance of the Purchase Price and any additional amounts owed to Seller under this Agreement to or as directed by Seller promptly upon the Closing by wire transfer in accordance with instructions received from Seller; and

(c)    next, disburse any remaining Buyer's Funds to or as directed by Buyer promptly upon the Closing by wire transfer or otherwise in accordance with instructions received from Buyer.

6.5.3    Title Policy.  Direct the Title Company to issue the title policy to Buyer in accordance with Paragraph 5.1.1.

{E0158 / P0180 / 00008474.DOC V3}                                9

6.5.4    Deliveries to Seller. Deliver to Seller a conformed copy of the recorded Deed.

6.5.5    Deliveries to Buyer. Deliver to Buyer the original Certificate of Non-Foreign Status and a conformed copy of the recorded Deed.

6.6    Deliveries of Keys Upon Closing. Upon Closing, Seller shall deliver to Buyer all keys in Seller's possession with respect to the Property.

6.7    Real Estate Reporting Person. Escrow Holder is designated the "real estate reporting person" for purposes of section 6045 of title 26 of the United States Code and Treasury Regulation 1.6045-4 and any instructions or settlement statement prepared by Escrow Holder shall so provide. Upon the consummation of the transaction contemplated by this Agreement, Escrow Holder shall file Form 1099 information return and send the statement to Seller as required under the aforementioned statute and regulation.

## ARTICLE 7 - ADJUSTMENTS AND PRORATIONS

7.1    Prorations. The following shall be prorated and adjusted between Seller and Buyer as of the day of the Closing, except as otherwise specified:

7.1.1    Taxes. Non-delinquent taxes, including general real estate taxes, supplemental taxes and special assessments, and any improvement or other bonds affecting the Property, based upon the most recently available real estate or property tax information.

7.1.2    Rents. Rents, if any, from the Property.

7.1.3    Utilities. Charges for water, gas, electricity, telephone, sewer and other utilities.

7.1.4    Other Items. Such other items as are customarily prorated in a transaction of this nature.

For purposes of calculating prorations, Buyer shall be deemed to be in title to the Property, and, therefore, entitled to the income therefrom and, except as otherwise provided in this Agreement, responsible for the expenses thereof for the entire day upon which the Closing occurs. All such prorations shall be made on the basis of the actual number of days of the month which shall have elapsed as of the day of the Closing and based upon the actual number of days in the month and a three hundred sixty-five (365) day year. The amount of such prorations shall be initially performed by Escrow Holder at Closing based on information then available, but shall be subject to adjustment in cash after the Closing outside of escrow as and when complete and accurate information becomes available, if such information is not available at the Closing. This Paragraph 7.1 shall survive the Closing.

7.2    Closing Costs. Seller shall pay (i) the premium for the CLTA or "standard coverage" portion of the title policy, (ii) all of the documentary transfer tax imposed in connection with the sale of the Property, if any, and (iii) one-half (½) of the Escrow Holder fees.

{E0158 / P0180 / 00008474.DOC V3}                    10

Buyer shall pay (i) the portion of the premium for the title policy attributable to any ALTA or "extended coverage" and any endorsements thereto, (ii) the recording fees for the Deed, and (iii) one-half (½) of the Escrow Holder fees.

   7.3 <u>Cancellation Fees</u>.  If the sale of the Property contemplated hereunder does not occur because of a default or breach on the part of Buyer, all escrow and title cancellation fees shall be paid by Buyer, and if the sale of the Property does not occur because of a default or breach on the part of Seller, all escrow and title cancellation fees shall be paid by Seller.  In all other cases, all escrow and title cancellation fees shall be shared equally by the parties.

## ARTICLE 8- BROKERS AND EXPENSES

   8.1 <u>Brokers</u>.  Buyer and Seller each represents and warrants to the other that it has not entered into any agreement or taken any other action which would result in any brokerage commission, finder's fee or other compensation being due or payable with respect to the transaction contemplated hereby.  Buyer shall indemnify, defend and hold Seller harmless from and against any claims, losses, damages, costs and expenses (including attorneys' fees and costs) incurred by Seller by reason of any breach or inaccuracy of Buyer's representations and warranties contained in this <u>Paragraph 8.1</u>.  Seller shall indemnify, defend and hold Buyer harmless from and against any claims, losses, damages, costs and expenses (including attorneys' fees and costs) incurred by Buyer by reason of any breach or inaccuracy of Seller's representations and warranties contained in this <u>Paragraph 8.1</u>.  This <u>Paragraph 8.1</u> shall survive the Closing.

   8.2 <u>Legal and Other Fees</u>.  Each of Seller and Buyer is being represented by its own counsel, and each shall bear their own attorneys' fees and costs and other expenses, including due diligence expenses, incurred in connection with this Agreement, except as otherwise expressly provided in this Agreement.

## ARTICLE 9 - RISK OF LOSS

   9.1 <u>Condemnation</u>.  If, prior to the Closing, all or any material portion of the Property is taken by eminent domain (or is the subject of a pending taking which has not yet been consummated), then (i) Seller shall notify Buyer in writing of such fact promptly after obtaining knowledge thereof, (ii) Buyer may elect to terminate this Agreement by giving written notice to Seller within ten (10) days after receipt of such notice from Seller.  The failure by Buyer to elect in writing to terminate this Agreement within such time period shall be deemed an election not to terminate this Agreement.  If Buyer timely terminates this Agreement as provided above, then this Agreement shall terminate and Escrow Holder shall return to Buyer the Deposit, and any interest thereon, and Seller and Buyer shall be released from any further obligation and liability to the other under this Agreement (except for Buyer's obligations and liabilities that may have arisen under <u>Paragraph 2.4</u>).  If Buyer elects not to terminate this Agreement as provided in this <u>Paragraph 9.1</u>, there shall be no abatement of the Purchase Price; <u>provided</u>, <u>however</u>, that at the Closing, (i) Seller shall pay to Buyer the amount of any award for or other proceeds on account of such taking which have been actually paid to Seller prior to the Closing as a result of such taking, or (ii) to the extent such award or proceeds have not been paid, Seller shall assign to

Buyer at the Closing, without recourse to Seller, the rights of Seller to, and Buyer shall be entitled to receive and retain, all awards for the taking of the Property or such portion thereof.

9.2    <u>Destruction or Damage</u>.  If, prior to Closing, all or any portion of the Property is damaged or destroyed, and the estimated cost to repair such damage or destruction ("**Repair Cost**") exceeds $2,000,000 and is not covered by insurance held by Seller, then Buyer may elect to terminate this Agreement by written notice to Seller received no later than ten (10) days after Seller notifies Buyer in writing of the Repair Cost.  If Buyer timely terminates this Agreement as provided above, then this Agreement shall terminate and Escrow Holder shall return to Buyer the Deposit, and any interest thereon, and Seller and Buyer shall be released from any further obligation and liability to the other under this Agreement (except for Buyer's obligations and liabilities that may have arisen under <u>Paragraph 2.4</u>).  If the Repair Cost is $2,000,000 or less or is otherwise covered by insurance held by Seller, then there shall be no abatement in Purchase Price and Seller and Buyer shall proceed to Closing in accordance with this Agreement, provided Seller shall assign to Buyer at Closing, without recourse to Seller, the rights of Seller to any insurance proceeds.

## ARTICLE 10 - DEFAULTS AND REMEDIES

10.1    <u>Seller's Default</u>.  If the Closing fails to occur on or before the Closing Date as a result of Seller's default or breach, then Buyer may elect, as its sole and exclusive remedy, either to (i) terminate this Agreement, in which case Buyer shall be entitled to a refund of the Deposit and all interest thereon, and Seller shall reimburse Buyer, and Buyer may recover from Seller, an amount equal to the out-of-pocket costs incurred by Buyer in connection with the transaction contemplated by this Agreement, as evidenced by paid invoices or other reasonably satisfactory backup documentation, but not to exceed $50,000, or (ii) maintain an action for specific performance.  Buyer hereby waives and relinquishes any right to maintain an action for or to recover against Seller any damages as a result of Seller's default or breach.

10.2    <u>Buyer's Default; LIQUIDATED DAMAGES</u>.  **THE PARTIES AGREE THAT IT WOULD BE IMPRACTICAL OR EXTREMELY DIFFICULT TO DETERMINE, PRIOR TO SIGNING THIS AGREEMENT, THE ACTUAL DAMAGES THAT SELLER WOULD SUFFER IF CLOSING DOES NOT OCCUR BY THE CLOSING DATE AS A RESULT OF BUYER'S BREACH OR DEFAULT HEREUNDER. THEREFORE, IF CLOSING DOES NOT OCCUR BY THE CLOSING DATE AS A RESULT OF A BUYER DEFAULT OR BREACH, SELLER MAY TERMINATE THIS AGREEMENT AND SHALL BE ENTITLED TO LIQUIDATED DAMAGES IN THE AMOUNT OF THE DEPOSIT. UPON SUCH TERMINATION, ESCROW HOLDER SHALL RELEASE AND PAY OVER THE DEPOSIT, AND ALL INTEREST THEREON, TO SELLER. UPON RELEASE AND PAYMENT OF THE DEPOSIT AND INTEREST TO SELLER, BUYER SHALL BE RELEASED FROM ANY FURTHER OBLIGATIONS UNDER THIS AGREEMENT, EXCEPT FOR OBLIGATIONS UNDER PARAGRAPHS 2.4 AND 11.10. THIS PARAGRAPH SHALL SURVIVE ANY TERMINATION OF THE AGREEMENT.**

_____          _____
Seller's Initials                             Buyer's Initials